La Rond Baker, WSBA No. 43610
lbaker@aclu-wa.org
AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, WA 98164
Phone: 206-624-2184

Steven M. Watt (*pro hac vice* pending)
Dror Ladin (*pro hac vice* pending)
Hina Shamsi (*pro hac vice* pending)
Jameel Jaffer (*pro hac vice* pending)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004

Paul Hoffman (*pro hac vice* pending)
Schonbrun Seplow Harris & Hoffman, LLP
723 Ocean Front Walk, Suite 100
Venice, CA 90291

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SULEIMAN ABDULLAH SALIM, MOHAMED AHMED BEN SOUD, OBAID ULLAH (AS PERSONAL REPRESENTATIVE OF GUL RAHMAN), Plaintiffs, v. JAMES ELMER MITCHELL and JOHN "BRUCE" JESSEN Defendants. | Civil Action No. **2:15-CV-286-JLQ** COMPLAINT AND DEMAND FOR JURY TRIAL |

COMPLAINT
Page | 1

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

## I.   INTRODUCTION

1.   Defendants James Elmer Mitchell and John "Bruce" Jessen are psychologists who designed, implemented, and personally administered an experimental torture program for the U.S. Central Intelligence Agency ("CIA").

2.   To create a torture program with a scientific veneer, Defendants drew on experiments from the 1960s in which researchers taught dogs "helplessness" by subjecting them to uncontrollable pain.  Defendants theorized that if human beings were subjected to systematic abuse, the victims would become helpless and unable to resist an interrogator's demand for information.  The CIA adopted Defendants' approach and paid Defendants to devise, supervise, refine, and evaluate the resulting torture program.  With Defendants' support, the CIA sought and obtained authorization from U.S. government agencies and officials for use of torture and cruel methods, and, over time, for the program's continuation and expansion.

3.   Plaintiffs Suleiman Abdullah Salim and Mohamed Ahmed Ben Soud were kidnapped by the CIA and tortured and experimented upon in accordance with Defendants' protocols.  They were subjected to

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

solitary confinement; extreme darkness, cold, and noise; repeated

beatings; starvation; excruciatingly painful stress positions; prolonged

sleep deprivation; confinement in coffin-like boxes; and water torture.

Plaintiffs Salim and Ben Soud suffered lasting psychological and

physical damage from this torture.  Gul Rahman was tortured in many

of the same ways, including after Defendant Jessen trained and

supervised CIA personnel to apply these methods.  Shortly after that

training, Mr. Rahman died as a result of hypothermia caused by his

exposure to extreme cold, exacerbated by dehydration, lack of food,

and his immobility in a stress position.  His family has never been

officially notified of his death and his body never returned to them.

4.    Plaintiffs Salim, Ben Soud, and Mr. Obaid Ullah on behalf of Mr.

Rahman's estate bring this action against Defendants for their

commission of torture, cruel, inhuman, and degrading treatment; non-

consensual human experimentation; and war crimes, all of which

violate well-established norms of customary international law.

COMPLAINT
Page | 3

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

**II. JURISDICTION AND VENUE**

5.  This Court has jurisdiction over this action pursuant to 28 U.S.C.

    § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction);

    and 28 U.S.C. § 1350 (Alien Tort Statute).

6.  This Court has personal jurisdiction over Defendant John "Bruce"

    Jessen because he is domiciled in Spokane, Washington.

7.  This Court has personal jurisdiction over Defendant James Elmer

    Mitchell because these causes of action arise from or are connected

    with his extensive business activities and residence in Washington

    State.

8.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(3).

**III.   PARTIES**

9.  Plaintiff Suleiman Abdullah Salim is a Tanzanian citizen.  In March

    2003, the CIA and Kenyan Security Forces captured Mr. Salim in

    Somalia, where he was working as a fisherman and trader, and

    rendered him to Kenya.  From there the CIA rendered Mr. Salim to an

    Agency prison in Afghanistan, referred to in an official U.S.

    government report as COBALT.  Mr. Salim was held at COBALT

    from March 2003 until May 2003.  He was then transferred to a second

COMPLAINT
Page | 4

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

CIA prison in Afghanistan, referred to as the "Salt Pit," where he was held for 14 months. In July 2004, Mr. Salim was transferred from the custody of the CIA to the custody of the U.S. military and held at a prison at Bagram Air Force Base in Afghanistan for four years. He was released from U.S. custody on August 17, 2008 and given a memorandum from the U.S. Department of Defense stating that he "has been determined to pose no threat to the United States Armed Forces or its interests in Afghanistan." The U.S. government has never charged Mr. Salim with any crime. He currently lives in Zanzibar with his wife and their three-year-old daughter.

10.    Plaintiff Mohamed Ahmed Ben Soud (formerly Mohamed Shoroeiya, Abd al-Karim) is a Libyan citizen. In April 2003, U.S. and Pakistani forces captured Mr. Ben Soud in Pakistan, where he was living in exile from Muammar Gaddafi's regime. The CIA rendered him to COBALT. Mr. Ben Soud was held at COBALT for a year, until April 2004. He was then transferred to a second CIA prison, where he was held for 16 months, until August 2005. The U.S. government has never charged Mr. Ben Soud with any crime. In August 2005, the CIA rendered Mr. Ben Soud to Libya, where he was imprisoned by

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

Gaddafi's regime for over five years.  Mr. Ben Soud was released from prison on February 16, 2011, following the overthrow of Gaddafi.  Mr. Ben Soud lives in Misrata, Libya, with his wife and their three children.

11. Plaintiff Obaid Ullah is an Afghan citizen and the personal representative of the estate of Gul Rahman. Mr. Rahman was also an Afghan citizen.  In 2002, Mr. Rahman and his family were living as refugees in the Shamshato Refugee Camp, Peshawar, Pakistan.  On or around November 5, 2002, the CIA captured Mr. Rahman in Islamabad, Pakistan, where he had gone for a medical checkup, and rendered him to COBALT.  On November 20, 2002, Mr. Rahman was tortured to death.  Mr. Rahman is survived by his wife and four daughters.

12. Defendant James Elmer Mitchell is a U.S. citizen and a psychologist. Defendant Mitchell was the chief psychologist at the U.S. Air Force Survival, Evasion, Resistance and Escape ("SERE") training program, Fairchild Air Force Base, Washington.  From 2001 to 2005, Defendant Mitchell worked as an independent contractor for the CIA.  From 2005 to 2009, Defendant Mitchell was the Chief Executive Officer of a

COMPLAINT
Page | 6

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

company he co-founded, Mitchell, Jessen & Associates, with corporate

headquarters and offices in Spokane, Washington, through which he

worked under contract to the CIA.

13.   Defendant John "Bruce" Jessen is a U.S. citizen and a psychologist.

Defendant Jessen was the chief psychologist for the Department of

Defense Joint Personnel Recovery Agency, which oversees all four of

the SERE training programs, serving there until 2002.  From 2002 to

2005, Defendant Jessen worked as an independent contractor for the

CIA.  From 2005 to 2009, Defendant Jessen was the President of a

company he co-founded, Mitchell, Jessen & Associates, with corporate

headquarters and offices in Spokane, Washington, through which he

worked under contract to the CIA.

## IV.   LEGAL FRAMEWORK

14.   The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, enacted in 1789,

permits non-citizens to bring suit in U.S. courts for violations of the

law of nations or a treaty of the United States.  Under the ATS, federal

courts are authorized to recognize a common law cause of action for

violations of clearly defined, widely accepted human rights norms.

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  The ATS extends

COMPLAINT
Page | 7

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

jurisdiction to federal courts to adjudicate non-citizens' claims for violation of those international law norms when the claims "touch and concern the territory of the United States." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013).

15. Defendants' conduct described herein constitutes (1) torture and cruel, inhuman, and degrading treatment; (2) non-consensual human experimentation; and (3) war crimes, all of which are violations of "specific, universal, and obligatory" international law norms, as evidenced by numerous binding international treaties, declarations, and other international law instruments. *Sosa*, 542 U.S. at 732. Accordingly, Defendants' conduct is actionable under the ATS.

16. Defendants Mitchell and Jessen are liable because they directly violated these prohibitions while acting under color of law.

17. Defendants Mitchell and Jessen are also liable because they conspired with the CIA in violating these international law norms, or committed those violations as part of a joint criminal enterprise with the Agency, and aided and abetted the CIA in their commission.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

18.   This Court has jurisdiction under the ATS to adjudicate Plaintiffs'

claims because they touch and concern the territory of the United

States.  For example:

• Defendants Mitchell and Jessen are U.S. citizens;

• Defendants Mitchell and Jessen are domiciled in the United States;

• Defendants Mitchell and Jessen devised their torture plan in the

United States;

• Defendants Mitchell and Jessen supervised their plan's

implementation from the United States, including pursuant to contracts

they executed with the CIA in the United States;

• Defendants Mitchell and Jessen participated in and oversaw

Plaintiffs' torture and cruel, inhuman, and degrading treatment; non-

consensual human experimentation; and war crimes while Plaintiffs

were held in the custody and control of the CIA in detention facilities

operated by the U.S. government.

19.   Congress's express intent in enacting the ATS was to give non-citizens

access to U.S. courts to hold U.S. citizens accountable for violations of

international law norms that "touch and concern" the United States, as

Defendants' actions do.

COMPLAINT
Page | 9

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3

## V.  FACTUAL ALLEGATIONS

**GENERAL FACTS**

20.    Defendants' design and implementation of, and personal participation

in, the experimental CIA torture program is documented in, *inter alia*,

official government reports, Congressional testimony, Defendant

Mitchell's own public admissions, and investigative reports by the

media and non-governmental organizations.  Official and public

government reports documenting Defendants' role include the CIA's

June 2013 Response to the Senate Select Committee on Intelligence's

Study on the Former Detention and Interrogation Program (June 27,

2013) ("CIA June 2013 Response"); CIA Office of Inspector General

Special Review of Counterterrorism Detention and Interrogation

Activities (Sept. 2001 – Oct. 2003) (May 7, 2004) ("CIA OIG

Report"); the Senate Committee on Armed Services Inquiry into the

Treatment of Detainees in U.S. Custody (Nov. 20, 2008) ("SASC

Report"); and the report of the Department of Justice's Office of

Professional Responsibility Investigation into the Office of Legal

Counsel's Memoranda Concerning Issues Relating to the Central

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

Intelligence Agency's Use of "Enhanced Interrogation Techniques" on Suspected Terrorists (July 2009).

21.    Defendants' central role in devising and administering the CIA's torture program is also detailed in the Executive Summary of the Senate Select Committee on Intelligence ("SSCI") *Study of the CIA's Detention and Interrogation Program* ("SSCI Report"), which was publicly released on December 9, 2014.  The report also identifies Plaintiffs by name as three of the 39 named victims and survivors of Defendants' "enhanced interrogation techniques."  The SSCI Report "is the most comprehensive review ever conducted" of the CIA's detention and interrogation program, and is based on six million pages of material, including "CIA operational cables, reports, memoranda, intelligence products, and numerous interviews conducted of CIA personnel by various entities within the CIA…as well as internal email and other communications."  SSCI Report 9.

**Defendants Devise a Torture Program for the CIA.**

22.    Defendants Mitchell and Jessen laid the foundations for the CIA's use of torture in or around December 2001 when, at the request of the Agency, they collaborated in reviewing a document known as the

COMPLAINT
Page | 11

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

"Manchester Manual."  The Manual was found by the Manchester (England) Metropolitan Police during a search of an alleged al-Qa'ida member's home.  The CIA assessed the Manchester Manual to be an al-Qa'ida document that included strategies to resist interrogation.

23.   The CIA requested Defendant Mitchell's review of the Manchester Manual.  Defendant Mitchell collaborated with Defendant Jessen to provide the review, even though neither Mitchell nor Jessen "had experience as an interrogator, nor did either have specialized knowledge of al-Qa'ida, a background in terrorism, or any relevant regional, cultural, or linguistic expertise."  SSCI Report 21.  The Agency thought Defendants had expertise in "non-standard means of interrogation."  SSCI Report 32 n. 138 (citing CIA June 2013 Response 49).  It conducted no research on the theory and practice of traditional, non-coercive interrogation methods.

24.   Defendants Mitchell and Jessen produced a white paper for the CIA entitled *Recognizing and Developing Countermeasures to Al-Qa'ida Resistance to Interrogation Techniques: A Resistance Training Perspective*.  In it, Defendants told the CIA that the Manchester Manual was evidence that al-Qa'ida members were trained to resist

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

interrogation, elaborated on their purported resistance capabilities, and proposed countermeasures that could be employed to defeat that resistance.  SASC Report 7.

25. Defendants proposed a pseudoscientific theory of countering resistance that justified the use of torture and other forms of cruel, inhuman, and degrading treatment.  Their theory relied on the work of psychologist Dr. Martin Seligman, who in the 1960s pioneered studies on a concept called "learned helplessness."  In his experiments, Dr. Seligman restrained dogs and subjected them to random and repeated electric shocks.  Dogs that could not control or influence their suffering in any way "learned" to become helpless, collapsing into a state of passivity.  Dr. Seligman found that if a researcher inflicted uncontrollable pain on a dog for a long enough period, the animal abandoned any attempt to escape its confinement or avoid further pain, even if given the opportunity.

26. Defendants hypothesized that they could "counter" any resistance to interrogation on the part of detainees by inducing the same state of "learned helplessness" in humans that Seligman had induced in dogs.  They proposed that interrogators induce "learned helplessness" in

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

people suspected of withholding information by confining them under physically and psychologically abusive conditions and further abusing them using coercive techniques.  Defendants theorized that detainees would become passive, compliant, and unable to resist their interrogators' demands for information.

27.   Defendants subsequently devised and proposed coercive methods and conditions of detention that bore a distant resemblance to training techniques they had used as instructors in the SERE training programs. As part of the SERE program, military personnel volunteer for training to resist abusive interrogation in the event of capture by an enemy that does not abide by the Geneva Conventions and other international laws prohibiting torture and other forms of cruel, inhuman, or degrading treatment.  Defendants, who had no experience with real-life interrogations, relied on their experience with SERE training at Fairchild Air Force Base to create and justify the torture program.

28.   All SERE training programs incorporate strict physical and psychological safeguards to protect students from harm, including "medical and psychological screening for students, interventions by trained psychologists during training, and code words to ensure that

COMPLAINT
Page | 14

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

students can stop the application of a technique at any time should the need arise." SASC Report xxvi.  A declassified version of the SERE training manual specifically requires that "[m]aximum effort will be made to ensure that the students do not develop a sense of 'learned helplessness'" during training.

29.    Because Defendants' very purpose was to induce "learned helplessness," the abusive methods that they devised and proposed to apply to CIA prisoners incorporated none of the SERE-school controls.

30.    Defendants' hypothesis became the basis for the experimental tortures that they and the CIA inflicted on prisoners.  In a memorandum dated December 30, 2004, the CIA confirmed to the Department of Justice Office of Legal Counsel ("OLC") that "[t]he goal of interrogation is to create a sense of learned helplessness and dependence conducive to the collection of intelligence in a predictable, reliable, and sustainable manner. . . . it is important to demonstrate to the [detainee] that he has no control over basic human needs."  Defendants' experimental "learned helplessness" model remained a key feature of the CIA's

COMPLAINT
Page | 15

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3

torture program from its inception to its end in 2009.  SSCI Report
484–487.

4

**Defendants test, apply, and refine torture.**

5
6
7
8
9
10
11
12
13
14

31.   In late March 2002, the CIA and Pakistani government authorities
captured Zayn al-Abidin Muhammad Husayn, also known as Abu
Zubaydah.  The CIA rendered Abu Zubaydah to Thailand.  Initially
Abu Zubaydah was hospitalized for serious gunshot wounds to his
thigh, groin, and stomach sustained during his capture, and from April
15, 2002, he was held at a CIA black-site prison referred to as GREEN
in the SSCI Report.

15
16
17
18
19
20
21
22
23

32.   Before the CIA conducted any meaningful assessment of Abu
Zubaydah's level of cooperation, on April 1, 2002, it contracted with
Defendant Mitchell to "provide real-time recommendations to
overcome Abu Zubaydah's resistance to interrogation."  SSCI Report
26.  That same evening, Mitchell, "who had never conducted an actual
interrogation, encouraged the CIA to focus on developing 'learned
helplessness' in CIA detainees."  SSCI Report 463–464.

24
25
26

33.   Even as Mitchell and the CIA were considering Abu Zubaydah's
torture, FBI agents with interrogation experience and Arabic language

COMPLAINT
Page | 16

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

skills were interviewing him in the hospital using non-coercive,

rapport-building interrogation methods. "Abu Zubaydah confirmed

his identity to the FBI officers, informed the FBI officers he wanted to

cooperate, and provided background information on his activities."

SSCI Report 25. FBI agents continued to obtain information from

Abu Zubaydah while he was hospitalized. FBI agents assisted in Abu

Zubaydah's medical care and remained at his bedside to establish trust

and rapport.

34.    On the assumption that Abu Zubaydah was withholding information,

Mitchell recommended that Abu Zubaydah be "kept in an all-white

room that was lit 24 hours a day, that Abu Zubaydah not be provided

any amenities, that his sleep be disrupted, that loud noise be constantly

fed into his cell, and that only a small number of people interact with

him." SSCI Report 26. The CIA ultimately adopted this

recommendation. In early April 2002, CIA Headquarters sent Mitchell

to GREEN to consult on the psychological aspects of Abu Zubaydah's

interrogation.

35.    In the first two weeks of April 2002, an interagency conflict developed

between the CIA and FBI over whether Abu Zubaydah should be

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

tortured.  "In a message to FBI Headquarters, an FBI special agent wrote that the CIA psychologists had acquired 'tremendous influence.'"  SSCI Report 27.  The conflict was resolved when the White House transferred full responsibility for Abu Zubaydah's continued interrogation to the CIA.

36.    Once in control of the interrogation, Defendant Mitchell seized the opportunity to test Defendants' theory on Abu Zubaydah.  Defendants would go on to document their methods meticulously.

*Phase I: "Setting the conditions" for "learned helplessness"*

37.    While Abu Zubaydah was still hospitalized, Mitchell and the rest of the CIA interrogation team implemented their "new interrogation program."  SSCI Report 27.

38.    The program began by setting abusive conditions that were specifically intended to "enhance[] the strategic interrogation process" through "psychological disorientation," and to increase Abu Zubaydah's "sense of learned helplessness." SSCI Report 26 n. 94.  On April 15, 2002, pursuant to Defendant Mitchell's scripted plan, Abu Zubaydah was sedated and moved from the hospital where he was still recovering from his injuries to a tiny cell in GREEN.  He was stripped naked and

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

held in solitary confinement.  His cell was brightly lit with four halogen lights 24 hours a day.  The cell's temperature was kept extremely cold and he was constantly bombarded with either loud rock music or discordant noise.  Throughout, he was kept shackled to one of two chairs in his cell, and only unchained long enough to let him use the toilet, which was a bucket in the cell.  His diet was restricted to minimal sustenance.  He was continuously deprived of sleep; whenever he started to fall asleep, one of his guards sprayed water in his face to wake him.  He was continually and repeatedly interrogated while held under these conditions for the next two to three weeks.

39.	At the end of April 2002, assessing Abu Zubaydah to still be uncooperative, Defendant Mitchell and the rest of the CIA interrogation team at GREEN provided CIA Headquarters with three strategies for obtaining information from him.  CIA Headquarters chose the most coercive option, which had been proposed by Mitchell.

40.	In early June 2002, Defendant Mitchell and the other members of the CIA interrogation team at GREEN proposed that Abu Zubaydah be subjected to several weeks of isolation, in part to keep him "off-balance" and so the interrogation team could discuss the "endgame"

COMPLAINT
Page | 19

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

for him with CIA Headquarters.  SSCI Report 30.  CIA Headquarters agreed and Abu Zubaydah was held in complete isolation without being asked any questions for 47 days, from June 18 to August 4, 2002.

*Phase II: "Aggressive phase" of torture and cruel, inhuman, and degrading treatment*

41.    In July 2002, Defendant Mitchell and the CIA assessed Abu Zubaydah as "uncooperative," and decided that additional coercive measures were required for him to become "compliant" and reveal the information the CIA believed he was withholding.  SSCI Report 31.  Based in part on a psychological evaluation Defendant Mitchell conducted of Abu Zubaydah, Defendant Mitchell proposed a new "aggressive phase" of Abu Zubaydah's torture during which he would be subjected to a regime of 12 highly coercive methods that Defendants had devised.  SSCI Report 42.

42.    Also in July 2002, on Defendant Mitchell's recommendation, the CIA contracted with Defendant Jessen to join Defendant Mitchell to assist him in testing and developing the Defendants' theory on Abu Zubaydah.

COMPLAINT
Page | 20

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

43.  Working with the CIA, Defendants helped convince Justice Department lawyers to authorize specific coercive methods that Mitchell had initially proposed for use on Abu Zubaydah.  These methods included: (1) the attention grasp, (2) walling, (3) facial hold, (4) facial slap, (5) cramped confinement, (6) wall standing, (7) stress positions, (8) sleep deprivation, (9) waterboard, (10) use of diapers, (11) use of (non-stinging) insects, and (12) mock burial.  SSCI Report 31–32.  The CIA agreed to propose all but the "mock burial" technique to the Attorney General and OLC.

44.  On July 24, 2002, the Attorney General gave his verbal approval to all of the proposed methods except the waterboard.  Defendants and the CIA interrogation team stated that they would not proceed until the Attorney General also approved use of the waterboard.  Defendants asserted that the waterboard was an "absolutely convincing technique," necessary for use on Abu Zubaydah.  SSCI Report 36.  On July 26, 2002, the Attorney General approved the use of the waterboard.

45.  On August 1, 2002, OLC authorized the use of every method the CIA proposed, except that it did not address the diapering technique.  The methods OLC authorized, together with others that were subsequently

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3

devised, developed and refined by Mitchell and Jessen, were referred to as "enhanced interrogation techniques."

4
5
6
7
8
9
10
11
12
13
14
15

46.    On August 4, 2002, Defendants Mitchell and Jessen began what they and the CIA referred to as the "aggressive phase" of Abu Zubaydah's torture.  Defendants personally conducted or oversaw this phase, subjecting Abu Zubaydah to a combination of the 10 coercive methods on a near 24-hour basis until August 23, 2004.  The abusive "conditions" of Abu Zubaydah's detention—combining prolonged solitary confinement, sensory bombardment by light and sound, use of extreme temperature, nudity, sleep deprivation and dietary restrictions—remained in place for the duration of this phase.

16
17
18
19
20
21
22
23
24

47.    At approximately 11:50 a.m. on August 4, security personnel entered Abu Zubaydah's cell, shackled and hooded him, and removed his towel, leaving him naked.  Without asking any questions, Mitchell and Jessen then placed a rolled towel around his neck like a collar and slammed him against a concrete wall.  They removed his hood and performed an "attention grab" on him, directing his face toward a coffin-like box.  SSCI Report 41.

25
26

48.    Defendants Mitchell and Jessen subjected Abu Zubaydah to "cramped

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

confinement" in two boxes that they had designed.  Defendants forced
Abu Zubaydah inside the larger of the two boxes, which was coffin-
sized, for several hours before forcing him inside the second,
significantly smaller, box, which measured 2.5 foot square and 21
inches deep.  In the smaller box, Zubaydah was made to squat in a
fetal position, reopening the stomach wounds he had sustained at the
time of his capture.  When Abu Zubaydah was inside each box, a
heavy cloth was draped over the outside to block any light, increase
the temperature inside, and restrict the air supply.

49.  Once Abu Zubaydah was removed from the smaller confinement box,
Defendants Mitchell and Jessen again subjected him to repeated wall
slamming.  In between, they shouted questions at him, demanding
information on terrorist operations planned against the United States.
SSCI Report 41.  Each time Abu Zubaydah denied having the
information, Defendants beat him severely around his face and torso,
using the facial slap, abdominal slap and facial grab techniques.
Defendants repeatedly employed this routine for some six and a half
hours on the first day of the "aggressive phase."

50.  At approximately 6:20 p.m. on the first day, Defendants Mitchell and

COMPLAINT
Page | 23

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

Jessen introduced the "waterboard" into the regimen.  Defendants conducted two to four waterboard sessions daily in this same manner. In total they waterboarded Abu Zubaydah 83 times in August 2002 alone.

51.    Over approximately three subsequent weeks, Defendants Mitchell and Jessen continued to subject Abu Zubaydah to walling, facial and abdominal slaps, the facial hold, stress positions, cramped confinement in stress positions (in the large and small boxes), prolonged sleep deprivation, and waterboarding repeatedly and in varying combinations on a near 24-hour basis.

52.    During this period and as a result of Defendants' methods, Abu Zubaydah, "cried," "begged," "pleaded," "whimpered," became "hysterical" and "distressed to the level that he was unable to effectively communicate."  He became "compliant" to the extent that when an interrogator "raised his eyebrow, without instructions," Abu Zubaydah "slowly walked on his own to the water table and sat down." When the interrogator "'snapped his fingers twice,' Abu Zubaydah would lie flat on the waterboard."  SSCI Report 42–43.

53.    In an email dated August 21, 2002, discussing their waterboarding of

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

Abu Zubaydah, Defendants wrote, "As for our buddy; he capitulated the first time.  We chose to expose him over and over until we had a high degree of confidence he wouldn't hold back.  He said he was ready to talk during the first exposure."  SSCI Report 471 n. 2578.

54.    Some contemporary CIA observers of Defendants' methods were "disturbed" by what they saw and concerned about consequences.  A few days into the "aggressive phase," "[s]everal on the team [were] profoundly affected . . . some to the point of tears and choking up."  SSCI Report 44.  Others were concerned that Abu Zubaydah would die from Defendants' methods, and videotaped his interrogation in an attempt to protect themselves from legal liability.  The CIA later destroyed those tapes.

55.    On August 23, 2002, the "aggressive phase" of Abu Zubaydah's torture stopped.  Defendants told the CIA it was a "success" because they could "confidently assess that he does not/not possess undisclosed threat information, or intelligence that could prevent a terrorist event."  SSCI Report 46.  Defendants explained: "Our goal was to reach the stage where we have broken any will or ability of subject to resist or deny providing us information (intelligence) to which he had access."

COMPLAINT
Page | 25

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

*Id.*

56.   Defendants recommended to the CIA that "'the aggressive phase . . .
      should be used as a template for future interrogation of high value
      captives.'" SSCI Report 46.  Presumably referring to themselves,
      Defendants recommended that psychologists "'familiar with
      interrogation, exploitation and resistance to interrogation should shape
      compliance of high value captives prior to debriefing by substantive
      experts.'" *Id.*

57.   Using their torture of Abu Zubaydah as a model, Defendants
      developed a phased program to induce "learned helplessness" in CIA
      captives through the infliction of severe physical and mental pain and
      suffering.  Defendants "largely devised the CIA enhanced
      interrogation techniques," SSCI 471 n.2578, including by designing
      instruments of torture such as confinement boxes.  They standardized,
      refined and recalibrated their methods over time.

58.   Defendants and the CIA collaborated in applying their coercive
      methods to varying degrees as they deemed necessary for individual
      prisoners.  In the phased program, Defendants designated coercive
      conditions and methods as either "standard"/"conditioning" or

COMPLAINT
Page | 26

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

"enhanced"/"aggressive," depending on the perceived degree of physical or psychological coercion applied to prisoners.

59.   Defendants' first phase "set the conditions" for inducing a state of "learned helplessness" in CIA captives.  Abusive "conditions" in this phase began as soon as persons were captured and rendered by the CIA to its black site prisons.  Conditions during rendition included sensory manipulation and humiliation to create "significant apprehension" and "dread."  Memorandum from CIA to OLC, Background Paper on CIA's Combined Use of Interrogation Techniques (Dec. 30, 2004).  This "conditioning" phase was continued once captives were imprisoned at CIA black sites.  Prisoners there were subjected to some or all of: solitary confinement; constant extreme light or darkness; the perpetual loud playing of music or white noise; extreme temperatures; forced nudity or dressing solely in diapers; restrictions on food and water; shackling in painful stress positions; and prolonged sleep deprivation.  Some or all of these confinement conditions remained in place for the duration of prisoners' confinement and interrogation, including during any second "aggressive" phase of interrogation and after.

COMPLAINT
Page | 27

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

60.    The conditions at COBALT, where all three Plaintiffs were held, conformed to Defendants' first phase.  In April 2003, the CIA's chief of interrogations explained that COBALT was "good for interrogations because it is the closest thing he has seen to a dungeon, facilitating the displacement of detainee expectations."  SSCI Report 50 n.240.  "[D]etainees were kept in total darkness.  The guards monitored detainees using headlamps and loud music was played constantly in the facility.  While in their cells, detainees were shackled to the wall and given buckets for human waste."  SSCI Report 49.  A CIA interrogator at COBALT during that time stated that detainees "'literally looked like a dog that had been kenneled.'  When the doors to their cells were opened, 'they cowered.'"  SSCI Report 50 n.240.

61.    If Defendants and the CIA assessed a prisoner as "resistant" after the first phase, they progressed to the second, the "aggressive phase," and used some or all of the coercive methods Defendants had initially tested on Abu Zubaydah.  These methods were applied repeatedly, in combination, and in escalating fashion, until Defendants and the CIA assessed a prisoner psychologically broken.

COMPLAINT
Page | 28

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

62.    Defendants trained and supervised CIA personnel in applying their phased torture program.  For example, in November 2002, Defendant Jessen traveled to COBALT for approximately a week to assess the "resistance" of prisoners to interrogation and determine whether they should be subjected to the "aggressive phase" of the program. While there, he instructed and trained CIA personnel in assessing prisoners' "resistance" and in using coercion on them.  Among the CIA personnel Jessen trained and supervised was the officer then in charge of COBALT, referred to in the SSCI Report as "CIA Officer 1."

63.    Together with the CIA, Defendants supervised and oversaw the implementation of Defendants' experiment.  Because the program's underlying theories had never been tested on actual prisoners before, Defendants and the CIA experimented on individual prisoners to assess whether: (1) they had been tortured long enough to induce a state of "learned helplessness" or additional torture was necessary; (2) certain combinations and sequences of torture techniques were most effective at overcoming "resistance"; and (3) prisoners became fully compliant with their interrogators' demands once they had been reduced to a state of learned helplessness.

COMPLAINT
Page | 29

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

64.    Defendants' role in assessing and evaluating their torture experiment gave rise to significant conflicts of interest.  In January 2003, CIA personnel expressed concerns over Defendants' financial and ethical conflicts of interest in employing coercive methods, assessing their "effectiveness," and being paid for both.  They observed that "the same individuals applied an EIT [Enhanced Interrogation Technique], judged both its effectiveness and detainee resilience, and implicitly proposed continued use of the technique—at a daily compensation" of $1,800 a day, "or four times that of interrogators who could not use the technique."  SSCI Report 66.  The CIA has since acknowledged that "the Agency erred in permitting [the Defendants] to assess the effectiveness of enhanced techniques.  They should not have been considered for such a role given their financial interest in continued contracts from CIA."  CIA June 2013 Response 49.

65.    On May 31, 2015, Defendant Mitchell confirmed in an email to the law firm Sidley Austin that he and Defendant Jessen were never fully able to assess the effectiveness of their theory and coercive methods.  Their contract was terminated, he stated, before they were able "to find

COMPLAINT
Page | 30

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

and pay an independent researcher, not involved with the program," to make a final assessment.

66.    Defendants were compensated for and profited from their work with and on behalf of the CIA.  From 2001 to 2005, as independent contractors to the CIA, Mitchell and Jessen each received $1,800 per-day, tax free, amounting to $1.5 million and $1.1 million respectively.

67.    In 2005, as the number of detainees in CIA custody grew, Defendants formed a company, Mitchell, Jessen & Associates, with corporate headquarters and offices in Spokane, Washington, to meet the CIA's increasing need for their services.  Under Defendants' direction and control, Mitchell, Jessen & Associates provided security teams for renditions, interrogators, facilities, training, operational psychologists, de-briefers, and security personnel at all CIA detention sites.  By April 2007, 11 out of 13 interrogators (85%) used by the CIA were directly employed by Mitchell, Jessen & Associates.  As of July 2007, the company had between 55 and 60 employees.

68.    Until the termination of its contract by the CIA in 2010, the Agency paid Mitchell, Jessen & Associates $81 million to implement and assist in rendition and coercive interrogation of CIA prisoners.

COMPLAINT
Page | 31

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

69.  Defendants and the CIA continued to use the phased torture program's most "aggressive" techniques until November 8, 2007.  Defendants and the CIA subjected at least 119 individuals to either the partial or full phased program.

70.  Plaintiffs are among 39 individuals who were experimented on and subjected by Defendants and the CIA to the most coercive methods of torture.

**SPECIFIC ALLEGATIONS BY PLAINTIFFS**

**Suleiman Abdullah Salim**

71.  Suleiman Abdullah Salim was born in Stone Town, Zanzibar, Tanzania in 1972.  Mr. Salim left high school early to fish and trade around the Swahili coast.  In 2003, Mr. Salim settled in Mogadishu, Somalia, and in March that year he married a Somali woman, Magida.

72.  On or around March 15, 2003, agents from the CIA and the Kenyan National Intelligence Service abducted Mr. Salim in Mogadishu.  He was rendered to Nairobi, Kenya, where he was secretly detained and interrogated on a daily basis for some eight days by Kenyan authorities.  On or around March 23, 2003, Mr. Salim was transferred to the exclusive custody and control of U.S. officials.  Mr. Salim's

COMPLAINT
Page | 32

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

detention in Kenya and subsequent transfer to U.S. custody is confirmed in public statements made at the time by Kenya's then-national security chief, Chris Murungaru.

73.  The CIA rendered Mr. Salim to its COBALT black site prison in three stages: from Kenya to a U.S. Air Base in Bossasso, Somalia; from Bossasso to Djibouti; and, on or around March 26, 2003, from Djibouti to COBALT.

74.  During Mr. Salim's custody by the CIA, he was experimented upon and subjected to a regimen of torture and cruel, inhuman, and degrading treatment in accordance with the phased torture program that Defendants Mitchell and Jessen designed, supervised, and implemented.  Mr. Salim suffered coercion and abuse during his rendition; torture, cruel, inhuman, and degrading treatment during his confinement; and further torture and abuse through the application of at least 8 of the 10 coercive methods Defendants devised for the torture program: prolonged sleep deprivation (seating and standing), walling, stress positions, facial slaps, abdominal slaps, dietary manipulation, facial holds, and cramped confinement (large and small boxes).  In addition, Mr. Salim was subjected to prolonged nudity and

COMPLAINT
Page | 33

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

to water dousing that approximated waterboarding.  He was also strapped to a waterboard and threatened with waterboarding.  Some of these methods were used on Mr. Salim repeatedly and in combination.

*Phase I: "Setting the conditions" for "learned helplessness"*

75.  The CIA began its torture of Mr. Salim during his rendition, subjecting him to severe physical and mental pain and suffering through humiliation, extreme sensory deprivation, and other forms of abusive treatment, in accordance with Defendant Mitchell and Jessen's specifications.  CIA personnel first cut Mr. Salim's clothes from his body.  Once he was naked, they forcibly inserted an object into his anus, causing him excruciating pain.  They photographed him; Mr. Salim could sense the flash of a camera.  He was then dressed in a diaper, a pair of trousers, and a short-sleeved shirt.  CIA personnel stuffed earplugs in his ears, placed a hood over his head, and over those, placed a pair of goggles and headphones.  They cuffed and shackled him.  Disorientated and terrified, Mr. Salim was shoved aboard a small aircraft, chained to the floor between two guards, and flown some eight or more hours.

COMPLAINT
Page | 34

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

76.   Upon landing, CIA personnel unchained Mr. Salim, forced him off the plane, and threw him into the back of a truck.  He was pinned to the floor on his stomach—with someone's knee pressing into the small of his back—and driven a short distance down a bumpy dirt track road. Two large men then removed him from the truck and marched into a nearby building, which was the CIA's COBALT prison.

77.   Mr. Salim was detained at COBALT for approximately five weeks. He was shackled, handcuffed, blindfolded, and in headphones when he first entered COBALT.  His sense of smell was immediately flooded with an overpowering stench that reminded Mr. Salim of rotting seaweed.  After his headphones, hood, and earplugs were removed, he was overwhelmed by ear-splitting noise: loud western pop-music sometimes interrupted by a mixture of cacophonous sounds like yowling and the clanging of bells.  Mr. Salim could also make out the sounds of voices speaking in different languages, including English, Kiswahili, and Somali.  He heard phrases such as, "*there's no God, no God, no God.*"  Even once his blindfold was removed, Mr. Salim could not see—the entire building was pitch black, though he sensed it was large and cavernous.  Mr. Salim and other CIA prisoners came to call

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

COBALT "The Darkness."

78.    The putrid smell, crashing noises and loud music, and pitch blackness at COBALT remained constant for the entire five weeks of Mr. Salim's imprisonment.  The smell and the noise were at their most intense in Mr. Salim's cell.  The only time the noise and music let up—and then only very briefly—was when the tracks changed or when the system malfunctioned.  The only light Mr. Salim saw was from the flashlights used by his guards and the dim lights and spotlights used in the rooms where he was interrogated.

79.    Upon arrival, guards marched Mr. Salim to a tiny, damp, and frigid concrete cell, which was about eight feet high, seven feet long, and three feet wide.  It was pitch black and empty except for a rug on the floor.  Mr. Salim had no bed or blanket, despite the cold, and no bathroom or washing facilities.  On one of the walls there was a small, rusty metal hoop.  The guards chained Mr. Salim's arms and legs to the hoop, with his arms outstretched and at eye level.  The only position he could adopt was a squatting position that very quickly became uncomfortable and extremely painful, and kept him from sleeping.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

80. For approximately a week, Mr. Salim was kept in the dark in his frigid cell, continually chained to the wall in an excruciating stress position, deprived of sleep, food, and water, and subjected to deafening noise and a nauseating stench.  He was in constant fear.

81. The first sustenance Mr. Salim received was approximately two days after his arrival, when guards gave him a small piece of bread in a watery, tasteless broth and a large bottle of water.  The guards briefly unchained him to allow him to eat.  This was also the first time that Mr. Salim was permitted to use the metal bucket that the guards placed in his cell as a toilet.  Before this, Mr. Salim urinated and defecated in his diaper and the clothes in which he had been rendered from Somalia.

82. For his entire time in COBALT, Mr. Salim was deprived of food and given the same meal—a small chunk of bread in a watery broth—only once every other day.  He was given a single bottle of water every day to be used both for drinking and hygiene.

83. The only time Mr. Salim left his cell during the first week or so in COBALT was about two days after his arrival, when two guards took him to meet with a man whom Mr. Salim assumed to be a doctor or

COMPLAINT
Page | 37

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

nurse.  Mr. Salim was blindfolded for the duration of the visit and the man never introduced himself.  The man conducted a general medical examination, weighing Mr. Salim and palpating various parts of his body.  He paid particular attention to Mr. Salim's broken nose and fingers—sustained during his abduction in Mogadishu about two weeks before.  After taking an X-ray of Mr. Salim's hand, the man told Mr. Salim that his fingers were broken, put them in a cast, and gave Mr. Salim a painkiller.  Mr. Salim was provided with painkillers on a daily basis thereafter.  He did not take them, however, and instead secreted them in his clothing or in his cell.  Mr. Salim had become so distressed and desperate that he had begun to contemplate suicide.  He thought that once he had enough painkillers he could use them to kill himself.

*Phase II: "Aggressive phase" of torture and cruel, inhuman, and degrading treatment*

84. Two or three days after his medical examination, Mr. Salim's torture increased in severity.  To Mr. Salim, it seemed that the man who had examined him had given the go-ahead for more abuse.

85. Before implementation of the "aggressive phase," Mr. Salim had not been questioned.  Mr. Salim was one of "[a]t least 6 detainees [who]

COMPLAINT
Page | 38

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

were stripped and shackled nude, placed in the standing position for

sleep deprivation, or subjected to other CIA enhanced interrogation

techniques prior to being questioned by an interrogator in 2003."

SSCI Report 77 n. 409.

86.　For the next two or three weeks, Mr. Salim was subjected to greater

humiliation, prolonged periods of sleep deprivation, repeated dousing

in extremely cold water in a manner that approximated waterboarding,

beatings, attention grabs, forceful slaps to the face and body, cramped

confinement in two boxes—one coffin-sized and the other

significantly smaller—and prolonged nudity.  He was also strapped to

a waterboard and threatened with waterboarding.

87.　On the first day, two guards dressed entirely in black came to Mr.

Salim's cell.  Working by flashlight, they unchained Mr. Salim from

the wall of his cell, cuffed his hands and shackled his legs, marched

him to a large, dimly-lit room, and sat him down in a chair.  Mr. Salim

was surrounded by eight or nine men, all but one of whom wore black

hats, masks, and overalls.  The unmasked man seemed to be the leader.

Mr. Salim later learned he was called "Viram."  Viram silently

approached Mr. Salim with an electric razor in one hand.  He began to

COMPLAINT
Page | 39

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

shave Mr. Salim's head, and after one swipe passed the razor to one of the masked men. Each of the masked men took a turn with the razor, shaving Mr. Salim until he was bald and removing all his facial hair. The entire episode left Mr. Salim deeply humiliated, degraded, and terrified of what would happen next.

88. The two guards who had brought Mr. Salim into the room then forced Mr. Salim to stand, removed his handcuffs and shackles, and ripped the clothes from his body. Once he was naked, they cuffed and shackled Mr. Salim again and laid him down in the center of a large plastic sheet that covered part of the floor. A thin film of ice-cold water covered the surface of the plastic sheet. Using a large jug, two men repeatedly doused Mr. Salim in gallons of ice-cold water. The water was so cold it left Mr. Salim breathless. In between the water dousing, the two men kicked and slapped Mr. Salim on the stomach or face and shouted at him in English. After some 20 or 30 minutes of this water torture, the men pulled up the corners of the freezing cold sheet and rolled Mr. Salim inside. Covered in the plastic sheet, Mr. Salim was left to shiver violently in the cold for some 10 or 15 minutes.

COMPLAINT
Page | 40

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

89.  Mr. Salim was then taken into another room where two guards forcibly restrained him and a spotlight was aimed directly in his face.  A third unmasked man then shouted at Mr. Salim in English while another man translated into Somali.  Mr. Salim had a limited grasp of English but knew Somali fairly well.  The interrogator demanded personal background information from Mr. Salim and asked what Mr. Salim had being doing in Somalia and who he knew there.  The interrogator listed names of people and asked Mr. Salim if he knew any of them.  Mr. Salim answered truthfully that he was a trader doing business in Somalia; that he had recently married a woman from there; and that he only knew one person from the interrogator's list of names, and only because he had bought a boat from that person.  The interrogation team changed two times during the "aggressive phase."  Throughout Mr. Salim's interrogation and the entire time he spent in U.S. custody, he was asked the same questions and he provided the same truthful responses.

90.  After roughly half an hour, Mr. Salim was taken back into the first room.  His head was covered in a cloth bag, and he was again placed in the middle of the plastic sheet.  His two interrogators repeated the ice-

COMPLAINT
Page | 41

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

cold water dousing, but this time the cloth bag clung to Mr. Salim's face, suffocating him. Mr. Salim felt like he was drowning. His heart felt as if it was beating out of his chest. He was paralyzed with cold. This water dousing session ended like the first: the men rolled Mr. Salim in the plastic sheet so he felt "like a corpse" and left him in the cold for around 15 minutes before he was dragged once again to the second room for interrogation. The water torture sessions followed by interrogation continued in this same manner for hours.

91. After the last water-torture session ended that first day, Mr. Salim's interrogators showed him a small wooden box, measuring about three square feet. There were holes on one side and another was hinged with a lock and padlock. Naked, chained, and shackled, Mr. Salim was stuffed inside the box and it was locked shut. The space was pitch black, and so small that Mr. Salim had to crouch over on his knees. The box smelled rancid. Mr. Salim was locked in the box for what he estimates was half an hour, though it felt much longer.

92. Mr. Salim vomited in pain and fear while he was inside the small cramped confinement box. Interrogators used this technique on him only on the first day, but they threatened to use it on him on a number

COMPLAINT
Page | 42

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

of other occasions during interrogations at COBALT.  At one time

they stuffed him inside the box for a short period without locking the

door.  Even the threat of this technique filled Mr. Salim with dread.

93.    Immediately after the first cramped confinement session, Mr. Salim

was interrogated again.

94.    At the end of this first day of "aggressive" torture, Mr. Salim was

taken back to his cell by two guards and again put in a painful stress

position.  The guards chained him, naked, to the metal ring in the wall

but now used a slightly longer length on the leg and arm chains, which

allowed Mr. Salim to sit on the floor of his cell instead of squatting.  It

was still extremely painful, however, and coupled with the constant

loud music and cold, Mr. Salim was unable to sleep.

95.    For the duration of this "aggressive phase," Mr. Salim was kept naked.

The only time he was given clothing was during a few of his

interrogation sessions.  Mr. Salim did not understand why he was

given clothing for these sessions, nor why he was stripped afterwards.

96.    On the second day of the "aggressive" phase, Mr. Salim was again

subjected to repeated and hours-long water torture and interrogation

sessions.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

97.   After the last water torture session ended on the second day, Mr. Salim was taken to a room in which a wooden wall had been constructed. The lead interrogator placed a foam collar, attached to a leash, around Mr. Salim's neck.  Using the leash, the interrogator threw Mr. Salim against the wooden wall.  Mr. Salim crashed into the wall, and as he rebounded, the interrogator struck Mr. Salim in the stomach.  The interrogator repeated this procedure several times, shouting at Mr. Salim as he propelled Mr. Salim against the wall and beat him.

98.   After the walling ended, Mr. Salim was interrogated again. Immediately after the interrogation, he was forced into a tall, thin, coffin-like box.  The box was just wide and high enough to accommodate a fully grown adult with arms stretched over their head. Once crammed inside, Mr. Salim's hands were chained above his head to a thin metal rod that ran the width of the box.  The door of the box was then closed and Mr. Salim was left in darkness, with music blasting at him in the box from all angles.

99.   After two or three hours in the tall box, Mr. Salim was removed and taken to an interrogation room.  Interrogators then shone a spotlight in his face and bombarded him with the same questions they had asked

COMPLAINT
Page | 44

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

the day before.  Once this interrogation session ended, guards took Mr. Salim back to his cell and chained him by his legs and arms to the iron ring in the wall.  He was left overnight in pain, naked, cold, and unable to sleep.

100.    Mr. Salim was subjected to water torture and interrogation sessions for two more days.  On the third day, after one of the water torture sessions ended and before the interrogation session began, one interrogator attached a chain with a large ball at the end around Mr. Salim's waist and made him drag it around the perimeter of the room—naked with a hood over his head—for thirty minutes, until he collapsed with exhaustion, weakened by hunger and the water torture.

101.    On the fourth and final day of Mr. Salim's water torture, at the end of one of the sessions, interrogators strapped his hands and feet to a pivoted, wooden board—a water board—and threatened to waterboard him, but instead spun him around 360 degrees several times.

102.    Around the beginning of the third week of Mr. Salim's detention at COBALT, sometime after the water torture sessions had ended, Mr. Salim was subjected to prolonged standing sleep deprivation in a new painful stress position.  Two guards took Mr. Salim from his cell to a

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

small, pitch-black room. Working by flashlight, the guards chained Mr. Salim's arms above his head to a metal rod that ran the width of the small room and positioned him so that the balls of his feet barely touched the floor. Mr. Salim was left hanging, naked, in the darkness, barraged with ear-splitting music. During this entire period, Mr. Salim was given no food and only sips of water. He remained suspended from the ceiling without interruption, including when he relieved himself. The only time he was taken down was for interrogation. On occasion, he started to drift into sleep but immediately jolted awake from the excruciating pain that shot through his arms and shoulders as they momentarily supported his full body weight. Mr. Salim was subjected to this form of standing sleep deprivation for what seemed to him four or five days.

103. As a result of the prolonged standing sleep deprivation, Mr. Salim's back and shoulders ached and his arms felt as if they had become dislocated. Both Mr. Salim's legs were swollen and there was a sickening smell from beneath the plaster cast on his hand. A large cut had also opened on the same hand. Once the technique stopped and Mr. Salim was taken back to his cell, a male doctor or nurse came to

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

treat Mr. Salim, doing nothing for his swollen legs but removing the cast from his fingers and attempting to straighten them. He also bathed Mr. Salim's wound and re-bandaged his fingers.

104. Two or three weeks after the "aggressive phase" had begun, Mr. Salim's interrogators assessed him "broken" and "cooperative" and stopped it.

105. During the fourth or fifth week of Mr. Salim's detention at COBALT, a man Mr. Salim had never seen before administered what Mr. Salim believes was a polygraph test. He started by asking Mr. Salim a series of questions that Mr. Salim thought bizarre—Are the lights on or off? What time of day is it?—as well as the same questions previous interrogators had shouted at him. Mr. Salim answered in his limited English, providing the same truthful answers as before.

106. Sometime after this polygraph test, guards took Mr. Salim from his cell, blindfolded him, strapped him to a stretcher, and wheeled him to a dimly lit room. There he received three very painful injections in his arm. Mr. Salim was not told what these injections were for, and he did not consent to them. From under his blindfold, Mr. Salim could see that he was hooked up to some kind of a computer screen or monitor.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

After the injections were administered Mr. Salim felt drowsy, like a drunken person, and his face went numb, as if he'd been slapped very hard. The next thing Mr. Salim was aware of was waking up in his cell, chained to the wall. He has no recollection of what happened to him in the intervening period, or how long the period lasted.

107. In approximately his fourth or fifth week at COBALT, Mr. Salim become so hopeless and despondent that he decided to kill himself by taking the painkillers he had stockpiled in his cell. As he began to take the pills, however, guards stormed into his cell and stopped him.

108. Immediately after Mr. Salim's failed suicide attempt, CIA personnel transferred him from COBALT to another CIA black-site prison. Two or three guards restrained him and another dressed him in shorts and a t-shirt, cuffed his hands, and shackled his legs. A guard stuffed plugs in his ears, placed a hood over his head, and placed goggles and headphones over the hood. Mr. Salim was then dragged into the back of a vehicle. He was driven a short distance, some 15 or 20 minutes, to an underground prison that Mr. Salim later learned was known as the "Salt Pit."

COMPLAINT
Page | 48

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

109.    The CIA held Mr. Salim incommunicado and in solitary confinement in the "Salt Pit" for 14 months.  The Agency did not interrogate him during that time, although the FBI did.  On about seven occasions, two individuals who represented themselves as agents of the FBI, one male and the other female, came to talk to him.  The male agent called himself "Mike," and spoke to Mr. Salim in Kiswahili.  Mike asked Mr. Salim the same questions that he had been asked in COBALT, and Mr. Salim again gave the same truthful responses.

110.    The only other visitor Mr. Salim had during his time in the "Salt Pit" was one of his interrogators from COBALT.  The interrogator brought fruit and nuts for Mr. Salim, said he had been forced to torture Mr. Salim, apologized, and asked for Mr. Salim's forgiveness.

111.    In approximately July 2004, Mr. Salim was transferred to the custody of the U.S. military and held at a prison at the Bagram Air Force Base, a thirty-minute helicopter ride away.  For over four years, Mr. Salim was detained at Bagram, where his prisoner number was 1075.  Throughout, Mr. Salim was held in solitary confinement in a series of small cages in a large, hanger-type building.  Bright lights remained on constantly.  He never saw daylight.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

112.    On August 17, 2008, a representative of the International Committee of the Red Cross ("ICRC") told Mr. Salim that he was to be released. The ICRC gave Mr. Salim a memorandum from the U.S. Department of Defense confirming his detention by the "United States/Coalition Forces," certifying his release, and stating that Mr. Salim "has been determined to pose no threat to the United States Armed Forces or its interests in Afghanistan." The memo also stated that there were no charges pending against Mr. Salim.

113.    The ICRC arranged to fly Mr. Salim to Dubai, and from there to Dar es Salaam and on to his home and family in Zanzibar.

114.    Upon Mr. Salim's return, he made repeated efforts to find his wife, with whom he had lost all contact during his incommunicado detention. He has never been able to find her. Mr. Salim now lives with his second wife, whom he married in 2011, their three-year-old daughter, and his extended family.

115.    Mr. Salim continues to suffer acute physical injuries from torture. He experiences debilitating pain in his jaw and teeth, making it difficult to eat solid foods. His senses of taste and smell are impaired. He suffers

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

severe pain in his back, shoulders, and legs.  The chronic pain makes it extremely difficult for Mr. Salim to work or perform other activities.

116.  Mr. Salim also suffers severe and lasting psychological injuries from torture.  His injuries include frequent nightmares and terrifying flashbacks to his time in COBALT and, during daytime, frequent spells of dizziness and confusion.  A forensic examination conducted after his release confirms many other symptoms of post-traumatic stress disorder, including intrusive recollections, avoidance/emotional numbing, hyper-arousal symptoms, and major depression.

**Mohamed Ahmed Ben Soud (formerly Mohamed Shoroeiya, Abd al-Karim)**

117.  Plaintiff Mohamed Ahmed Ben Soud is a Libyan citizen, born in Misrata in 1969.  In 1991, Mr. Ben Soud fled Libya, fearing persecution for his opposition to Muammar Gadaffi's regime.  In exile, Mr. Ben Soud later joined a group opposed to the Gadaffi government, the Libyan Islamic Fighting Group.  He resided temporarily in a number of countries before settling in Pakistan.  In April 2003, he was living in the city of Peshawar with his wife, whom he married in 2000, and their nine-month old daughter.

COMPLAINT
Page | 51

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

118.   On April 3, 2003, Mr. Ben Soud was arrested during a raid on his home by U.S. and Pakistani forces.  During the raid, Mr. Ben Soud was shot in the left leg.  The gunshot shattered a bone.

119.   Mr. Ben Soud was detained, interrogated and abused for two weeks by Pakistani and U.S. officials.  At one point, a doctor x-rayed his injured leg and fitted it with a plaster cast.  The interrogators questioned Mr. Ben Soud about his knowledge of terrorism threats against the United States and his connections with al-Qa'ida.  Mr. Ben Soud explained truthfully that he had no knowledge of any terrorism plans against the United States and no connection with al-Qa'ida.  Mr. Ben Soud was repeatedly asked these same questions during his time in U.S. custody.

120.   On April 18, Mr. Ben Soud's U.S. interrogators told him that he was being uncooperative and that they were going to send him to a place where he would be made to cooperate.  That night, Mr. Ben Soud was blindfolded and handcuffed and driven some forty minutes to an airport.  The CIA rendered Mr. Ben Soud to its black-site prison, COBALT.

121.   During Mr. Ben Soud's imprisonment by the CIA, Mr. Ben Soud was experimented upon and subjected to and regimen of torture and cruel,

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

inhuman, and degrading treatment in accordance with the phased torture program that Defendants Mitchell and Jessen designed, supervised and implemented. He suffered coercion and abuse during his rendition; torture and cruel, inhuman and degrading treatment during his confinement and further torture and abuse through the application of 9 of the 10 coercive methods Defendants devised for the torture program: prolonged sleep deprivation (seating and standing), walling, stress positions, the facial slap, abdominal slap, dietary manipulation, the facial hold, cramped confinement (large and small boxes), and a form of waterboarding. In addition, he was subjected to prolonged nudity and water dousing that approximated waterboarding. Some of these methods were used on him repeatedly and in combination.

*Phase I: "Setting the conditions" for "learned helplessness"*

122. The CIA began its torture of Mr. Ben Soud during its rendition of him to COBALT by subjecting him to severe physical and mental pain and suffering through humiliation, extreme sensory deprivation, and other forms of abusive treatment in accordance with Defendant Mitchell and Jessen's specifications. Mr. Ben Soud's blindfold was removed, and

COMPLAINT
Page | 53

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

he saw he was surrounded by five or six men, all dressed in black and wearing masks so that only their eyes were visible.  A strong light was shone directly into his face.  CIA personnel cut his clothes from his body.  Once Mr. Ben Soud was naked, one of the men conducted what appeared to be a medical examination, checking his anus, eyes, ears, nose and throat.  He was then dressed in a diaper, a pair of trousers and a short-sleeved shirt.  The men handcuffed Mr. Ben Soud and chained his cuffs to a belly chain.  They shackled his legs together and fastened them to the same belly chain.  They stuffed earplugs into his ears and taped cotton pads over his eyes.  They covered his head with a hood and placed headphones over the hood and his ears.  Deafened, blinded, and terrified, Mr. Ben Soud was forced up a set of stairs and into what he sensed was an aircraft.  Once inside, he was chained to one of the seats, and flown for what seemed like an hour, although it was difficult for him to gauge time given his disorientation and sensory deprivation.

123.  After landing, Mr. Ben Soud was removed from the plane and thrown into the back of a truck.  He landed on top of another prisoner.  The vehicle drove a short distance, arriving at a hangar-type building,

COMPLAINT
Page | 54

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

which was COBALT.  Mr. Ben Soud was removed from the back of

the truck and hoisted onto someone's shoulder.

124.    Inside COBALT, Mr. Ben Soud's headphones, hood, earplugs, and

blindfold were removed.  CIA personnel sat him on an old ammunition

box at a table with two spotlights aimed directly at his face.  Across

the table from him stood a middle-aged woman whom he identified

from her accent as American.  Two guards stood behind him, one on

each side.  Through a translator, the woman shouted at him that he was

a prisoner of the CIA, that human rights ended on September 11, and

that no laws applied in this prison.  She asked him no questions.

125.    Guided by flashlights, two guards then took Mr. Ben Soud to a small,

concrete, pitch-black, windowless cell measuring approximately 13

feet high by 10 feet long, with a steel door and tiny barred ventilation

slot.  There was a metal ring attached to one wall.  A small metal

bucket served as a toilet.  There were no washing facilities, only a

liter-sized water bottle that was filled every morning but was sufficient

only for drinking.  There was no bed, just two thin blankets, one of

which Mr. Ben Soud used to sleep on and the other he used as a cover,

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3

although the cover did little to keep him warm during the winter months.

4
5
6
7
8

126.   In the cell, the CIA guards removed Mr. Ben Soud's handcuffs and belly chain, his clothing and his diaper, but left the shackles around his ankles. The whole procedure was precise and well-practiced, seeming almost scientific to Mr. Ben Soud. Mr. Ben Soud was left naked.

9
10
11
12
13
14

127.   Mr. Ben Soud was kept naked for more than a month. At what he estimated was the end of May, he was provided with clothing for the first time, a light pair of trousers and a t-shirt, but both were cut-up oddly, missing a leg or a sleeve.

15
16
17
18
19
20
21
22
23
24
25
26

128.   Throughout his time in COBALT, Mr. Ben Soud was bombarded by Western music. The music was played at ear-splitting levels and filled the entire building. It only ever stopped very briefly as the tracks changed or when the system malfunctioned. Mr. Ben Soud's cell was kept pitch black, and stank. At first, the stench came chiefly from the toilet bucket, but eventually also from Mr. Ben Soud, who was not permitted to wash for five months nor cut his hair, beard or nails. The smell in his cell was so bad that the guards wore masks when they came to take him to interrogation.

COMPLAINT
Page | 56

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

129.    Mr. Ben Soud was subjected to food deprivation and dietary manipulation throughout his year-long detention at COBALT.  In the first five months, from April until September 2003, Mr. Ben Soud was provided one meal a day, and occasionally two meals.  These meals consisted of rice or bread and beans.  After five months, meals were provided on a more regular basis, but the nutritional quality remained low.  Mr. Ben Soud was weighed by a medic when he first arrived at COBALT and again three months later.  In this period he lost nearly 49 pounds, falling from 187 pounds to 139 pounds.

130.    Throughout Mr. Ben Soud's imprisonment at COBALT he was subjected to sleep deprivation, able to sleep only for minutes at a time because of painful stress positions, constant blaring music, and guards banging loudly on the door of his cell every hour or so.  In the first few months at COBALT, Mr. Ben Soud was continually placed in one of three painful seated stress positions: he was kept chained to the ring on his cell wall by one wrist; both wrists; or by the wrists and both legs. The seated positions were, "[t]o accommodate [Mr. Ben Soud's] injuries . . . rather than being shackled standing during sleep deprivation, [he should] be 'seated, secured to a cell wall, with

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

intermittent disruptions of normal sleeping patterns." SSCI Report 492 n.2675. Once medics removed the cast from his injured leg, Mr. Ben Soud was subjected to standing sleep deprivation. Guards would take him from his cell and force him to march around the prison naked, "'15 minutes every half-hour through the night and into the morning.'" SSCI Report 492. This caused Mr. Ben Soud excruciating pain in his leg.

131.  For Mr. Ben Soud, the prolonged sleep deprivation was the worst form of torture that he had to endure. It drove him close to madness.

132.  During the first two weeks of Mr. Ben Soud's detention at COBALT, he was interrogated on a regular basis. Mr. Ben Soud was cuffed, shackled and naked, with a spotlight aimed in his face, and two interrogators took turns questioning him. In addition to the questions he had been asked in Pakistan, the interrogators asked Mr. Ben Soud whether he knew certain individuals, including Osama Bin Laden, Abu Faraj al Libi, and Abu Leith al-Libi. Mr. Ben Soud answered truthfully that he knew of them but only from reports in the media. In response to the questions he had also been asked in Pakistan, Mr. Ben Soud gave the same truthful answers as before: he had no connections with

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

al Qa'ida and he was neither involved in nor knew of any terrorism

plots against the United States.

*Phase II: "Aggressive phase" of torture and cruel, inhuman, and degrading treatment*

133. It was difficult for Mr. Ben Soud to have a firm sense of time—the

differences between day and night were almost imperceptible—but he

estimates that roughly two weeks after he arrived at COBALT his

torture increased in severity with the introduction of new methods.

134. The "aggressive phase" of Mr. Ben Soud's torture lasted for about four

or five weeks.  During this phase, Mr. Ben Soud saw Defendant

Mitchell three times in COBALT: at least twice while being subjected

to water torture, where Mitchell appeared to be observing and

supervising the proceedings, and once at the end of the "aggressive

phase."

135. The "aggressive phase" was conducted by two separate interrogation

teams.  Each team tortured Mr. Ben Soud for approximately two

weeks.  The first team was comprised of a male lead interrogator and

four assistants, both men and women.  The second team was

comprised of two male lead interrogators and four or five male and

female assistants.

COMPLAINT
Page | 59

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

136.    The first interrogation team subjected Mr. Ben Soud to repeated walling sessions, abdominal slaps, and water torture sessions, often in combination on the same day for over a two-week period.

137.    During wall slamming sessions the lead interrogator placed a foam collar around Mr. Ben Soud's neck and then slapped him firmly, first in the face and then in the stomach, before throwing him against a wooden wall.  Interrogators repeated walling and slaps for 20 or 30 minutes before taking Mr. Ben Soud to be interrogated in another room, and then back again for another session.  As the sessions continued they became increasingly painful.  The noise of Mr. Ben Soud hitting the wall was also extremely loud and terrifying to him. When back in his cell, Mr. Ben Soud could hear others also being subjected to walling, even above the noise of the music.

138.    About a week after his first wall slamming session, Mr. Ben Soud's interrogators started to combine walling with water torture.  On the first day of his water torture, two guards took Mr. Ben Soud from his cell to a room where the interrogation team and some others were waiting.  A large plastic sheet covered part of the floor.  Guards forced Mr. Ben Soud, naked, into the center of the plastic sheet.  With his

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

hands cuffed at the wrists, they forced his arms over his head.  On the lead interrogator's word, four of the assistants pulled up the four corners of the sheet to form a shallow basin.  They then threw buckets of ice-cold water over Mr. Ben Soud's face and body until he was partially submerged in the ice-cold water.  The water seemed to have been treated with some substance and clung to Mr. Ben Soud's body like a gel.  It was so cold he shook violently.  A person whom Mr. Ben Soud took to be a doctor monitored the proceedings, periodically checking Mr. Ben Soud's vital signs.  When the doctor decided that Mr. Ben Soud's temperature was dangerously low, he would give instructions for warm water to be thrown over him until Mr. Ben Soud's temperature raised modestly.  The water torture sessions lasted about half an hour to forty minutes, sometimes longer.  After each ended, Mr. Ben Soud was taken naked and shivering to another room and interrogated.  This process was repeated multiple times.

139.    After the first water torture session, the cast on Mr. Ben Soud's leg began to disintegrate.  The same doctor who had monitored his temperature examined the plaster.  In the next session, the doctor tried to protect the plaster by covering it in a plastic bag before the water

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

was applied, in accordance with guidance in a CIA cable: "For water

dousing, [Mr. Ben Soud's] injured leg[] would be 'wrapped in

plastic.'" SSCI Report 492 n.2675. When this proved ineffective,

however, the doctor later designed and fitted Mr. Ben Soud with a cast

that could be easily removed during water torture sessions.

140. After approximately two weeks, the lead interrogator told Mr. Ben

Soud that he was not being cooperative and that another team of

interrogators would be taking over to make Mr. Ben Soud cooperate.

Before leaving, he provided Mr. Ben Soud with a pair of trousers and a

t-shirt.

141. For the next two to three weeks, a second interrogation team took over

and subjected Mr. Ben Soud to a combination of walling, water

torture, cramped confinement in large and small boxes, prolonged

standing sleep deprivation and a form of waterboarding, while

threatening him with additional abuses. The new team stripped Mr.

Ben Soud of the clothing he had briefly possessed; he was kept naked

for the duration of this period.

142. The walling and accompanying physical beatings were more severe

than those conducted by the first team. The water torture sessions also

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

increased in intensity because interrogators covered Mr. Ben Soud's head with a hood before pouring ice-water over him.  The addition of the hood caused Mr. Ben Soud to choke and suffocate.  He felt like he was drowning.

143.  Mr. Ben Soud's interrogators also placed him in a narrow, coffin-like box which was approximately 1.5 ft. wide and tall enough for him to stand with his hands chained above his head in a painful position. Speakers were located on both sides of the box at the level of his ears. Once inside, loud Western rock music was turned full volume through the speakers.  Mr. Ben Soud was forced into this box for forty-five minutes, and found it unbearable.  After using this technique on him once, interrogators threatened him with it again if he did not cooperate.

144.  Interrogators also forced Mr. Ben Soud into a smaller wooden box, measuring approximately 3 feet by 3 feet. The box had a series of small holes on each side.  Once squeezed inside, the box was locked and Mr. Ben Soud was left there for some forty-five minutes. Again, Mr. Ben Soud found this experience unbearable.  He was subjected to this method once, but interrogators threatened Mr. Ben Soud with its use on numerous other occasions.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

145.    During this same period, for one and a half days, Mr. Ben Soud was hung naked from a metal rod by his arms. He was positioned with his arms over his head and so that the balls of his feet—including the foot of his broken leg—were barely able to touch the ground. If he loosened his arms, they felt like they would come out of their sockets. It was impossible for Mr. Ben Soud to sleep. The room was small and pitch-black except for a tiny blinking red light level with his head. As he was being strung up he could see blood-smeared walls by the light of the guards' flashlights. Loud Western music was blasted into the room for the duration of his suspension from the ceiling. After a very short time, alone in that room and unable to sleep, Mr. Ben Soud began to hallucinate and slowly became hysterical. After a day and a half, the guards released him and brought him to see a doctor, who examined his legs. They had become engorged and swollen with fluid, his broken leg especially. Both limbs were excruciatingly painful. Mr. Ben Soud was unable to walk and had to be carried by the guards to the examination room for treatment.

146.    On one occasion, Mr. Ben Soud was subjected to a form of waterboarding. He was strapped to a wooden board that could spin

COMPLAINT
Page | 64

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

around 360 degrees.  His interrogators spun him around on this board

with a hood over his head covering his nose and mouth.  While

strapped to the board with his head lower than his feet, his

interrogators poured buckets of cold water him.  While they did not

pour water directly over his mouth and nose, they threatened to do so

if he did not cooperate.

147.  After two to three weeks, the interrogation team assessed Mr. Ben

Soud as "broken" and "cooperative," and stopped the "aggressive

phase" of his torture.

148.  From around June 2003 through April 2004, Mr. Ben Soud continued

to be subjected to solitary confinement, other forms of extreme sensory

deprivation, including being kept in the dark and bombarded with high

decibel music, painful stress positions and prolonged sleep

deprivation.

149.  During this period, there was also a change in the personnel

conducting his interrogations, which now consisted only of

questioning.  These sessions occurred on a daily basis, but towards the

end of Mr. Ben Soud's time in COBALT they became less regular.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

150.   On September 3, 2003, Mr. Ben Soud was taken outside, into the daylight.  It was the first time he had seen the sun in over four months. He knew the exact date because he spoke with an American man at this time and noticed the date and time on his wrist watch.  Seeing the date allowed Mr.  Ben Soud to calculate the time he had spent in COBALT. He then kept a tally of the days moving forward using paper and a pen that his captors provided to him.

151.   On April 25, 2004, Mr. Ben Soud was transferred to another CIA black site prison referred to in the SSCI Report as ORANGE, where he was detained and interrogated for a further year and four months.  Mr. Ben Soud was held in secret, in solitary confinement and chained to the wall of his cell when he was not being interrogated.

152.   On August 22, 2004, the CIA rendered Mr. Ben Soud from ORANGE to Gaddafi's government in Libya.

153.   In Libya, Mr. Ben Soud was handed over to Libyan officials.  He was detained pending a show trial and sentenced to life imprisonment on July 20, 2006.  He was released February 16, 2011, a day after the uprising that led to the overthrow of the Gaddafi regime.

COMPLAINT
Page | 66

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

154.  Mr. Ben Soud lives in Misrata together with his wife and their three children.  He continues to suffer physically and psychologically from the tortures he endured when he was a subject of Mitchell and Jessen's experimental program.  He experiences pain in his left leg in particular and is unable to walk on it for any length of time.  A CIA cable from May, 2003 "stated that, even given the best prognosis, [Mr. Ben Soud] would have arthritis and limitation of motion for the rest of his life." SSCI Report 492.  He has been diagnosed with rheumatism in his knees and back and has been prescribed medication for the pain.  Mr. Ben Soud has also been receiving on-going treatment for hearing loss in both ears, and hears a continuous ringing sound.  He has also lost his sense of taste and smell.  He continues to suffer deep psychological harm.

**Gul Rahman**

155.  Gul Rahman was born in Afghanistan in the 1970s.  He married there and he and his wife had four daughters.  In 2001, the family fled Afghanistan to Pakistan to escape the armed conflict after the U.S.-led invasion.  They lived together as refugees in the Shamshatoo refugee

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

camp located on the outskirts of Peshawar, in Pakistan.  Mr. Rahman earned a living selling wood to the other Shamshatoo camp refugees.

156.  On October 28, 2002, Mr. Rahman, who suffered from allergies, went to Islamabad for a medical checkup.  He stayed the night in Islamabad with an old friend and former employer, Dr. Ghairat Baheer.  While living in Afghanistan before 2001, Mr. Rahman had [periodically] worked as a driver for Dr. Baheer, who was a physician and leader of Hezb-e-Islami, a group formed in opposition to the Communist Government of Afghanistan.

157.  In the early hours of October 29, 2002, Dr. Baheer's home in Islamabad was raided in a joint U.S./Pakistani operation.  Mr. Rahman was taken captive, together with Dr. Baheer, two guards and a cook.  All of them were detained at a facility in Islamabad for about a week.

158.  On or around November 5, 2002, Mr. Rahman was rendered by the CIA from Pakistan to the CIA's black-site COBALT prison.

159.  During Mr. Rahman's custody by the CIA, he was experimented on and subjected to a regime of torture and abuse in accordance with the phased program Defendants Mitchell and Jessen designed, supervised and implemented.  Mr. Rahman suffered abuse and coercion during his

COMPLAINT
Page | 68

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

rendition; torture and cruel, inhuman, and degrading treatment during

his  confinement; and further torture and abuse through the application

of at least 6 of the 10 coercive techniques Defendants devised for the

torture program: facial holds, insult slaps, abdominal slaps, stress

positions, dietary manipulation, and prolonged sleep deprivation.  Mr.

Rahman was also subjected to prolonged nudity and water dousing.

Some of these coercive methods were used on Mr. Rahman repeatedly

and in combination.

160.    In November 2002, Defendant Jessen conducted a psychological

evaluation of Mr. Rahman at COBALT "to determine which CIA

enhanced interrogation techniques should be used on him" to counter

perceived resistance.  SSCI Report 497.  Defendant Jessen concluded

that Mr. Rahman was resistant and that further torture would be

required to "break" his will and render him compliant.  Defendant

Jessen directly participated in the more "aggressive phase" of Mr.

Rahman's torture, with the assistance of an individual identified in the

SSCI Report as CIA Officer 1.  Both Jessen and CIA Officer 1 tortured

Mr. Rahman.  The abuses to which Jessen and CIA Officer 1 subjected

Mr. Rahman included "48 hours of sleep deprivation, auditory

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

overload, total darkness, isolation, a cold shower and rough treatment"
SSCI Report 54.

161.    Defendant Jessen also oversaw and encouraged Mr. Rahman's
continued torture by the other CIA agents and guards Jessen was
training.  Those methods included "rough takedown"/"hard
takedown," which "was done for shock and psychological impact and
signaled the transition to another phase of the interrogation." CIA OIG
Report at 77.  Defendant Jessen described the technique as a
"thoroughly planned and rehearsed" form of severe physical and
psychological abuse that when performed on Mr. Rahman resulted in
abrasions to his face, legs, and hands from his being slapped, punched
and dragged naked, hooded and bound over the concrete and dirt floors
of COBALT.  Defendant Jessen explained that after the technique was
used, "interrogators should speak to the prisoner to give them
something to think about." SSCI Report at 56 n. 278.

162.    Before Defendant Jessen departed COBALT, he proposed that the CIA
continue its torture of detainees using the methods he and Defendant
Mitchell had devised for the agency "and offered suggestions to [CIA
OFFICER 1], the site manager, on the use of such techniques."   SSCI

COMPLAINT
Page | 70

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

Report 54.  After Defendant Jessen's departure, CIA interrogators continued to use many of those same methods on Mr. Rahman. "Rahman was placed back under the cold water by the guards at [CIA Officer 1]'s direction.  Rahman was so cold that he could barely utter his alias . . . the entire process lasted no more than 20 minutes.  It was intended to lower Rahman's resistance and was not for hygienic reasons.  At the conclusion of the shower, Rahman was moved to one of the four sleep deprivation cells where he was left shivering for hours or overnight with his hand chained over his head."  SSCI Report at 63 n.314.

163.   On November 19, 2002, CIA Officer 1 assessed Mr. Rahman as still uncooperative, and ordered him to be shackled in a painful stress position that required Mr. Rahman to kneel on the bare concrete floor of his cell with his hands chained above his head.  CIA Officer 1 also ordered Mr. Rahman to be stripped of his clothes, except for a sweatshirt, as punishment for a perceived lack of cooperation during an earlier torture session.  CIA Officer 1 ordered Mr. Rahman to be left partially nude and in a stress position overnight, when the temperatures were known to dip below 36 degrees Fahrenheit.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

164.   On November 20, 2002, guards found Mr. Rahman dead in his cell. An autopsy report and internal CIA review found that Mr. Rahman likely died from hypothermia caused "in part from being forced to sit on the bare concrete floor without pants," with the contributing factors of "dehydration, lack of food, and immobility due to 'short chaining.'" SSCI Report at 54–55 n. 272.

165.   The CIA and the CIA Office of the Inspector General completed reports on Mr. Rahman's death on January 28, 2003 and April 27, 2003, respectively.  Mr. Rahman's death was also examined by the CIA Inspector General in a report on the CIA's detention and interrogation activities from September 2001 to October 2003, dated May 7, 2004.  No one was held accountable for Mr. Rahman's death or the torture that caused it.

166.   In March 2003, CIA Officer 1 was recommended for a "cash award" for his "consistently superior work" and remained in charge of the COBALT facility until July 2003.  SSCI Report 55.

167.   The CIA covered up Mr. Rahman's death until 2010, when the Associated Press reported on the story.  Mr. Rahman's wife and four

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

daughters have never been officially notified of Mr. Rahman's death, nor has his body ever been returned to them for a dignified burial.

## VI.    CAUSES OF ACTION

### First Claim for Relief

### Alien Tort Statute: Torture and Other Cruel, Inhuman, and Degrading Treatment

168.    Defendants Mitchell and Jessen tortured Plaintiffs and subjected them to other forms of cruel, inhuman and degrading treatment under color of law in that they intentionally inflicted severe physical and mental pain or suffering on each of the Plaintiffs, for the purposes of obtaining information or a confession, punishing them, and/or intimidating or coercing them, and that they did so at the instigation of or with the consent or acquiescence of public officials or other persons acting in an official capacity.

169.    Defendants are directly liable because they designed, developed, and implemented a program for the CIA intended to inflict physical and mental pain and suffering on Plaintiffs, and because Plaintiffs were tortured and subjected to cruel, inhuman, and degrading treatment as a consequence of their inclusion in that program.

COMPLAINT
Page | 73

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

170.    Defendants are also liable because they conspired and/or acted together in a joint criminal enterprise with agents of the United States in Plaintiffs' torture and cruel, inhuman and degrading treatment. Defendants entered into an agreement with agents of the United States to design and implement a program of torture and cruel, inhuman, and degrading treatment for the CIA and Plaintiffs suffered severe physical and mental pain and suffering as a consequence of their inclusion in that program.  Defendants participated in or committed wrongful acts in furtherance of the conspiracy, resulting in injury to Plaintiffs.

171.    Defendants are also liable because they aided and abetted Plaintiffs' torture and cruel, inhuman, and degrading treatment by agents of the United States.  Defendants intended to cause Plaintiffs severe physical and mental pain and suffering.  Defendants controlled and profited from Plaintiffs' pain and suffering.  Torture and cruel, inhuman, and degrading treatment were an inextricable and purposeful component in every aspect of Defendants' program.  Defendants provided substantial practical assistance to agents of the United States, resulting in Plaintiffs' torture and cruel, inhuman, and degrading treatment.

COMPLAINT
Page | 74

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

172.   Defendants' acts and omissions caused Plaintiffs to suffer damages, including severe physical, mental, and emotional pain and suffering.

173.    Defendants' acts or omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Plaintiffs' rights under international and U.S. law and should be punished by an award of punitive damages in an amount to be determined at trial.

## Second Claim for Relief

## Alien Tort Statute: Non-Consensual Human Experimentation

174.   Defendants Mitchell and Jessen experimented on Plaintiffs under color of law and without Plaintiffs' consent.  Specifically, Plaintiffs were forced to be part of the test of Defendants' experimental theory that prisoners could be reduced through abusive treatment to a state of "learned helplessness" and thereby rendered passive, compliant, and unable to resist their interrogators' demands for information.  As part of this experiment, Defendants implemented an experimental protocol that required assessments of whether (1) prisoners had been tortured long enough to induce a state of "learned helplessness" or additional torture was necessary; (2) certain combinations and sequences of

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

torture techniques were most effective at overcoming "resistance"; and

(3) whether detainees became fully compliant with interrogators'

demands once they had been reduced to a state of learned helplessness.

175.    Defendants are directly liable because they experimented on Plaintiffs

by seeking to induce in them a state of "learned helplessness" to break

their will by means of torture and cruel, inhuman, and degrading

treatment.  Defendants monitored, recalibrated, and refined their

experiment based on their assessment of Plaintiffs' and other

prisoners' physical and psychological reactions to torture and cruel,

inhuman, and degrading treatment.

176.    Defendants are also liable because they conspired and/or acted

together in a joint criminal enterprise with agents of the United States

in conducting their experiments on Plaintiffs without their consent.

Defendants conspired with agents of the United States to experiment

on Plaintiffs by torturing and subjecting them to cruel, inhuman, and

degrading treatment and by monitoring, recalibrating, and refining

their experiment based on their assessment of Plaintiffs' and other

prisoners' physical and psychological reactions to their torture and

cruel, inhuman, and degrading treatment.  Defendants participated in

COMPLAINT
Page | 76

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

or committed wrongful acts in furtherance of said conspiracy and/or joint criminal enterprise, resulting in injury to Plaintiffs.

177.   Defendants are also liable because they aided and abetted agents of the United States to experiment on Plaintiffs without their consent. They controlled and directly profited from those experiments.  Non-consensual human experimentation was an inextricable and purposeful component in every aspect of Defendants' program.  Defendants provided substantial practical assistance to U.S. government officials in experimenting on Plaintiffs, resulting in Plaintiffs' becoming subjects of non-consensual human experimentation, and resulting in their physical pain and mental suffering, as a consequence.

178.   Defendants' acts and omissions caused Plaintiffs to suffer damages, including severe physical, mental, and emotional pain and suffering.

179.   Defendants' acts or omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and in conscious disregard for Plaintiffs' rights under international and U.S. law prohibiting non-consensual human experimentation and should be punished by an award of punitive damages in an amount to be determined at trial.

COMPLAINT
Page | 77

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

**Third Claim for Relief**

**Alien Tort Statute: War Crimes**

180.    Plaintiffs were subjected to war crimes of torture, cruel treatment and other "outrages upon personal dignity," and "medical and scientific experimentation" without their consent in the context of an international armed conflict.

181.     Mitchell and Jessen are directly liable for these war crimes. Defendants designed, developed, and implemented a program intended to inflict physical pain and mental suffering on Plaintiffs.  Plaintiffs were tortured and cruelly treated as a consequence of their inclusion in that program.  Defendants also experimented on Plaintiffs without their consent by attempting to induce in them a state of "learned helplessness" to break their wills by torturing and cruelly-treating them, and by monitoring, recalibrating, and refining their mistreatment based on their assessment of Plaintiffs' and other prisoners' physical and psychological reactions to torture and cruel treatment.

182.    Mitchell and Jessen are also liable because they conspired and/or entered into a joint criminal enterprise with agents of the United States in the commission of these war crimes: (1) *Torture and cruel*

COMPLAINT
Page | 78

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

*treatment*:  Defendants entered into an agreement with agents of the United States to design and implement a program for the CIA intended to inflict physical and mental suffering on Plaintiffs.  Plaintiffs were tortured and cruelly treated within that program.  Defendants participated in or committed wrongful acts in furtherance of said conspiracy and/or joint criminal enterprise, resulting in injury to Plaintiffs.  (2) *Non-consensual medical and scientific human experimentation*: Defendants conspired or entered into a joint criminal enterprise with agents of the United States to experiment on Plaintiffs without their consent by abusing them to induce a state of "learned helplessness."  Defendants and agents of the United States experimented on Plaintiffs by torturing and cruelly treating them, and monitoring and assessing their physical and psychological reactions to that torture and cruel treatment.  Defendants participated in or committed wrongful acts in furtherance of said conspiracy and/or joint criminal enterprise, resulting in injury to Plaintiffs.

183.   Defendants Mitchell and Jessen are also liable because they aided and abetted agents of the United States in the commission of these war crimes: (1) *Torture and cruel treatment*: Defendants intended to inflict

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

physical and mental pain and suffering on Plaintiffs.  They controlled and directly benefited from Plaintiffs' torture and cruel treatment.  Torture and cruelty were an inextricable and purposeful component in every aspect of the CIA's torture program.  Defendants' provided substantial practical assistance to agents of the U.S. government in carrying out that program, resulting in Plaintiffs' torture and cruel treatment.  (2) *Non-consensual medical and scientific human experimentation*: Defendants aided and abetted agents of the United States in experimenting on Plaintiffs without their consent.  They controlled and directly benefited from those experiments.  Non-consensual medical and scientific experimentation was an inextricable and purposeful component in every aspect of the CIA's torture program.  Mitchell and Jessen provided substantial practical assistance to U.S. government officials in experimenting on Plaintiffs resulting in Plaintiffs' being experimented on without their consent and their torture and cruel treatment.

184.    Defendants' acts and omissions described herein caused Plaintiffs to suffer damages, including severe physical, mental and emotional pain and suffering.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

185.    Defendants' acts or omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Plaintiffs' rights under international and U.S. law prohibiting war crimes and should be punished by an award of punitive damages in an amount to be determined at trial.

## VII.   REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

A. compensatory damages in an amount to be proven at trial, but in an amount over $75,000;

B. punitive and exemplary damages in an amount to be proven at trial;

C. reasonable attorneys' fees and costs of suit; and

D. such other relief as the Court deems just and proper.

## VIII.  JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184

1   Dated: October 13, 2015                    Respectfully submitted,

2                                               s/ La Rond Baker

3

4   Steven M. Watt (*pro hac vice*            La Rond Baker, WSBA No. 43610
    pending)                                  lbaker@aclu-wa.org
5   swatt@aclu.org                            AMERICAN CIVIL LIBERTIES
6   Dror Ladin (*pro hac vice* pending)       UNION OF WASHINGTON
    dladin@aclu.org                           FOUNDATION
7   Hina Shamsi (*pro hac vice* pending)      901 Fifth Avenue, Suite 630
8   hshamsi@aclu.org                          Seattle, WA 98164
    Jameel Jaffer (*pro hac vice* pending)    Phone: 206.624.2184
9   jjaffer@aclu.org
10  AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
11  125 Broad Street, 18th Floor
12  New York, New York 10004
    Phone: 212-519-7870
13

14
    Paul Hoffman (*pro hac vice*
15  pending)
16  Hoffpaul@aol.com
    Schonbrun Seplow Harris &
17  Hoffman, LLP
18  723 Ocean Front Walk, Suite 100
    Venice, CA 90291
19  Phone: 310-396-0731

20

21

22

23

24

25

26

COMPLAINT
Page | 82

AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 Fifth Ave, Suite 630
Seattle, WA 98164
(206) 624-2184