1

2                    UNITED STATES DISTRICT COURT

3                    EASTERN DISTRICT OF WASHINGTON

4

5   SULEIMAN ABDULLAH SALIM, et al.,    )
                                        )
6                                       )   No.  CV-15-0286-JLQ
              Plaintiffs,               )
7                                       )   MEMORANDUM OPINION
                                        )   AND ORDER DENYING
8                vs.                    )   MOTION TO DISMISS
                                        )
9                                       )
    JAMES E. MITCHELL and JOHN          )
10  JESSEN,                             )
                                        )
11            Defendants.               )
    _____ )

12

13       BEFORE THE COURT is Defendants' Motion to Dismiss (ECF No. 27), which

14   seeks dismissal of the action with prejudice.  Response and Reply briefs have been filed

15   and considered.   Oral argument was held on April 22, 2016.   James Smith, Henry

16   Schuelke, III, and Christopher Tompkins appeared for Defendants James Mitchell and

17   John Jessen, with Mr. Smith taking the lead on argument.  Hina Shamsi, La Rond Baker,

18   Steven Watt, and Dror Ladin appeared for Plaintiffs Suleiman Abdullah Salim, Mohamed

19   Ahmed Ben Soud, and Obaid Ullah, with Mr. Ladin taking the lead on argument.  The

20   court issued its oral ruling denying the Motion to Dismiss.  This Opinion memorializes

21   and supplements the court's oral ruling.

22       **I. Introduction and Factual Background**

23       The Complaint in this matter alleges Plaintiffs Suleiman Abdullah Salim ("Salim"),

24   Mohamed Ahmed Ben Soud ("Soud"), and Obaid Ullah ("Ullah")[1](collectively herein

25   _____

26       [1]Ullah is the personal representative of the Estate of Gul Rahman who allegedly "died as a result

27   of hypothermia caused by his exposure to extreme cold, exacerbated by dehydration, lack of food, and

28   his immobility in a stress position." (Complaint ¶ 3).

    ORDER - 1

Plaintiffs) were the victims of psychological and physical torture. Plaintiffs are all foreign citizens and bring these claims pursuant to the Alien Tort Statute, 28 U.S.C. § 1350 (hereafter "ATS"). As this is review of a motion to dismiss under Fed.R.Civ.P. 12, the factual allegations are taken as true, unless they do not pass the plausibility standard of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The court's recitation of the alleged facts are taken solely from Plaintiffs' Complaint and do not constitute findings of fact by this court. Plaintiffs allege the Defendants, James Mitchell and John Jessen, "are psychologists who designed, implemented, and personally administered an experimental torture program for the U.S. Central Intelligence Agency." (Complaint, ¶ 1).

**A. Allegations of Mr. Salim**

Plaintiff Salim is a Tanzanian citizen who was captured by the CIA and Kenyan Security Forces in Somalia in March, 2003, where he was working as a trader and fisherman. He was transferred to official U.S. Government sites in Afghanistan and held there for a total of sixteen months. In July 2004, he was transferred to Bagram Air Force Base in Afghanistan and held in custody there for an additional four years, until being released in August 2008. (Complaint ¶ 9). Mr. Salim alleges he was subjected to numerous coercive methods, including: prolonged sleep deprivation, walling, stress positions, facial slaps, abdominal slaps, dietary manipulation, facial holds, and cramped confinement. (*Id*. at ¶ 74). He also claims he was subjected to prolonged nudity and "water dousing that approximated waterboarding."(*Id*.). The conditions of his confinement are pled with great specificity, including that he was kept in a dark, frigid cell, "continually chained to the wall" in a stress position in which the "only position he could adopt was a squatting position that very quickly became uncomfortable and extremely painful" and was fed a meager meal of "a small chunk of bread in a watery broth–only once every other day." (*Id*. at ¶ 79-82).

The allegations of ongoing torture are also pled with great specificity. (Complaint

ORDER - 2

¶¶ 71-116).  By way of brief example, the following:  Mr. Salim alleges being stripped naked and then placed, cuffed and shackled on the center of a large plastic sheet where, he alleges, he was repeatedly doused with ice-cold water and kicked and slapped in the stomach and face.  After 20 to 30 minutes of dousing, he was then rolled up in the plastic sheet and "left to shiver violently in the cold for some 10 or 15 minutes." (*Id.* at ¶ 88). He claims he was forced naked into "a small wooden box, measuring about three square feet", which was locked with a padlock.  Inside, the box smelled "rancid" and he "vomited in pain and fear" while locked inside the box. (*Id.* at ¶ 91-92).

Mr. Salim claims after two or three weeks of these "aggressive" methods he was assessed by his interrogators to be "broken" and "cooperative." (*Id.* at ¶ 104). Mr. Salim occasionally met with people he believed to be health care providers and received treatment.  He was given a polygraph test. (*Id.* at ¶ 105).  Shortly thereafter, he claims he was given "three very painful injections in his arm", against his will.  He states he does not know what happened after his face went numb and he fell asleep/lost consciousness. (*Id.* at ¶ 106).  After some four or five weeks in custody, he alleges he attempted to kill himself by taking pain pills. (*Id.* at ¶ 107).

Shortly after the suicide attempt, Mr. Salim was transferred by CIA personnel to another site in Afghanistan he states was known as the "Salt Pit" and  remained there for 14 months, often in solitary confinement. (*Id.* at ¶ 109).  Thereafter he was transferred to Bagram Air Force Base, where he was detained for four years, in a small cage in a "hangar-type building" with constant illumination.  He was never allowed outside. (*Id.* at ¶ 111).  After being released Mr. Salim contends he continues to suffer repercussions from the torture: debilitating pain in his jaw and teeth; pain in his back, shoulders, and legs; frequent nightmares/flashbacks; and other symptoms of post-traumatic stress disorder (PTSD). (*Id.* at ¶ 115-116).

## B.  Allegations of Mr. Soud

Mr. Soud is a Libyan citizen, who allegedly fled Libya fearing prosecution from

the Gadaffi regime and went to Pakistan, where in 2003 his home was raided by U.S. and Pakistani forces. (Complaint at ¶ 117-18).  During the raid, he states he was shot which shattered a bone in his left leg.  He claims he was detained, interrogated, and abused for two weeks after the raid by Pakistani and U.S. officials. (*Id*. at ¶ 119).  He denied any knowledge of terrorism plans against the U.S. or any connection to al-Qa'ida.  He alleges he was then told he was not being cooperative and transported to COBALT[2].  He alleges he was subjected to several of the same interrogation techniques as Mr. Salim, including: prolonged sleep deprivation, stress positions, walling, being slapped, dietary manipulation, facial holds, cramped confinement, and a form of waterboarding. (*Id*. at ¶ 121).  Mr. Soud claims that after he arrived at COBALT he was told "he was a prisoner of the CIA, that human rights ended on September 11, and that no laws applied in prison." (*Id*. at ¶ 124).

At COBALT, Mr. Soud was "kept naked for more than a month" and he was not allowed to wash for five months. (*Id*. at ¶ 127-28).  Mr. Soud alleges he was given meager meals of poor nutritional quality and during his year-long detention at COBALT his weight fell from 187 to 139 pounds. (*Id*. at ¶ 129).  He additionally claims to have been subjected to prolonged sleep deprivation which "drove him close to madness". (*Id*. at ¶ 131).  He alleges about two weeks after he arrived at COBALT the "torture increased in severity" and moved into an "aggressive phase" that lasted four to five weeks. (*Id*. at ¶ 133-34).   He alleges he was subjected to "walling" where a foam collar was placed around his neck, and he was then thrown into a wooden wall, while also being slapped in the face and stomach. (*Id*. at ¶ 137-38).  Similar to Mr. Salim, he describes being doused in ice water while on a plastic sheet.  These methods of interrogation allegedly lasted for approximately two weeks, until another interrogation team took over.

Mr. Soud alleges the new interrogation team increased the severity of the physical beatings. (*Id*. at ¶ 142).  He states he was also subjected to two different confinement

---

[2]COBALT is alleged to be a CIA prison in Afghanistan. (Complaint ¶ 9).

ORDER - 4

boxes.  After two to three weeks, the second interrogation team found Mr. Soud to be "broken" and "cooperative" and stopped the aggressive interrogation tactics.  Mr. Soud was held by the U.S. Government, often in solitary confinement, until August 22, 2004 when he was turned over to the Libyan Government.  In Libya, Mr. Soud was sentenced to life imprisonment, but was released in 2011 after the overthrow of the Gaddafi regime. (*Id*. at ¶ 153).   Mr. Soud alleges he "continues to suffer both physically and psychologically from the tortures he endured" while in the custody of the U.S. Government. (*Id*. at ¶ 154).

### C.  Allegations of Gul Rahman

Gul Rahman was born in Afghanistan.  In October 2002, Mr. Rahman was living in Pakistan where we was detained by a joint U.S./Pakistani operation.  Plaintiff alleges that in November 2002, "Defendant Jessen conducted a psychological evaluation of Mr. Rahman at COBALT." (Complaint at ¶ 160).  Defendant Jessen allegedly concluded Mr. Rahman was resistant and further torture would be required to break his will.  It is alleged Defendant Jessen "directly participated in the more aggressive phase" of Mr. Rahman's interrogation and "tortured" him. (*Id*.)

After Mr. Jessen left COBALT, the interrogation of Mr. Rahman allegedly continued, using techniques such as: slaps, stress positions, dietary manipulation, sleep deprivation, prolonged nudity, and water dousing.  On November 19, 2002, Mr. Rahman was chained, partially nude, in a stress position, with temperatures in the 30s.  The next morning he was found dead.  The autopsy report listed the likely cause of death as hypothermia, with contributing factors of dehydration, lack of food, and "immobility due to short chaining." (*Id*. at ¶ 164).

Plaintiffs allege Mr. Rahman's death was investigated by the CIA and included in a CIA Inspector General Report in 2004, but no one was held accountable.  Plaintiffs allege Mr. Rahman's death was concealed from the public until 2010. (*Id*. at 165-167).

ORDER - 5

### D.  Alleged Conduct and Involvement of Defendants

Defendant James Mitchell is a U.S. citizen and a psychologist.  He was the chief psychologist at the Survival, Evasion, Resistance, and Escape ("SERE") training program at Fairchild Air Force Base near Spokane, Washington.  From 2001 to 2005 he "worked as an independent contractor for the CIA", and from 2005 to 2009 worked at Mitchell, Jessen & Associates in Spokane, Washington, and continued to work under contract with the CIA. (Complaint at ¶ 12).  Defendant John "Bruce" Jessen is also a psychologist, U.S. citizen, and worked under contract with the CIA and at Mitchell, Jessen & Associates in Spokane, Washington. (*Id*. at ¶ 13).

Plaintiffs allege Defendants began working with the CIA in December 2001. Defendants allegedly produced a "white paper" for the CIA entitled: "Recognizing and Developing Countermeasures to Al-Qa'ida Resistance to Interrogation Techniques: A Resistance Training Perspective." (*Id*. at ¶ 24).  The paper allegedly proposed countermeasures that could be employed to defeat resistance to interrogations, and according to Plaintiffs "justified the use of torture and other forms of cruel, inhuman, and degrading treatment." (*Id*. at ¶ 25).  The paper allegedly described a theory of "learned helplessness".

In March 2002, U.S. authorities captured Abu Zubaydah and Defendant Mitchell was allegedly contacted to provide "real-time recommendations to overcome Zubaydah's resistance to interrogation." (*Id*. at ¶ 32).  Mitchell allegedly encouraged the CIA to develop the learned helplessness techniques. (*Id*.)  In April 2002, "CIA Headquarters sent Mitchell to GREEN [a CIA black-site prison] to consult on the psychological aspects of Abu Zubaydah's interrogation." (*Id*. at ¶ 34).  Allegedly there was a dispute between the CIA and FBI as to whether Zubaydah should be tortured, and control of the interrogation was transferred to the CIA and led by Mitchell. (*Id*. at ¶ 35-37).  In July 2002, the CIA and Mitchell believed Zubaydah was being "uncooperative" and decided to pursue a more "aggressive" phase of interrogation, and contracted with Defendant Jessen to assist

ORDER - 6

Mitchell. (*Id*. at ¶ 41-42).   The Complaint alleges Jessen and Mitchell proposed 12 coercive methods, and the CIA agreed to propose 11 of them to the Attorney General. On July 24, 2002, the Attorney General allegedly verbally approved all of the proposed methods except waterboarding. (*Id*. at ¶ 43-44).   Defendants argued waterboarding was a convincing technique and necessary, and the Attorney General approved it on July 26, 2002.   Plaintiffs allege  Defendants "personally conducted or oversaw" aspects of Zubaydah's interrogation, including physically assaulting him, forcing him into confinement boxes, and waterboarding. (*Id*. at ¶ 46-48).

Plaintiffs claim Defendants pronounced the interrogation of Zubaydah a "success" and recommended the CIA use the aggressive coercion methods for future high value captives. (*Id*. at ¶ 55-56).   Defendants then allegedly devised the program of CIA "enhanced interrogation techniques" including "designing instruments of torture such as confinement boxes". (*Id*. at ¶ 57).   Defendants "trained and supervised CIA personnel in applying their phased torture program". (*Id*. at ¶ 62).     Plaintiffs allege that "together with the CIA, Defendants supervised and oversaw" the program including assessing: 1) whether prisoners had been tortured long enough to induce "learned helplessness"; 2) what combinations and sequences of torture were most effective; and 3) had the prisoners become fully compliant. (*Id*. at ¶ 63).   Plaintiffs allege the CIA has since concluded that Defendants should not have assessed the effectiveness of the techniques, because Defendants had designed the techniques and had a financial conflict of interest in the continuation of the interrogation program. (*Id*. at ¶ 64).   Plaintiffs contend that between 2001 and 2010, Defendants, and the company they formed, Mitchell, Jessen, & Associates, were paid over $80 million to provide "security teams for renditions, interrogators, facilities, training, operational psychologists, de-briefers, and security personnel at all CIA detention sites." (*Id*. at ¶ 65-68).

## II.  Standard of Review

Defendants bring their Motion pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).

ORDER - 7

Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain statement of the claim showing the pleader is entitled to relief."  This rule does not require "detailed factual allegations" but does require more than labels and conclusions. *Twombly*, 550 U.S. at 555.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 677.

As to the jurisdictional challenge under Rule 12(b)(1), Defendants argue they can "challenge the sufficiency of the pleadings to establish jurisdiction (facial attack), or a lack of any factual support for subject matter jurisdiction despite the pleading's sufficiency (factual attack)". (ECF No. 27, p. 2).  A factual attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  If a defendant raises a factual attack on subject matter jurisdiction, a plaintiff must then support jurisdictional allegations with competent proof. *Id.*  Defendants have presented no evidence outside the pleadings to support a "factual attack."  Therefore, the court reviews this matter as a facial attack, accepting the Plaintiffs' allegations as true and drawing all reasonable inferences in the Plaintiffs' favor and determining if those allegations are sufficient to invoke the court's jurisdiction. *Id.*

## III.  Discussion

Defendants raise four primary arguments in support of dismissal: 1) the court lacks jurisdiction due to the Political Question Doctrine; 2) Defendants are entitled to derivative sovereign immunity; 3) the Alien Tort Statute does not confer jurisdiction over Plaintiffs' claims; and 4) Plaintiff Obaid Ullah lacks the capacity to sue.  Plaintiffs contest all these arguments in their Response (ECF No. 28).

### A.  Political Question Doctrine

Defendants argue the case is not justiciable due to the Political Question Doctrine and claim Plaintiffs seek review of "foreign policy" choices.  Defendants argue there are

ORDER - 8

not "judicially manageable standards" and that there is no clear definition of torture. (ECF No. 27, p. 7).  Plaintiffs rebut this argument and claim  prisoner abuse and torture are not unreviewable political decisions, and argue prior case law demonstrates such are justiciable.

Executive branch decisions are not immune from judicial review. See for example *N.L.R.B. v. Noel Canning*, 134 S.Ct. 2550 (2014)(holding the President lacked the power to make the recess appointments at issue in the case).  "Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *Alperin v. Vatican Bank*, 410 F.3d 532, 539 (9th Cir. 2005).  The Supreme Court set forth its most detailed discussion of the political question doctrine in *Baker v. Carr*, 369 U.S. 186, 217 (1962), wherein the Court articulated six considerations: 1) is there a textually demonstrable constitutional commitment of the issue to a coordinate political department; 2) a lack of judicially discoverable and manageable standards for resolving the case; 3) the impossibility of deciding the case without an initial policy determination of the kind clearly for nonjudicial discretion; 4) the impossibility of the court undertaking independent resolution without expressing lack of respect for coordinate branches of government; 5) an unusual need for unquestioning adherence to a political decision already made; or 6) potentiality of embarrassment from multifarious pronouncements by various departments on one question.

These six factors have been described as "formulations" and "six independent tests," yet there is often overlap. *Alperin*, 410 F.3d at 544.  In the arena of foreign affairs, the Supreme Court has "cautioned against sweeping statements that imply all questions involving foreign relations are political ones." *Id.* at 544-45 citing *Baker v. Carr*. Defendants argue the Constitution commits decisions involving war and foreign policy to the Executive and Legislative branches.  However, Defendants' argument sweeps too broadly, and the Supreme Court has stated, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369

U.S. at 211.  The Ninth Circuit has stated: "The Supreme Court has made clear that the federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians." *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992).

Defendants also argue no judicially manageable standards apply and contend there is no clear definition of "torture".  This argument is rejected.  Courts are well-equipped to construe the meaning of terms and do so frequently.  Congress passed the Torture Victims Protection Act in 1991, and the TVPA contains a definition of "torture".  Other statutes also define "torture". See for example 18 U.S.C. 2340 ("torture" means an act committed by a person acting under color of law specifically intended to inflict severe physical or mental pain or suffering..."); 18 U.S.C. § 2241(d)(1)(A)(defining "torture" under the War Crimes Act).  Thus, it cannot credibly be argued that no judicially manageable standards exist to adjudicate a case involving allegations of "torture".  Nor is the adjudication of cases involving "torture" a relatively recent development. See *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2nd Cir. 1980)("We conclude that official torture is now prohibited by the law of nations.  The prohibition is clear and unambiguous, and admits of no distinction between treatment of aliens and citizens.").  The Ninth Circuit has stated "the unconstitutionality of torturing a United States citizen was beyond debate by 2001." *Padilla v. Yoo*, 678 F.3d 748, 763 (9th Cir. 2012).  In *Chowdhury v. Worldtel Bangladesh Holding*, 746 F.3d 42, 51 (2nd Cir. 2014), the court concluded that administering electric shocks for the purpose of coercion met the definition of "torture".  The inquiry under the second *Baker* factor is not "whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint," but rather whether the courts "have the legal tools to reach a ruling that is principled, rational, and based upon reasoned distinctions." *Alperin*, 410 F.3d at 552.

Defendants further argue the remaining four *Baker* factors support this court

ORDER - 10

declining jurisdiction based on the Political Question Doctrine. The argument submitted as to those four factors is brief. The Defendants' arguments as to the remaining *Baker* factors is limited. Plaintiffs have not addressed it in their Response. This focus on the first two factors is not surprising. See *Alperin*, 410 F.3d at 545 ("The *Vieth* plurality's observation that the *Baker* tests 'are probably listed in descending order of both importance and certainty,' 124 S.Ct. at 1776, is borne out by the disproportionate emphasis on the first two tests in both Supreme Court and lower court cases.").

Some courts apply a different variation of the *Baker* factors, in cases such as this, that include Government contractor defendants. The Fourth Circuit has stated it has "distilled the six Baker factors into two critical components: 1) whether the government contractor was under the 'plenary' or 'direct' control of the military; and 2) whether national defense interests were 'closely intertwined' with military decisions governing the contractor's conduct, such that a decision on the merits of the claim would require the judiciary to question actual, sensitive judgments made by the military." *Al Shimari v. CACI Premier Technology*, 758 F.3d 516, 533-34 (4th Cir. 2014). The Fourth Circuit's test requires a court to "look beyond the complaint" and consider "facts developed through discovery or otherwise made a part of the record in the case." *Id*. at 534. No discovery has yet been conducted in this case.

In Reply (ECF No. 29), Defendants rely heavily on the District Court opinion from the Eastern District of Virginia, *Al Shimari v. CACI Premier Technology*, 119 F.Supp.3d 434 (E.D.Va. 2015), where the court dismissed the action based on the political question doctrine. Although the parties agree *Al Shimari* is relevant, and Plaintiffs cite the Fourth Circuit opinion, as discussed *infra*, in regard to ATS jurisdiction, the District Court's opinion is not controlling authority. The case is currently on appeal to the Fourth Circuit. Furthermore, the *Al Shimari* case sits in a very different procedural posture, with the District Court having made its decision after seven years of litigation and "based on the discoverable evidence presented." *Id.* at 438. In contrast, this Motion to Dismiss seeks

ORDER - 11

dismissal on the pleadings, when no discovery has taken place.

The court finds the very decisions cited in the briefing on the political question issue are contrary to Defendants' argument. The Ninth Circuit has already adjudicated a case involving the several year detention of an American citizen, allegedly "held incommunicado in military detention, subjected to coercive interrogation techniques and detained under harsh conditions." The Defendant was a Deputy Assistant Attorney General with the Department of Justice. See *Padilla v. Yoo*, 678 F.3d 748 (9th Cir. 2012). The Supreme Court found it had jurisdiction to "consider challenges to the legality of detention of foreign nationals captured abroad in connection with hostilities and incarcerated at the Guantanamo Bay Naval Base." See *Rasul v. Bush*, 542 U.S. 466 (2004). Much closer in time to the events of September 11, 2001, the courts of this country have adjudicated cases involving Executive and Legislative branch actions taken in response to those attacks. See for example *Hamdi v. Rumsfeld*, 542 U.S. 507, 509 (2004)("At this difficult time in our Nation's history, we are called upon to consider the legality of the Government's detention of a United States citizen on United States soil as an 'enemy combatant' ... We hold that although Congress authorized the detention of combatants in the narrow circumstances alleged here, due process demands that a citizen held in the United States as an enemy combatant be given a meaningful opportunity to contest the factual basis for that detention before a neutral decisionmaker."). The Ninth Circuit has stated that a "claim of military necessity will not, without more, shield governmental operations from judicial review." *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992). The court further stated, "this is true in time of war as well as in time of peace, and with respect to claims by enemy civilians as well as by Americans." *Id*. at 1332. Although application of the political question doctrine is case-specific, the cases cited demonstrate the present fallacy of Defendants' argument that the court must decline jurisdiction because the case falls within the realm of war and foreign policy.

The court does not find, based on the current record, that the *Baker* factors require

ORDER - 12

the court to decline jurisdiction based on the political question doctrine.  Defendants'
Motion to Dismiss on political question grounds is **DENIED**.

### B.  Derivative Sovereign Immunity

Defendants claim private citizens and contractors who are performing work on the
Government's behalf are immune from suit under the doctrine of derivative sovereign
immunity.  Defendants argue Plaintiffs claim Defendants acted pursuant to contract with
the CIA and Plaintiffs cannot "allege that the authority conferred upon Defendants
pursuant to their contracts with the CIA was improperly conferred or that Defendants
exceeded this authority." (ECF No. 27, p. 14).  Defendants also contend in their Motion
to Dismiss that the Ninth Circuit's decision in *Gomez v. Campbell-Ewald*, 768 F.3d 871
(9th Cir. 2014) was wrongly decided.  However, after the Motion was filed, the *Gomez*
decision was affirmed by the Supreme Court, *infra*.

Plaintiffs, in their Response, rely on the Supreme Court's recent decision in
*Campbell-Ewald v. Gomez*, 136 S.Ct. 663 (Jan. 20, 2016), wherein the Supreme Court
framed the question as: "Do federal contractors share the Government's unqualified
immunity from liability and litigation?" *Id*. at 672.  The Court answered the question
quite succinctly and definitively: "We hold they do not." *Id*.  Plaintiffs further argue the
Government may not immunize illegal acts by delegating them to private parties.
Plaintiffs argue the Executive could not lawfully authorize torture and abuse, and
therefore immunity does not shield the Defendants.   Additionally, Plaintiffs argue
Defendants are not entitled to derivative immunity under *Filarsky v. Delia*, 132 S.Ct.
1657 (2012) because psychologists were not traditionally entitled to immunity at common
law and Defendants violated clearly established rights. (ECF No. 28, p. 16).

Government contractor immunity "unlike the sovereign's, is not absolute."
*Campbell-Ewald*, 136 S.Ct. at 672.  An inquiry is required into whether the contractor
"exceeded his authority," or whether the governmental authority "was not validly
conferred." *Id*. at 673.  In either of those circumstances, the contractor could be liable.

ORDER - 13

It is too early in this action, where no discovery has been conducted, to make a qualified immunity determination. As the Supreme Court instructed in *Campbell-Ewald*, "at the pretrial state of litigation, we construe the record in a light favorable to the party seeking to avoid summary disposition." *Id*. Plaintiffs' allegations are not merely that Defendants Mitchell and Jessen acted specifically at the direction of the Government, but rather that they designed and implemented an experimental torture program. (ECF No. 1, ¶ 20). Plaintiffs allege it was Defendants who proposed the "pseudoscientific theory" of "learned helplessness." (*Id*. at ¶ 25). Plaintiffs allege, "Defendants helped convince Justice Department lawyers to authorize specific coercive methods" and argued to the Attorney General for the use of waterboarding as "an absolutely convincing technique." (*Id*. at ¶ 43-44). It is also alleged Jessen and Mitchell personally participated in the torture of Abu Zubaydah, including waterboarding. (*Id*. at ¶ 46-52).

Rather than merely acting at the direction of Government personnel, it is alleged "Defendants trained and supervised CIA personnel in applying their phased torture program." (*Id*. at ¶ 62). Plaintiffs allege Defendants operated under a conflict of interest where Defendants were allowed to judge the effectiveness of the interrogation methods when they had a financial interest in the program continuing. (*Id*. at ¶ 64). It is alleged Defendants ultimately were paid over $80 million for their efforts. (*Id*. at ¶ 68). Given the allegations of the Complaint, which must be accepted as true at this stage in the litigation, the court cannot conclude Defendants Mitchell and Jessen merely acted at the direction of the Government, within the scope of their authority, and that such authority was legally and validly conferred. See also *Cabalce v. Thomas E. Blanchard & Associates*, 797 F.3d 720, 732 (9th Cir. 2015)("We have held that derivative sovereign immunity ... is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'").

Defendants' Motion to Dismiss on the basis of derivative sovereign immunity is **DENIED**.

ORDER - 14

### C.  Alien Tort Statute

Defendants contend Plaintiffs' allegations do not overcome the presumption against extraterritorial application of the Alien Tort Statute, 28 U.S.C. § 1350, ("ATS") as set forth by the Supreme Court in *Kiobel v. Royal Dutch Petroleum*, 133 S.Ct. 1659 (2013).  Defendants claim Plaintiffs have failed to plead sufficient facts to demonstrate their actions "touch and concern" the territory of the United States.

Plaintiffs counter that although the alleged "injuries were sustained abroad, virtually every fact underpinning their claims is connected to the United States." (ECF No. 28, p. 20).  Plaintiffs rely on *Al Shimari v. CACI Premier Tech, Inc.*, 758 F.3d 516 (4th Cir. 2014), which they contend is the "most closely analogous" case.  Paragraph 18 of the Complaint contains several allegations which Plaintiffs contend demonstrate the claims herein "touch and concern" the United States.  Plaintiffs allege:

- Defendants are U.S. citizens;

- Defendants are domiciled in the U.S.;

- Defendants devised the torture plan in the U.S.;

- Defendants supervised the plan's implementation from the U.S. and pursuant to contracts they executed with the CIA in the U.S.; and

- Plaintiffs were subjected to the interrogation methods while in the custody and control of the CIA in detention facilities operated by the U.S. government.

(ECF 1, ¶ 18).

The Ninth Circuit has recognized the Supreme Court in *Kiobel v. Royal Dutch Petroleum*, 133 S.Ct. 1659 (2013), did not delineate the "touch and concern" test with a great deal of specificity.  In *Mugica v. AirScan Inc.*, 771 F.3d 580 (9th Cir. 2014), the court stated: "Admittedly, *Kiobel* (quite purposely) did not enumerate the specific kinds of connections to the United States that could establish that ATS claims 'touch and concern' this country." *Id*. at 594.  The court recognized a defendant's U.S. citizenship is an appropriate factor to consider, but that a plaintiff cannot bring an action based solely

ORDER - 15

on extraterritorial conduct merely because the defendant is a U.S. national.  *Mugica* is factually distinguishable from the case at bar.  In *Mugica*, the plaintiffs were Colombian citizens who brought suit in California arising out of the bombing of a Colombian village by members of the Colombian Air Force.  *Id*. at 584.  Plaintiffs sued two U.S.-headquartered corporations for their alleged complicity in the bombing.  The *Mugica* majority decision dismissed the claim on the basis that the 'touch and concern' test was not met by the mere allegation that the defendants were United States corporations.

This case, as Plaintiffs contend, bears more similarity to *Al Shimari v. CACI Premier Technology*, 758 F.3d 516 (4th Cir. 2014).  In *Al Shimari*, four foreign citizens brought claims against a U.S. corporation that was a military contractor alleging they were tortured during their detention at Abu Ghraib.  The Fourth Circuit found important that the claims involved the performance of a contract executed by a U.S. corporation with the U.S. Government.  Also, the court considered the defendant was headquartered in Virginia, the alleged torture occurred at a U.S. military facility, defendant hired employees in the U.S. to perform the contract, and defendant collected payments by mailing invoices to a government office in Colorado.  *Id.* at 528-29.

In the present case, the two individual Defendants are U.S. citizens.  The Defendants ran a company, located in Spokane, Washington, that allegedly employed 55 to 60 people to assist with the enhanced interrogation program at CIA detention sites. (Complaint ¶ 67).  Plaintiffs allege Defendants devised and supervised the interrogation program from the United States.  Plaintiffs claim Defendants executed contracts with the CIA in the United States.  Although the court has not seen the alleged contracts, it is certainly plausible that a company located in the United States and the CIA, a U.S. agency, executed a contract in the United States.  Similarly, as Mitchell, Jessen, & Associates was located in Spokane, Washington, it is also plausible that, as alleged, work on the interrogation program was performed from the United States.  Plaintiffs' allegations are sufficient to overcome the presumption against extraterritorial application

ORDER - 16

of the ATS.

Defendants also argue Plaintiffs fail to state a claim for relief under the ATS. The Supreme Court has stated that although the ATS is primarily jurisdictional, "we think that at the time of enactment the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). The Court further stated that lower courts "should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with specificity comparable to the features of the 18th-century paradigms we have recognized." *Id*. at 725. It is recognized torture violates the law of nations. See *Filartiga*, 630 F.2d at 878 (2nd Cir. 1980)("we hold that deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties.")

The majority opinion of the Supreme Court in *Kiobel* addressed only jurisdiction, and not whether plaintiffs stated a claim. 133 S.Ct. at 1664 ("The question here is not whether petitioners have stated a proper claim under the ATS, but whether a claim may reach conduct occurring in the territory of a foreign sovereign."). However, Justice Breyer, in concurrence and joined by Justices Ginsburg, Sotomayor, and Kagan clearly found the ATS reached acts of torture:

> We should treat this Nation's interest in not becoming a safe harbor for violators of the most fundamental international norms as an important jurisdiction-related interest justifying application of the ATS in light of the statute's basic purposes–in particular that of compensating those who have suffered harm at the hands of, e.g., torturers or other modern pirates. Nothing in this statute or its history suggests that our courts should turn a blind eye to the plight of victims in that "handful of heinous actions. *Id*. at 674.

By analogy to piracy, which was covered by the ATS at the time of its enactment, it is clear the four concurring Justices believed that those who commit torture fall within the reach of the ATS, both as to jurisdiction and substantively.

ORDER - 17

Plaintiffs have sufficiently alleged the acts of Defendants "touch and concern" the United States, such as to rebut the presumption against extraterritorial application of the ATS.   Plaintiffs have further alleged that the Defendants engaged in torture, and substantively state a claim under the ATS.  Defendants' Motion to Dismiss for lack of jurisdiction and failure to state a claim under the ATS is **DENIED**.

### D.  Capacity of Obaid Ullah

Defendants contend that capacity to sue is determined by state law, and  under Washington law, a personal representative must be appointed by a court.  Defendants argue the allegation that Mr. Ullah is the personal representative of Mr. Rahman (ECF No. 1, ¶ 11) is insufficient.  Plaintiffs respond they are not required to plead the facts supporting legal capacity, and  in any event, Mr. Ullah is the court appointed personal representative.  Plaintiffs have submitted an Order from the Spokane County Superior Court, dated September 24, 2015 (before this action was commenced), demonstrating that Mr. Ullah was appointed as personal representative of Mr. Rahman's estate. (ECF No. 28-1).  Defendants Motion to Dismiss Mr. Ullah for lack of capacity is **DENIED**.

### IV.  Conclusion

Defendants' Motion to Dismiss asks the court to dismiss the action, with prejudice, based solely on the allegations in the Complaint.  No discovery has taken place, and the court has been presented with no materials outside the pleadings.  Taking the well-pleaded factual allegations as true, and for the reasons stated herein, the Motion to Dismiss is denied.

**IT IS HEREBY ORDERED:**

1. Defendants' Motion to Dismiss (ECF No. 27) is **DENIED**.

2. The court discussed with counsel for the parties and with Department of Justice attorney Andrew Warden the discovery process in this matter.  The parties have agreed to discuss further a proposed discovery plan and to submit that plan to the court.  The proposed plan concerning both the procedure for discovery and scope shall be submitted

ORDER - 18

1    **no later than May 23, 2016**.

2         **IT IS SO ORDERED**.  The Clerk shall enter this Order and furnish copies to

3    counsel.

4         Dated this 28th day of April, 2016.

5                              s/ Justin L. Quackenbush
                         JUSTIN L. QUACKENBUSH
6               SENIOR UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   ORDER - 19