**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**
**AT SPOKANE**

SULEIMAN ABDULLAH SALIM, et al.,

Plaintiffs,

vs.

JAMES E. MITCHELL and JOHN JESSEN,

Defendants.

NO. 2:15-cv-286-JLQ

**DECLARATION OF JOHN RIZZO**

I, John Rizzo, hereby declare under penalty of perjury in accordance with the laws of the State of Washington, that the following is true and correct and within my personal knowledge and belief to the best of my recollection, and while I have no specific recollection of all the exhibits, I have no reason to dispute their accuracy or authenticity:

**A. BACKGROUND**

1. I am over the age of 18, have personal knowledge of all facts contained in this declaration, and am competent to testify as a witness to those facts.

2. I spent 34 years working in the Office of General Counsel at the United States Central Intelligence Agency ("CIA"). From November 2001 until October 2002 and from July 2004 until October 2009, I served as the Chief Legal Officer for the CIA. From October 2002 until July 2004, I served as Senior Deputy General Counsel for the CIA.

3. I was involved in drafting the Memorandum of Notification ("MON") that President George W. Bush signed on September 17, 2001.

4. The MON authorized the CIA to "undertake operations designed to capture and detain persons who pose a continuing, serious threat of violence or death to U.S. persons and interests or who are planning terrorist activities."

5. In response to the MON, attorneys for the CIA's Counterterrorism Center ("CTC") drafted memoranda on the parameters of legally permissible interrogation techniques.

6. Also pursuant to the MON, the CIA began building secret detention facilities referred to as "black-sites." Certain of these black-sites existed by early 2002.

7. In late March 2002, the CIA captured the first detainee that it classified as a "high-value" detainee ("HVD"), Abu Zubaydah ("Zubaydah").

8. At the time of his capture in Pakistan, Zubaydah was a senior lieutenant of Usama Bin Ladin and was extensively involved in al Qa'ida's operational planning. He had previously served as an al Qa'ida external liaison and logistics coordinator.

**B. PROPOSAL REGARDING INTERROGATION TECHNIQUES**

9. In early April 2002, I was approached by CTC personnel and CTC attorneys. They explained that the CTC had devised an interrogation plan for Zubaydah that contemplated use of certain nontraditional interrogation techniques. The interrogation plan that was described is memorialized in the cable attached hereto as **Exhibit A**.

10. I was told that these techniques were designed to disorient Zubaydah by rendering him unconscious through sedation, shaving his face and scalp and transferring him to an interrogation site. At the interrogation site, he would be placed in a featureless, white, brightly lit room and prevented from sleeping for one to two days, resulting in further disorientation. It was also contemplated that Zubaydah's medical care and meals would be provided at

unpredictable intervals, and that he would be interrogated at random times to cause further disorientation.

11. I, as the CIA's Chief Legal Officer, then took the lead in determining and documenting the legal parameters and constraints for CIA interrogations of HVDs going forward, including whether these techniques could be legally applied.

12. I had my staff research whether these techniques were legal, and we concluded that most of them were lawful. In the cable attached hereto as **Exhibit B,** we conveyed our conclusions to the Zubaydah interrogation team located at the black-site where Zubaydah was being held, GREEN.

13. Still, I suggested that we confer with the United States Department of Justice ("DOJ") to secure a written opinion from the DOJ advising whether all of these techniques were legal.

14. I thought such a memorandum desirable because of the protections it affords from future legal prosecution and otherwise.

## C. THE DEPARTMENT OF JUSTICE AND THE WHITE HOUSE BECOME INVOLVED

15. Sometime in early April 2002, I contacted the National Security Council's ("NSC") Legal Advisor, John Bellinger ("Bellinger"). I told him that the CIA was developing an interrogation plan for Zubaydah that included these techniques and that I wanted the DOJ's Office of Legal Counsel ("OLC") to assess the legality of the techniques.

16. On April 16, 2002, I met with Bellinger, OLC Deputy Assistant Attorney General John Yoo ("Yoo"), and two CTC attorneys.

17. During that meeting, I explained that the CIA had developed an interrogation plan that included these techniques and described them in considerable detail.

18. The CTC attorneys in attendance also outlined the effects of these techniques. Specifically, the CTC attorneys outlined the effects of learned helplessness, citing the psychologist who had developed the theory for them, who was not Dr. James Elmer Mitchell ("Dr. Mitchell") or Dr. John "Bruce" Jessen ("Dr. Jessen").

19. I asked that the OLC assess the legality of these techniques and issue a memorandum opinion addressing the legality of each of the proposed techniques.

20. Bellinger thereafter briefed National Security Advisor Condoleezza Rice, Deputy National Security Advisor Stephen Hadley, and White House Counsel Alberto Gonzales about the matters discussed during the April 16, 2002 meeting.

21. The CIA did not have a role in the OLC's internal deliberations about the legality of the proposed techniques, except to respond to requests for additional information. My office did provide the OLC with requested information on a number of occasions.

22. To my knowledge, Drs. Mitchell and Jessen had no role in the OLC's assessment of these techniques' legality and had no contact with OLC personnel as they conducted their assessment.

### D. DR. MITCHELL'S AND DR. JESSEN'S INVOLVEMENT IN ZUBAYDAH'S INTERROGATION

23. I understand that an OTS assessment of al Qa'ida resistance techniques had been drafted that was entitled, "Recognizing and Developing Countermeasures to Al Qaeda Resistance to Interrogation Techniques: A Resistance Training Perspective." I later learned that Drs. Mitchell and Jessen were the authors of this OTS assessment.

24. In early July 2002, I attended a meeting at CIA Headquarters with the Zubaydah interrogation team to discuss the future of the Zubaydah interrogation.

25. Shortly thereafter, I was provided with a copy of the July 8, 2002 document entitled "Description of Physical Pressures" attached hereto as **Exhibit C.**

26. The document attached hereto as **Exhibit D** identified and described 12 physical and psychological pressure techniques for potential use during Zubaydah's interrogation. These techniques have subsequently been referred to as "enhanced interrogation techniques" or "EITs." I subsequently learned Dr. Mitchell was the author of this document.

27. It is my understanding that these EITs were based upon techniques that are used on volunteers at the United States Air Force's Survival, Evasion, Resistance and Escape ("SERE") training program.

## E. APPROVAL OF THE ENHANCED INTERROGATION TECHNIQUES

28. On July 13, 2002, I met with Yoo, Bellinger, Bellinger's deputy Bryan Cunningham, Assistant Attorney General for the Criminal Division Michael Chertoff ("Assistant Attorney General Chertoff"), chief of staff to the FBI Director Daniel Levin, and a CTC attorney from my office.

29. During this meeting, I described the proposed EITs and requested from the DOJ either advanced approval for their use or an advanced declination of prosecution arising from their use. The DOJ refused to provide an advanced declination of prosecution.

30. It was the CIA, not Drs. Mitchell or Jessen, that determined what approvals from other parts of the United States Government were needed before the EITs could be applied to Zubaydah.

31. To my knowledge, Drs. Mitchell and Jessen had no role in the OLC's assessment of the EITs' legality and had no contact with OLC personnel as they conducted their assessment.

32. On July 15, 2002, I received a letter from Yoo dated July 13, 2002. That letter is attached hereto as **Exhibit E.** The letter identified what is necessary to establish the crime of torture under 18 U.S.C. § 2340 *et seq.* and discussed the specific intent required to establish the infliction of severe mental pain or suffering.

33. On July 17, 2002, I was advised that National Security Advisor Rice had approved use of the EITs upon Zubaydah pending DOJ approval of the techniques.

34. On July 24, 2002, Yoo called me and advised that United States Attorney General John Ashcroft ("Attorney General Ashcroft") had authorized him to inform me that the first six EITs (attention grasp, walling, facial hold, facial slap, cramped confinement, and wall standing) were lawful and could be used on Zubaydah.

35. I then, on July 25, 2002, had word of such approval sent by cable to the facility where Zubaydah was being held. A copy of that cable is attached hereto as **Exhibit F.**

36. As can be seen from the cable, it was contemplated that a medical expert with SERE experience would be present during the use of any of the EITs upon Zubaydah.

37. Around this time, the OLC advised the CIA that approval of the remaining EITs would be delayed if the "mock burial" technique remained part of the EITs. As a result, the CIA withdrew its request for approval of the "mock burial" technique.

38. During the EIT assessment and approval process, I ensured that a memorandum prepared by the OTS titled "Psychological Terms Employed in the Statutory Prohibition on Torture" was provided to the OLC. The OTS Memo discussed the proposed EITs and explained

that the EITs may impact detainees differently than they impact volunteers in the SERE school, stating:

> However, while the interrogation techniques mentioned above (attention grasp, walking, facial hold, facial slap (insult slap), cramped confinement, wall standing, stress positions, sleep deprivation, waterboard, and mock burial) are administered to student volunteers in the U.S. in a harmless way, with no measurable impact on the psyche of the volunteer, we do not believe we can assure the same here for a man forced through these processes and who will be made to believe this is the future course of the remainder of his life. While CIA will make every effort possible to ensure that the subject is not permanently physically or mentally harmed, some level of risk still exists. The intent of the process is to make the subject very disturbed, but with the presumption that he will recover.

39. I did this to ensure that the CIA was not overselling the significance of the EITs' use during SERE training and to clarify that the experience of CIA HVDs exposed to the proposed EITs might not be identical to the experience of SERE trainees.

40. OTS solicited input from the Joint Personnel Recover Agency ("JPRA"), the governmental agency entrusted with overseeing all SERE programs, regarding the techniques used in SERE training, *i.e.* the techniques now constituting the proposed EITs, and any resulting psychological effects. The JPRA concluded no long-term psychological effects resulted from use of the EITs.

41. I also worked to get any questions the OLC had about the proposed EITs answered. Specifically, in July 2002, a request was made on my behalf that a SERE psychologist other than Drs. Mitchell or Jessen provide information on the short and long-term psychological effects of the water board technique so that I could provide the information to OLC for consideration. The request for this information was sent in the cable attached hereto as **Exhibit G.**

42. On July 26, 2002, Yoo contacted a CTC attorney and advised that Attorney General Ashcroft had approved the use of the water board during Zubaydah's interrogation. A July 26, 2002 email memorializing Yoo's request is attached hereto as **Exhibit H.**

43. On August 1, 2002, I received the memorandum attached hereto as **Exhibit I** from OLC Assistant Attorney General Jay Bybee. The memorandum concluded that ten of the EITs that the CIA had proposed (attention grasp, walling, facial hold, facial slap, cramped confinement, wall standing, stress positions, sleep deprivation, insects placed in a confinement box, and the water board) did not violate the prohibition against torture established by 18. U.S.C. § 2340A (the "August 1, 2002 Bybee Memo").

44. On August 3, 2002, I had the August 1, 2002 Bybee Memo converted into a cable that was sent to GREEN, the black-site where Zubaydah was being detained. The cable, attached hereto as **Exhibit J,** contained detailed guidance concerning the EITs' approved usage.

45. This cable confirms that appropriately trained medical staff would be on-site during the use of any EIT.

46. The cable confirms that should any member of the team interrogating Zubaydah (including appropriately trained medical personnel) or any on-site personnel request that Zubaydah's interrogation be halted, all members of the interrogation team as well as CIA headquarters would be consulted. It also confirms that the final decision to halt or recommence EIT use would lie exclusively with the CIA's Chief of Base and Senior CTC Officer.

47. As indicated in the cable attached hereto as **Exhibit K,** no EITs were applied to Zubaydah until after this cable confirming the OLC's approval of the EITs was sent, received, and acknowledged by all members of the interrogation team.

48. It is my understanding that all EITs were applied to Zubaydah consistent with the August 1, 2002 Bybee Memo.

49. A summary of the actions taken by the CTC Legal Department to ensure that all of the EITs complied with U.S. laws and were applied consistent with DOJ authorization are memorialized in the "CIA Interrogation Techniques: Abu Zubaydah," attached hereto as **Exhibit L.**

## F. CONTINUED EVOLUTION OF THE USE AND APPROVAL OF ENHANCED INTERROGATION TECHNIQUES

50. Within a few months of the August 1, 2002 Bybee Memo, the OLC confirmed that EITs could be used on other HVDs. The May 27, 2004 Letter from Assistant Attorney General Jack Goldsmith to CIA General Counsel Scott Muller, attached hereto as **Exhibit M,** confirmed the OLC's earlier approval.

51. On January 31, 2003, CIA Director Tenet sent via the cable attached hereto as **Exhibit N**, specific guidelines for interrogations of detainees held pursuant to the MON to all CIA black-sites. The CTC Legal Department drafted these guidelines.

52. In March 2003, I updated Assistant Attorney General Chertoff, Deputy Assistant Attorney General for the Criminal Division Alice Fisher, Yoo, and Bryan Cunningham from the NSC about the CIA's EIT Program and EIT usage.

53. From April 2003 through June 2003, the CIA's Office of General Counsel worked with the OLC to draft bullet points entitled: "Legal Principles Applicable to CIA Detention and Interrogation of Captured Al-Qa'ida Personnel." A copy of the final version of this document is attached hereto as **Exhibit O**.

54. On May 25, 2004, CIA Director Tenet suspended the use of all EITs pending receipt of an opinion from the DOJ assessing whether use of the EITs would meet the applicable "shocks the conscience" standard. CIA Director Tenet's Notice of Suspension is attached hereto as **Exhibit P**.

55. In June 2004, the OLC clarified that the bullet points captioned "Legal Principles Applicable to CIA Detention and Interrogation of Captured Al-Qa'ida Personnel," affixed hereto as **Exhibit O**, did not represent an opinion or a statement from the OLC.

56. On July 22, 2004, Attorney General Ashcroft, by way of the letter attached hereto as **Exhibit Q**, confirmed that the nine EITs (other than the water board) described in the August 1, 2002 Bybee Memo did not violate the United States Constitution or any statute or treaty obligation of the United States.

57. Still, at this time, the CIA agreed to continue to apply EITs to new HVDs only if the OLC provided advance, written, legal approval on a case-by-case basis for each specific EIT proposed for use on each new detainee. Only four such approvals were ever obtained.

58. Those four approvals occurred on August 6, 2004; August 26, 2004; September 6, 2004; and September 20, 2004. Copies of the four approvals are attached hereto collectively as **Exhibit R**.

59. On May 10, 2005, OLC Principal Deputy Assistant Attorney General Steven Bradbury ("Bradbury") sent me two memoranda that reaffirmed the legality of the ten EITs discussed above, used individually and in combination. Copies of the May 10, 2005 memoranda are attached hereto as **Exhibits S and T**, respectively

60. By December 2005, the water board was no longer an interrogation technique authorized by the CIA.

61. In 2006, the CIA suspended the use of all nine of the additional EITs and CIA Director Michael Hayden decided that use of the EITs going forward needed to be less secretive and scaled-down.

62. I took the lead on determining what EITs remained legal following then recent changes in the law.

63. Thereafter, only certain of the EITs previously approved by the OLC remained part of the EIT Program: dietary manipulation, sleep deprivation, facial hold, attention grasp, abdominal grasp, open-fingered abdominal slap, and open-fingered facial slap.

64. On June 22, 2007, I met with then Secretary of State Condoleezza Rice ("Secretary Rice"), then Department of State Legal Advisor Bellinger, and Drs. Mitchell and Jessen.

65. At the meeting, Secretary Rice indicated her familiarity with the EIT Program and the manner in which it was conducted. Secretary Rice acknowledged that she had been part of the decision-making process at the genesis of the EIT Program, and expressed support for the Program and her understanding of its importance. Secretary Rice was also adamant regarding the EIT Program's legality and expressed satisfaction that the Program had been implemented professionally and responsibly. An email memorializing the content of the meeting was sent to me that day, and a copy of that email is attached hereto as **Exhibit U**.

66. On July 20, 2007, Bradbury sent me a memorandum, attached hereto as **Exhibit V**, that reaffirmed the continuing legality of six of the EITs: dietary manipulation, extended sleep deprivation, attention grasp, abdominal slap, and insult slap.

67. As of April 7, 2009, the CIA had ceased using any of the EITs.

68. I was one of the key legal architects of the CIA's EIT Program, which I monitored and oversaw from its beginning to end.

69. Gul Rahman ("Rahman") was not classified as an HVD.

70. Rahman was not part of the EIT Program.

71. Rahman died, in part, because the CIA did not devote sufficient attention and resources to less significant detainees captured on the battlefield and held elsewhere, *i.e.* so called middle-value and low-value detainees, like Rahman.

72. After Rahman's death, the CIA Inspector General conducted an investigation into the cause of Rahman's death.

73. The investigation concluded that Rahman died of hypothermia because CIA Staff Officer ordered Rahman to be short chained such that he was compelled to sit on the concrete floor of his cell clothed in only a sweatshirt.

74. The investigation further found that an individual other than Drs. Mitchell or Jessen was responsible for not providing adequate supervision of CIA Staff Officer and the activities at COBALT, the black-site where Rahman was detained.

75. The DOJ was apprised of the circumstances surrounding Rahman's death. In 2005, the DOJ declined to prosecute anyone in connection with Rahman's death. Then, in 2012, after a year-long special criminal investigation into Rahman's death was conducted by Assistant United States Attorney John Durham, the DOJ again declined to prosecute anyone in connection with Rahman's death.

76. Despite monitoring and overseeing the CIA's EIT Program from beginning to end, I was not interviewed in connection with the preparation of the Senate Select Committee on

Intelligence's Study of the Central Intelligence Agency's Detention and Interrogation Program (the "SSCI Report").

77. The SSCI Report is an errant, inaccurate, one-sided, unremitting, wholesale assault on the CIA's EIT Program.

78. Many of the statements within the SSCI Report are simply the opinions of those who drafted the SSCI Report and are easily disputed when taken in proper context of the cited source documents or other documents not cited.

79. Indeed, the SSCI Report is at times demonstrably inconsistent with the actual events that occurred.

80. For instance, the SSCI Report states that on July 17, 2002, National Security Advisor Condoleezza Rice requested a delay in the approval of the interrogation techniques.

81. In fact, on that date, Rice approved the CIA's use of EITs subject to DOJ approval.

82. Similarly, the SSCI Report claims that the CIA briefed only Committee Chairman Bob Graham and Vice Chairman Richard Shelby on the EIT Program. That statement is misleading.

83. In fact, the CIA was directed by the White House to restrict knowledge of the EIT Program to the leaders of the House and Senate, and the chair and ranking member of the two intelligence committees. The CIA followed this direction and in September 2002 and February 2003 provided full briefings on the EIT Program to all eight of those individuals.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: January 23, 2017

[signature]
John Rizzo

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of May, 2017, I electronically filed the foregoing document, the Declaration of John Rizzo, with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Emily Chiang<br>echiang@aclu-wa.org<br>ACLU of Washington Foundation<br>901 Fifth Ave, Suite 630<br>Seattle, WA 98164 | Paul Hoffman<br>hoffpaul@aol.com<br>Schonbrun Seplow Harris & Hoffman, LLP<br>723 Ocean Front Walk, Suite 100<br>Venice, CA 90291 |
| Andrew I. Warden<br>Andrew.Warden@usdoj.gov<br>Senior Trial Counsel<br>Timothy A. Johnson<br>Timothy.Johnson4@usdoj.gov<br>Trial Attorney<br>United States Department of Justice<br>Civil Division, Federal Programs Branch<br>20 Massachusetts Ave NW<br>Washington, DC 20530 | Steven M. Watt, admitted *pro hac vice*<br>swatt@aclu.org<br>Dror Ladin, admitted *pro hac vice*<br>dladin@aclu.org<br>Hina Shamsi, admitted *pro hac vice*<br>hshamsi@aclu.org<br>ACLU Foundation<br>125 Broad Street, 18th Floor<br>New York, NY 10007 |
| Avram D. Frey, admitted *pro hac vice*<br>afrey@gibbonslaw.com<br>Daniel J. McGrady, admitted *pro hac vice*<br>dmcgrady@gibbonslaw.com<br>Kate E. Janukowicz, admitted *pro hac vice*<br>kjanukowicz@gibbonslaw.com<br>Lawrence S. Lustberg, admitted *pro hac vice*<br>llustberg@gibbonslaw.com<br>Gibbons PC<br>One Gateway Center<br>Newark, NJ 07102 | Anthony DiCaprio, admitted *pro hac vice*<br>ad@humanrightslawyers.com<br>Law Office of Anthony DiCaprio<br>64 Purchase Street<br>Rye, NY 10580 |

By *s/ Shane Kangas*
Shane Kangas
skangas@bpmlaw.com
Betts, Patterson & Mines, P.S.