**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**
**AT SPOKANE**

| | |
|---|---|
| SULEIMAN ABDULLAH SALIM, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>JAMES E. MITCHELL and JOHN JESSEN,<br><br>Defendants. | NO. 2:15-cv-286-JLQ<br><br>**DECLARATION OF JOSE RODRIGUEZ** |

I, Jose Rodriguez, hereby declare under penalty of perjury in accordance with the laws of the State of Washington, that the following is true and correct and within my personal knowledge and belief to the best of my recollection, and while I have no specific recollection of all the exhibits, I have no reason to dispute their accuracy or authenticity:

**A. BACKGROUND**

1. I am over the age of 18, have personal knowledge of all facts contained in this declaration, and am competent to testify as a witness to those facts.

2. I began working for the United States Central Intelligence Agency ("CIA") in 1976, shortly after graduating from law school.

3. As of September 11, 2001, I had achieved the rank of SIS 4 within the CIA. This is equivalent to the rank of a three-star general.

4. In the immediate aftermath of September 11, 2001, I served as the CIA's Counterterrorism Center's ("CTC") Chief Operating Officer/Deputy Director. The CTC is a division of the CIA's National Clandestine Service.

5. From May 2002 until November 2004, I served as the Director of the CTC.

6. From November 2004 until October 2005, I served as the Deputy Director of Operations for the CIA.

7. From October 2005 until August 2007, I served as the CIA's Director of the National Clandestine Service.

8. I announced my retirement from the CIA in August 2007.

## B. THE IMPETUS FOR THE CREATION OF THE CIA'S EIT PROGRAM, THE CREATION OF THE PROGRAM, AND DRS. MITCHELL AND JESSEN'S INVOLVEMENT THEREIN

9. Pursuant to the Memorandum of Notification ("MON") signed by President George W. Bush on September 17, 2001, the then Director of the CIA, George Tenet, in mid-2002 directed CTC to establish a program to capture, detain and interrogate al Qa'ida operatives considered to have the highest value to obtain critical threat and actionable intelligence.

10. At the time, CIA possessed intelligence that al Qa'ida had been developing anthrax at its lab near Kandahar, Afghanistan, and that Usama Bin Ladin ("Bin Ladin") had been involved in discussions with Pakistani scientists about developing a nuclear or radio-logical bomb for use against the United States and/or its interests.

### (1) Zubaydah Is Captured by the CIA and the CIA Hires Dr. Mitchell to Observe Zubaydah's Interrogation

11. In April 2002, Dr. James Elmer Mitchell ("Dr. Mitchell") was already working for the CIA's Office of Technical Services ("OTS"). He was under contract with the CIA to conduct research and draft applied psychological papers for OTS. A copy of Dr. Mitchell's original December 21, 2001 contract with the CIA is attached hereto as **Exhibit A**.

12. OTS then recommended Dr. Mitchell to CTC Legal, and CTC hired him.

13. Dr. Mitchell's contract with the CIA was modified in April 2002 to reflect CTC hiring him to provide additional services. A copy of the April 4, 2002 modification of his contract with the CIA is attached hereto as **Exhibit B**.

14. Once hired, Dr. Mitchell was directed to provide psychological consultation to the CTC in connection with the United States Federal Bureau of Investigation ("FBI") and CIA's ongoing effort to debrief and interrogate Abu Zubaydah ("Zubaydah").

15. Zubaydah had been captured in March 2002 and was the first al Qa'ida operative characterized by the United States as a "High-Value Detainee" ("HVD").

16. At the time of his capture in Pakistan, Zubaydah was a senior lieutenant of Bin Ladin and was extensively involved in al Qa'ida's operational planning. He had previously been an al Qa'ida external liaison and logistics coordinator.

17. At the CTC's direction, Dr. Mitchell was deployed overseas to the CIA's black-site where Zubaydah was being held, GREEN, to observe Zubaydah's ongoing interrogation by agents of the FBI and CIA, and to make recommendations to the CTC designed to overcome Zubaydah's resistance to traditional interrogation methods.

**(2) <u>The CIA's Initial Interrogation of Zubaydah</u>**

18. Dr. Mitchell was on-site to observe Zubaydah's interrogation by the FBI and CIA from March 2002 – June 2002. While in this role, Dr. Mitchell reported directly to CIA Headquarters ("HQS"), and I was aware of his activities.

19. During this time, as expressed in the cable attached hereto as **Exhibit C**, the CTC Primary Interrogator was in charge of and responsible for all aspects of Zubaydah's interrogation. Furthermore, I and all those at HQS expected all personnel to follow the CTC Primary Interrogator's directions.

20. As part of the interrogation plan, Zubaydah was placed in a physical environment that was meant to disorient him such that it removed his ability to affect his environment and encouraged him to develop the necessary mindset in which he would have difficulty concentrating, planning, and resisting the process or using counter-measure interrogation skills.

21. This was done by using bright (physically not harmful) lights in an all-white environment, white noise produced by sound "masking" equipment (physically not harmful), loud (physically not harmful) rock music, disorientation by not allowing in natural light or a routine schedule, and keeping him awake.

22. Although Dr. Mitchell was part of the psychological team overseeing Zubaydah's interrogation, an officer assigned to CTC full-time led the psychological team.

23. Throughout Zubaydah's interrogation, the CIA consulted closely with the CTC legal department. In the cable attached hereto as **Exhibit D**, the CTC legal department approved the proposed interrogation strategy for Zubaydah.

24. As the interrogation team implemented the interrogation strategy on Zubaydah, it continued to keep HQS apprised of its actions to ensure that they were acting within all legal requirements, as expressed in the cable from GREEN attached hereto as **Exhibit E**.

25. During this entire phase of Zubaydah's interrogation, Dr. John "Bruce" Jessen ("Dr. Jessen") was not working for the CIA, but rather the United States Department of Defense.

### (3) The CIA Decides That New Techniques Must Be Developed to Overcome Zubaydah's Resistance, and Requests That Drs. Mitchell and Jessen Provide Recommendations

26. By June 2002, I became aware that Zubaydah had ceased providing useful information to his FBI and CIA interrogators.

27. As a result, a meeting was held at HQS to discuss the next phase of Zubaydah's interrogation. A variety of plans were presented. Individuals other than Drs. Mitchell or Jessen proposed an "isolation option" that called for Zubaydah to be placed in pseudo-isolation for three weeks, during which time the Zubaydah interrogation team would return to HQS for consultations. HQS approved this plan in the cable attached hereto as **Exhibit F**.

28. As explained in the cable attached hereto as **Exhibit G**, the goal of isolation was to induce doubt and uncertainty within Zubaydah concerning his disposition.

29. Still believing that Zubaydah possessed useful knowledge concerning al Qa'ida plans for imminent attacks upon targets within the United States or United States interests abroad, I and others within the CTC began considering whether other potential interrogation techniques existed that could be used upon Zubaydah to secure this critical desired information—if the interrogation phase was unsuccessful.

30. As mentioned above, at the time the CIA possessed intelligence that al Qa'ida had been developing anthrax at its lab near Kandahar, Afghanistan, and that Bin Ladin had been involved in discussions with Pakistani scientists about developing a nuclear or radio-logical bomb for use against the United States and/or its interests.

31. Indeed, when he was captured, Zubaydah possessed videotapes prerecorded to celebrate a contemplated successful second wave of attacks against the United States.

32. In late June 2002, I requested that Dr. Mitchell consult with the CTC to consider what other potential techniques could be used upon Zubaydah to overcome his resistance and secure the desired information.

33. At the time, I was convinced that only the CIA could effectively interrogate Zubaydah and other HVDs given the critical information sought to be obtained.

34. During the first week of July 2002, I and other CTC members had meeting at HQS. Dr. Mitchell attended this meeting.

35. During this meeting, we discussed Zubaydah's resistance to traditional interrogation methods and various other techniques that could be potentially used to overcome Zubaydah's resistance and secure the critical, desired information.

36. At the time, the CIA believed that pressure upon Zubaydah must be increased, was intent upon increasing such pressure to secure the desired information, and was interested in learning what types of such pressure might be applied.

37. During this meeting Dr. Mitchell mentioned the potential use of various techniques that were then being used (and had been used for decades) on trainers at the United States Air Force's Survival, Evasion, Resistance and Escape ("SERE") training program. These techniques have subsequently been referred to as "enhanced interrogation techniques" or "EITs," and encompassed only the following: (1) attention grasp; (2) walling; (3) facial hold; (4) facial slap/insult slap; (5) cramped confinement; (6) wall standing; (7) stress positions; (8) sleep deprivation; (9) water board; (10) use of diapers; (11) insects; and (12) mock burial.

38. Dr. Mitchell explained that the particular goal of EITs would be to dislocate the subject's expectations and overcome his resistance and thereby motivate him to provide the information the CIA was seeking. Dr. Mitchell further explained that in working to achieve this goal, the interrogation could produce a range of mental states in the subject, including, but not limited to, fear, learned helplessness, compliancy, or false hope. Dr. Mitchell said that the mental state that a particular subject might experience would vary based on a number of factors, such as the circumstances of the interrogation and the subject's abilities and past experiences.

39. At or about the conclusion of this meeting, I, on behalf of the CTC, asked Dr. Mitchell to consider working with the CIA to use some or all of the EITs to interrogate Zubaydah.

40. At or about this same time, Dr. Mitchell requested that Dr. Jessen be hired by the CTC to assist Dr. Mitchell with the CTC's request.

41. I approved Dr. Mitchell's request, and Dr. Jessen was hired by the CTC by contract effective July 22, 2002. A copy of this contract is attached hereto as **Exhibit H**.

42. The purpose of hiring Drs. Mitchell and Jessen to consult with the CTC in the CTC's effort to develop and apply the EITs upon Zubaydah (and later upon other HVDs as authorized) was as follows:

a. Before September 11, 2001, the CTC had no resident expertise in interrogation.

b. To be used effectively, interrogation skills must be developed over years. CIA staff officers routinely change assignments every two to three years, which does not allow for adequate training or the long term development of the required interrogation expertise. Moreover, interrogation was not a part of the CTC's core counter-terrorism mission.

c. Having been referred to the CTC by the OTS, Drs. Mitchell and Jessen were eminently qualified to assist the CTC in developing and applying EITs. Specifically, Drs. Mitchell and Jessen had developed the requisite expertise in connection with their SERE work, and combined had over 30 years of experience in this area.

d. Utilizing highly trained and experienced individuals like Drs. Mitchell and Jessen to assist in the development and application of EITs under the direct oversight, supervision, and control of CIA staff allowed for the most effective use of key interrogation skills, and enabled the CTC staff to focus more readily on the CTC's counter-terrorism mission.

43. During the week following the early July 2002 meeting mentioned above, I had many conversations with Dr. Mitchell at HQS during which we discussed various items related to the aforementioned EITs, including additional details concerning their usage and their potential efficacy in Zubaydah's interrogation.

**(4) <u>Drs. Mitchell and Jessen Identify Specific EITs for Potential Use upon Zubaydah; the Department of Justice Confirms Their Legality; and the White House Approves their Usage upon Zubaydah</u>**

44. On July 8, 2002, I and other CTC members attended a meeting at HQS with Drs. Mitchell and Jessen. Representatives from the CIA's ALEC Station, OTS, and Office of Medical Services ("OMS"), CTC attorneys, an FBI Official, and the FBI interrogators that had been interrogating Zubaydah prior to his being placed in isolation also attended this meeting. A cable documenting the attendees of this meeting and what occurred generally during this meeting is attached hereto as **Exhibit I**.

45. I do not recall a specific discussion about "learned helplessness" during this period and it was not something I focused on, though I may have heard the term.

46. At the conclusion of this meeting, I requested that Drs. Mitchell and Jessen provide me with a written list identifying the potential EITs, describing how they could be implemented, and identifying their intended effects upon Zubaydah.

47. In response to my request, Dr. Mitchell, on July 8 or 9, 2002, provided me with the email affixed hereto as **Exhibit J** entitled, "Description of Physical Pressures," identifying the potential EITs, describing how they could be implemented, and identifying their intended effects upon Zubaydah.

48. The CIA, not Drs. Mitchell nor Jessen, solely determined which of the proposed methods of interrogation—EITs being one of them—would be used on Zubaydah. And the CIA solely determined which of the EITs identified by Dr. Mitchell in **Exhibit J**, if any, would (or would not) be considered for use by the CIA.

49. During July 2002, with Drs. Mitchell and Jessen's input only as requested, the CTC began devising an interrogation plan for Zubaydah utilizing some or all of the EITs (hereinafter, the "EIT Program"). The hope was that use of some or all of the EITs upon Zubaydah would help overcome his resistance and dislocate his expectations so as to enable the CIA to secure information concerning imminent al Qa'ida attacks upon the United States and its interests.

50. During July 2002, CIA lawyers, including John Rizzo, specifically consulted with the White House and members of the United States Department of Justice's ("DOJ") Office of Legal Counsel ("OLC") to assess the legality of using the EITs during Zubaydah's interrogation, either individually or in combination, and to secure policy approval for their use.

51. On or about July 17, 2002, I was advised that National Security Council Advisor Condoleezza Rice had approved use of the EITs upon Zubaydah pending DOJ approval of the proposed techniques.

52. Then, on or about July 24, 2002, I was advised that United States Attorney General John Ashcroft ("Attorney General Ashcroft") had concluded that the first six EITs

(attention grasp, walling, facial hold, facial slap, cramped confinement, and wall standing) were lawful and could be used on Zubaydah.

53. This determination and approval was conveyed via cable, on July 25, 2002, to the black-site where Zubaydah was being held, GREEN. A copy of that cable is attached hereto as **Exhibit K**.

54. As can be seen from the cable, it was contemplated that a medical expert with SERE experience would be present during the use of any of the EITs so as to as to ensure Zubaydah's safety.

55. Around this time, I learned that the OLC had advised the CIA that approval for the remaining EITs would be delayed if the "mock burial" technique remained part of the EITs. As a result, the CIA withdrew its request for approval of the "mock burial" technique.

56. On or about July 26, 2002, I learned that Attorney General Ashcroft had approved the use of the water board during Zubaydah's interrogation.

57. On August 1, 2002, I received a copy of the memorandum to John Rizzo attached hereto as **Exhibit L** from OLC Assistant Attorney General Jay Bybee. The memorandum concluded that ten of the EITs that the CIA had proposed (attention grasp, walling, facial hold, facial slap, cramped confinement, wall standing, stress positions, sleep deprivation, insects placed in a confinement box, and the water board) did not violate the prohibition against torture found at 18 U.S.C. § 2340A (the "August 1, 2002 Bybee Memo").

58. The information contained in the August 1, 2002 Bybee Memo was included in an August 3, 2002 cable sent to the black-site where Zubaydah was being detained, GREEN. The cable, constituting Zubaydah's formal interrogation plan, contained detailed guidance concerning the EITs approved usage upon Zubaydah. A copy of this cable is attached hereto as **Exhibit M**.

59. This interrogation plan confirms that appropriately trained medical staff would be on-site during the use of any EIT upon Zubaydah.

60. The interrogation plan confirms that should any member of Zubaydah's interrogation team (including appropriately trained medical personnel) or any personnel at the black-site request that Zubaydah's interrogation be halted for any reason, all members of the interrogation team as well as HQS would be consulted.

61. It also confirms that the decision to halt or recommence EITs use would lie exclusively with HQS, and that if HQS could not be reached in a timely manner, the decision would lie exclusively with the CIA's Chief of Base located at that black-site ("COB") and the Senior CTC Officer consulted.

**(5) <u>The Use of EITs to Interrogate Zubaydah, and Drs. Mitchell and Jessen's Role in their Usage upon Zubaydah</u>**

62. It is my understanding that the DOJ's determination of the EITs' legality and the related interrogation plan was promptly conveyed to Drs. Mitchell and Jessen by personnel located at the black-site where Zubaydah was detained, GREEN.

63. As indicated in the cable attached hereto as **Exhibit N**, no EITs were applied to Zubaydah until after this cable confirming the OLC's approval of the EITs was sent, received, and acknowledged by all members of the interrogation team and the interrogation plan was secured.

64. All EITs were applied to Zubaydah in a manner consistent with the August 1, 2002 Bybee Memo and the interrogation plan memorialized in the August 3, 2002 cable.

65. The CIA's subsequent interrogation of Zubaydah using the EITs was conducted entirely at the behest of and within the control of HQS and the CTC.

66. HQS exclusively determined what, if any, EITs were approved for use upon Zubaydah, and within what parameters.

67. HQS also exclusively determined the interrogation intelligence requirements for Zubaydah.

68. Moreover, the CIA, through HQS, the CTC and the COB of GREEN, maintained complete operational control over Drs. Mitchell and Jessen while they interrogated Zubaydah, whether using EITs or otherwise. Specifically, Drs. Mitchell and Jessen reported directly to the black-site COB.

69. The black-site COB, in turn, reported directly to me. As such, I was keenly aware of and approved of all of Drs. Mitchell and Jessen's activities.

70. The GREEN COB was responsible for ensuring that all on-site staff and support, including Drs. Mitchell and Jessen, complied with all applicable regulations, guidelines, standard operating procedures, and the applicable interrogation plan (for Zubaydah initially and other HVDs thereafter).

71. The COB provided me and HQS with detailed correspondence regarding interrogations on both a daily and an as needed basis.

72. I am aware that during the use of EITs upon Zubaydah, Drs. Mitchell and Jessen voiced a desire to discontinue their use.

73. Based upon this request, arrangements were made to enable not only members of the interrogation team, but representatives of HQS and the CTC, to observe the use of EITs, including the water board, upon Zubaydah.

74. Based upon this observation, and a subsequent assessment by HQS and the CTC that continued EIT use upon Zubaydah was unnecessary, EITs ceased to be used upon Zubaydah.

**(6) <u>Continued Use of the EIT Program and Drs. Mitchell and Jessen's Involvement</u>**

75. In early September 2002, I led a delegation to brief the chair and ranking member of the United States House Permanent Select Committee on Intelligence concerning the use of the EITs. All of the previously approved EITs were described in detail and no congressperson expressed any objection to the use of any of the techniques. Follow-up briefings were provided in February 2003. In 2003, I had contact with members from the intelligence committees of both the House and the Senate.

76. Shortly thereafter, the OLC confirmed that its approval of the EITs' use applied not only to Zubaydah, but upon other HVDs as well. The May 27, 2004 Letter from Assistant Attorney General Jack Goldsmith to CIA General Counsel Scott Muller, attached hereto as **Exhibit O**, confirmed the OLC's earlier approval.

77. Thereafter, EIT Program procedures used on Zubaydah were formalized in various documents. For instance, a formal memorandum outlining the EIT Program's general interrogation plan with respect to HVDs, attached hereto as **Exhibit P**, explains that the COB was responsible for the overall management and supervisory duties of the interrogation team and for the specific interrogation plan. Drs. Mitchell and Jessen reported to the COB and did not maintain any supervisory responsibilities or control over the interrogation.

78. In other words, throughout the EIT Program, the CIA always maintained complete control over whether any EIT was used and under what circumstances. Neither Dr. Mitchell nor Dr. Jessen possessed the authority to: (1) apply one or more of the EITs in a manner inconsistent with the interrogation plan; (2) recommence EIT use in the event that use had been discontinued; or (3) use any EIT without authorization or approval from HQS and/or COB.

79. While the CTC exercised complete operational control over the application of EITs to HVDs, the CTC authorized and obligated the COB, any member of the interrogation team, or any CIA medical staff member to halt an interrogation if they observed any deviation from the approved interrogation plan.

80. An individual was then required to discuss their concern with the team and report any deviation immediately to CIA HQS. Moreover, at any time during the interrogation, the COB, any member of the interrogation team and any CIA medical staff member was authorized to declare an end to the interrogation session based on their individual assessment that the detainee may suffer significant long-term harm to his physical and mental health. These checks and balances were purposely designed to prevent abuse and freelancing in interrogations.

81. I am not aware of any instance in which Drs. Mitchell and Jessen took any action that was not specifically authorized by the CIA.

82. Drs. Mitchell and Jessen were not asked to provide any recommendations relating to the capture or rendition of any CIA detainee, including Zubaydah, nor did they.

83. Likewise, Drs. Mitchell and Jessen did not participate in the capture or rendition of any CIA detainee.

84. It is my understanding that the CTC solicited feedback from members of the EIT Program, including from Drs. Mitchell and Jessen, in order to develop and ensure proper procedures and training, and that interrogation team members' roles and responsibilities were fully defined.

85. It is also my understanding that Dr. Mitchell provided feedback regarding the EIT Program in December 2002. A copy of the memorandum summarizing Dr. Mitchell's feedback, which was not authored by Dr. Mitchell, is attached hereto as **Exhibit Q**. As noted in the

memorandum, Dr. Mitchell's feedback was considered to be only "one data point" among several with respect to the CTC's continued development and implementation of the EIT Program.

86. When it became clear that the EITs worked and that the CIA was going to be accumulating a number of additional HVDs, I instructed some of my staff to create a training program so that additional CIA personnel could learn precisely how to apply the EITs. This instruction resulted in a two-week pilot training program designed to teach the administration of the EITs.

87. Drs. Mitchell and Jessen did not provide instruction in this program. In fact, Drs. Mitchell and Jessen did not participate in this program, but were instead deemed certified to conduct interrogations upon HVDs using EITs as authorized by HQS in accordance with those specific interrogation plans adopted for specific HVDs, based on their experience as SERE instructors and their prior interrogations of Zubaydah and later-captured HVD Abd Al-Nashiri.

88. The use of EITs upon Zubaydah and other HVDs undoubtedly helped the CIA secure critical information concerning imminent threats to the United States and its interests abroad. Simply put, the CIA's EIT Program was very successful.

## C. SALIM, SOUD AND RAHMAN, AND DRS. MITCHELL AND JESSEN'S INVOLVEMENT WITH THESE DETAINEES, IF ANY

89. I am aware that a lawsuit has been commenced against Drs. Mitchell and Jessen by Suleiman Abdullah Salim ("Salim"), Mohamed Ahmed Ben Soud ("Soud") and Obaid Ullah, the representative of the estate of Gul Rahman ("Rahman").

90. It is my understanding that: (1) Salim "was detained ________ as a facilitator of Al-Qaeda's 1998 attacks against the US Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, as well as the 2002 attack on the Paradise Hotel in Kenya"; (2) Soud was a "senior"

and "chief" member responsible for running a military camp for an Islamic fighting group and a member of Libyan Islamic Fighting Group with "strong and immediate ties" to al Qa'ida; and (3) Rahman was declared an "enemy combatant."

91. It is my understanding that on March 19, 2004, a request was made to the United States Department of Defense military service in Bagram to take immediate custody and control of Salim, in accordance with his designation as an "enemy combatant." I understand that this transfer was made after Salim had admitted that he was recruited as a facilitator by al Qa'ida operatives in Somalia for his local knowledge, language skills and boat-driving ability. I understand that he had also admitted to being an associate of known al Qa'ida terrorists, including Khalfan Khamis Mohammed, Issa Osman Issa, and Aboud Rogo.

92. Neither Salim, Soud, nor Rahman was classified by the United States as an HVD. As such, none of these individuals was part of the CIA's HVD EIT Program.

93. Instead, Salim, Soud, and Rahman were each classified as either "medium value detainees" ("MVDs") or "low value detainees" ("LVDs"), meaning that it was believed that none of these men possessed information of the type possessed by HVDs, like Zubaydah, *i.e.* information concerning imminent threats against the United States or United States' interests abroad.

94. The classification distinction between an HVD on one hand, and an MVD or LVD on the other, is critical for many reasons.

95. Drs. Mitchell and Jessen had no involvement in the creation and implementation of any CIA program to capture, render, detain and/or interrogate any MVD or LVD, other than some limited contact with Rahman.

96. Indeed, the CIA's efforts to capture, render, detain, and/or interrogate all MVDs and/or LVDs, from inception through conclusion, did not involve Drs. Mitchell or Jessen. By late 2002, the CIA's Rendition and Detentions Group ("RDG"), in consultation with the CIA's ALEC Station, was responsible for all those efforts.

97. Unlike HVDs, which were detained exclusively at CIA black-sites GREEN or BLUE, MVDs and LVDs were not detained at black-sites GREEN or BLUE.

98. Instead, MVDs and LVDs were detained at black-site COBALT. HVDs were not detained at COBALT, except for Abd Al-Nashiri who was held at COBALT overnight while on the way to black-site GREEN.

99. Reports indicated that at COBALT untrained CIA officers conducted unauthorized and unsupervised interrogations of detainees using harsh physical interrogation techniques that were not part of the CIA's EIT Program.

100. Because Salim and Soud were not HVDs, they never came in contact with Drs. Mitchell or Jessen.

101. To the extent that Salim and Soud were interrogated or subjected to any interrogation techniques, such interrogation and/or techniques fell entirely outside the EIT Program with which Drs. Mitchell and/or Jessen were involved.

102. It is my understanding that Dr. Mitchell came in brief contact with Rahman even though he was not classified as an HVD.

103. I did not receive any input from Dr. Mitchell with respect to Rahman's conditions of confinement.

104. Dr. Mitchell also was not involved in any way in Rahman's interrogation, including the use of any interrogation techniques upon Rahman.

105. Specifically, it is my understanding that Dr. Mitchell observed Rahman one evening at COBALT while Dr. Mitchell was travelling with Abd Al-Nashiri as he was rendered to black-site GREEN.

106. It is my understanding that Dr. Mitchell observed Rahman and advised COBALT's COB as well as a medic involved in Rahman's interrogation that Rahman did not look well and required medical attention.

107. It is my understanding that this was Dr. Mitchell's only exposure to Rahman.

108. It is my understanding that Dr. Jessen was present at black-site COBALT for other purposes during a time when Rahman was being interrogated by CIA personnel.

109. As such, the CIA requested that Dr. Jessen assess Rahman's resistance posture.

110. In response to this request, it is my understanding that Dr. Jessen assessed Rahman's resistance and recommended an interrogation plan for him. A copy of the cable detailing the interrogation plan recommended by Dr. Jessen is attached hereto as **Exhibit R**.

111. As indicated in the attached cable, Dr. Jessen assessed Rahman's resistance as being very strong and, in light of the strength of his resistance, stated that "employing enhanced measures is not the first or best option to yield positive interrogation results" from Rahman.

112. Dr. Jessen was otherwise not responsible for Rahman's treatment or confinement.

113. As evident in the CIA Inspector General's Report on the Investigation into Rahman's death, attached hereto as **Exhibit S**, CIA personnel directed Rahman's interrogation.

114. It is also my understanding that Dr. Jessen conveyed concern for Rahman's physical and detention conditions to CIA personnel, both at the black-site COBALT and via cable to CIA HQS.

115. It is my understanding that based upon Dr. Jessen's stated concerns about the temperature of Rahman's cell, space heaters were placed in or near the cell.

116. Drs. Mitchell and Jessen departed black-site COBALT almost a week before Rahman was found dead in his cell.

117. After Rahman's death, the CIA Inspector General conducted an investigation into the cause of Rahman's death. The investigation concluded that Rahman died of hypothermia because CIA Staff Officer ordered Rahman to be short chained such that he was compelled to sit on the concrete floor of his cell clothed in only a sweatshirt.

118. The investigation further found that an individual other than Drs. Mitchell or Jessen was responsible for not providing adequate supervision of CIA Staff Officer and the activities at COBALT.

119. Drs. Mitchell and Jessen had absolutely no involvement whatsoever in the events leading to Rahman's death.

120. The DOJ was apprised of the circumstances surrounding Rahman's death. In 2005, the DOJ declined to prosecute anyone in connection with Rahman's death. Then, in 2012, after a year-long special criminal investigation into Rahman's death was conducted by Assistant United States Attorney John Durham, the DOJ again declined to prosecute anyone in connection with Rahman's death.

**D. SSCI REPORT**

121. Despite monitoring and overseeing the CIA's EIT Program from beginning to end, I was not interviewed in connection with the preparation of the Senate Select Committee on Intelligence's Study of the Central Intelligence Agency's Detention and Interrogation Program (the "SSCI Report").

122. The SSCI Report is an errant, one-sided assault on the CIA's EIT Program that reaches numerous unsupportable and baffling conclusions.

123. Many of the statements within the SSCI Report are simply the opinions of those who drafted the SSCI Report and disputable when taken in proper context of the sited sources documents or other documents not cited.

124. Indeed, the SSCI Report is at times demonstrably inconsistent with the actual events that occurred.

125. For instance, the SSCI Report states that on July 17, 2002, National Security Advisor Condoleezza Rice requested a delay in the approval of the interrogation techniques.

126. In fact, on that date, Rice approved the CIA's use of EITs subject to DOJ approval.

127. Similarly, the SSCI Report claims that the CIA briefed only Committee Chairman Bob Graham and Vice Chairman Richard Shelby on the EIT Program. That statement is misleading.

In fact, the CIA was directed by the White House to restrict knowledge of the EIT Program to the leaders of the House and Senate, and the chair and ranking member of the two intelligence committees. The CIA followed this direction and in September 2002 and February 2003 provided full briefings on the EIT Program to all eight of those individuals.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: January 24, 2017

By: [signature]
Jose Rodriguez

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of May, 2017, I electronically filed the foregoing document, the Declaration of Jose Rodriguez, with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Emily Chiang<br>echiang@aclu-wa.org<br>ACLU of Washington Foundation<br>901 Fifth Ave, Suite 630<br>Seattle, WA 98164 | Paul Hoffman<br>hoffpaul@aol.com<br>Schonbrun Seplow Harris & Hoffman, LLP<br>723 Ocean Front Walk, Suite 100<br>Venice, CA 90291 |
| Andrew I. Warden<br>Andrew.Warden@usdoj.gov<br>Senior Trial Counsel<br>Timothy A. Johnson<br>Timothy.Johnson4@usdoj.gov<br>Trial Attorney<br>United States Department of Justice<br>Civil Division, Federal Programs Branch<br>20 Massachusetts Ave NW<br>Washington, DC 20530 | Steven M. Watt, admitted *pro hac vice*<br>swatt@aclu.org<br>Dror Ladin, admitted *pro hac vice*<br>dladin@aclu.org<br>Hina Shamsi, admitted *pro hac vice*<br>hshamsi@aclu.org<br>ACLU Foundation<br>125 Broad Street, 18th Floor<br>New York, NY 10007 |
| Avram D. Frey, admitted *pro hac vice*<br>afrey@gibbonslaw.com<br>Daniel J. McGrady, admitted *pro hac vice*<br>dmcgrady@gibbonslaw.com<br>Kate E. Janukowicz, admitted *pro hac vice*<br>kjanukowicz@gibbonslaw.com<br>Lawrence S. Lustberg, admitted *pro hac vice*<br>llustberg@gibbonslaw.com<br>Gibbons PC<br>One Gateway Center<br>Newark, NJ 07102 | Anthony DiCaprio, admitted *pro hac vice*<br>ad@humanrightslawyers.com<br>Law Office of Anthony DiCaprio<br>64 Purchase Street<br>Rye, NY 10580 |

By *s/ Shane Kangas*
Shane Kangas
skangas@bpmlaw.com
Betts, Patterson & Mines, P.S.