1

2              UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF WASHINGTON

4

5  SULEIMAN ABDULLAH SALIM, et al.,        )

6                                          )  No.  CV-15-0286-JLQ
        Plaintiffs,                        )
7                                          )  MEMORANDUM OPINION
                                           )  RE: MOTIONS FOR SUMMARY
8           vs.                            )  JUDGMENT
                                           )
9                                          )
   JAMES E. MITCHELL and JOHN              )
10  JESSEN,                                )
                                           )
11         Defendants.                     )
   _____ )

12

13      BEFORE THE COURT are Defendants' Motion for Summary Judgment (ECF No.

14  169), Plaintiffs' Motion for Partial Summary Judgment (ECF No. 178), and Defendants'

15  Motion to Exclude (ECF No. 198). Response and Reply briefs have been filed and

16  considered.  The parties have submitted a voluminous record of over 4,000 pages of

17  evidentiary exhibits.  The court heard oral argument on the Motions on July 28, 2017.

    James Smith, Henry Schuelke, III, Brian Paszamant, and Christopher Tompkins appeared
18
    for Defendants James Mitchell and John Jessen.  Hina Shamsi, Steven Watt, Dror Ladin,
19
    Lawrence Lustberg, and Jeffry Finer appeared for Plaintiffs Suleiman Abdullah Salim,
20
    Mohamed Ahmed Ben Soud, and Obaid Ullah.  The court issued its preliminary oral
21
    ruling.  This Opinion memorializes and supplements the court's oral ruling.
22
23      **I.  Introduction and Factual Allegations from Complaint**

24      The Complaint in this matter alleges Plaintiffs Suleiman Abdullah Salim ("Salim"),

25  Mohamed Ahmed Ben Soud ("Soud"), and Gul Rahman ("Rahman")[1](collectively herein

26  Plaintiffs) were the victims of psychological and physical torture.  Plaintiffs are all

27  _____

        [1]Obaid Ullah is the personal representative of the Estate of Gul Rahman.
28  ORDER - 1

foreign citizens and bring these claims pursuant to the Alien Tort Statute, 28 U.S.C. § 1350 (hereafter "ATS").  Plaintiffs allege the Defendants, James Mitchell and John Jessen, "are psychologists who designed, implemented, and personally administered an experimental torture program for the U.S. Central Intelligence Agency." (Complaint, ¶ 1).

### A.  Allegations of Mr. Salim

Plaintiff Salim is a Tanzanian citizen who was captured by the CIA and Kenyan Security Forces in Somalia in March, 2003, where he was working as a trader and fisherman.  He was transferred to official U.S. Government sites in Afghanistan and held there for a total of sixteen months.  In July 2004, he was transferred to Bagram Air Force Base in Afghanistan and held in custody there for an additional four years, until being released in August 2008. (Complaint ¶ 9).  Mr. Salim alleges he was subjected to numerous coercive methods, including: prolonged sleep deprivation, walling, stress positions, facial slaps, abdominal slaps, dietary manipulation, facial holds, and cramped confinement. (*Id*. at ¶ 74).  He also claims he was subjected to prolonged nudity and "water dousing that approximated waterboarding."(*Id*.).  The conditions of his confinement are pled with great specificity, including that he was kept in a dark, frigid cell, "continually chained to the wall" in a stress position in which the "only position he could adopt was a squatting position that very quickly became uncomfortable and extremely painful" and was fed a meager meal of "a small chunk of bread in a watery broth–only once every other day." (*Id*. at ¶ 79-82).

The allegations of interrogation methods are pled with great detail. (Complaint ¶¶ 71-116).  By way of brief example, the following:  Mr. Salim alleges being stripped naked and then placed, cuffed and shackled on the center of a large plastic sheet where, he alleges, he was repeatedly doused with ice-cold water and kicked and slapped in the stomach and face.  After 20 to 30 minutes of dousing, he was then rolled up in the plastic sheet and "left to shiver violently in the cold for some 10 or 15 minutes." (*Id*. at ¶ 88).

ORDER - 2

He claims he was forced naked into "a small wooden box, measuring about three square feet", which was locked with a padlock. Inside, the box smelled "rancid" and he "vomited in pain and fear" while locked inside the box. (*Id*. at ¶ 91-92).

Mr. Salim claims after two or three weeks of these "aggressive" methods he was assessed by his interrogators to be "broken" and "cooperative." (*Id*. at ¶ 104). Mr. Salim occasionally met with people he believed to be health care providers and received treatment. He was given a polygraph test. (*Id*. at ¶ 105). He claims shortly thereafter he was given "three very painful injections in his arm", against his will. He states he does not know what happened after his face went numb and he fell asleep/lost consciousness. (*Id*. at ¶ 106). After some four or five weeks in custody, he alleges he attempted to kill himself by taking pain pills. (*Id*. at ¶ 107).

Shortly after the suicide attempt, Mr. Salim was transferred by CIA personnel to another site in Afghanistan he states was known as the "Salt Pit" and remained there for 14 months, often in solitary confinement. (*Id*. at ¶ 109). Thereafter he was transferred to Bagram Air Force Base, where he was detained for four years, in a small cage in a "hangar-type building" with constant illumination. He was never allowed outside. (*Id*. at ¶ 111). After being released Mr. Salim contends he continues to suffer repercussions from the torture: debilitating pain in his jaw and teeth; pain in his back, shoulders, and legs; frequent nightmares/flashbacks; and other symptoms of post-traumatic stress disorder (PTSD). (*Id*. at ¶ 115-116).

**B. Allegations of Mr. Soud**

Mr. Soud is a Libyan citizen, who allegedly fled Libya fearing prosecution from the Gadaffi regime and went to Pakistan, where in 2003 his home was raided by U.S. and Pakistani forces. (Complaint at ¶ 117-18). He states during the raid he was shot which shattered a bone in his left leg. He claims he was detained, interrogated, and abused for two weeks after the raid by Pakistani and U.S. officials. (*Id*. at ¶ 119). He denied any knowledge of terrorism plans against the U.S. or any connection to al-Qa'ida. He alleges

ORDER - 3

he was then told he was not being cooperative and transported to COBALT[2].  He alleges he was subjected to several of the same interrogation procedures as Mr. Salim, including: prolonged sleep deprivation, stress positions, walling, being slapped, dietary manipulation, facial holds, cramped confinement, and a form of waterboarding. (*Id*. at ¶ 121).  Mr. Soud claims that after he arrived at COBALT he was told "he was a prisoner of the CIA, that human rights ended on September 11, and that no laws applied in prison." (*Id*. at ¶ 124).

At COBALT, Mr. Soud was "kept naked for more than a month" and he was not allowed to wash for five months. (*Id*. at ¶ 127-28).  Mr. Soud alleges he was given meager meals of poor nutritional quality and during his year-long detention at COBALT his weight fell from 187 to 139 pounds. (*Id*. at ¶ 129).  He additionally claims to have been subjected to prolonged sleep deprivation which "drove him close to madness". (*Id*. at ¶ 131).  He alleges about two weeks after he arrived at COBALT the "torture increased in severity" and moved into an "aggressive phase" that lasted four to five weeks. (*Id*. at ¶ 133-34).   He alleges he was subjected to "walling" where a foam collar was placed around his neck, and he was then thrown into a wooden wall, while also being slapped in the face and stomach. (*Id*. at ¶ 137-38).  Similar to Mr. Salim, he describes being doused in ice water while on a plastic sheet.  These methods of interrogation allegedly lasted for approximately two weeks, until another interrogation team took over.

Mr. Soud alleges the new interrogation team increased the severity of the physical beatings. (*Id*. at ¶ 142).  He states he was also subjected to two different confinement boxes.  After two to three weeks, the second interrogation team found Mr. Soud to be "broken" and "cooperative" and stopped the aggressive interrogation tactics.  Mr. Soud was held by the U.S. Government, often in solitary confinement, until August 22, 2004 when he was turned over to the Libyan Government.  In Libya, Mr. Soud was sentenced to life imprisonment, but was released in 2011 after the overthrow of the Gaddafi regime.

---

[2]COBALT is alleged to be a CIA prison in Afghanistan. (Complaint ¶ 9).

ORDER - 4

1  (*Id.* at ¶ 153).   Mr. Soud alleges he "continues to suffer both physically and
2  psychologically from the tortures he endured" while in the custody of the U.S.
3  Government. (*Id.* at ¶ 154).

4  **C. Allegations Concerning Gul Rahman**

5       Gul Rahman was born in Afghanistan.  In October 2002, Mr. Rahman was living
6  in Pakistan where we was detained by a joint U.S./Pakistani operation.  Plaintiff alleges
7  that in November 2002, "Defendant Jessen conducted a psychological evaluation of Mr.
8  Rahman at COBALT." (Complaint at ¶ 160).  Defendant Jessen allegedly concluded Mr.
9  Rahman was resistant and further torture would be required to break his will.  It is alleged
10 Defendant Jessen "directly participated in the more aggressive phase" of Mr. Rahman's
11 interrogation and "tortured" him. (*Id.*)

12      After Mr. Jessen left COBALT, the interrogation of Mr. Rahman allegedly
13 continued, using techniques such as: slaps, stress positions, dietary manipulation, sleep
14 deprivation, prolonged nudity, and water dousing.  On November 19, 2002, Mr. Rahman
15 was chained, partially nude, in a stress position, with temperatures in the 30s.  The next
16 morning he was found dead.  The autopsy report listed the likely cause of death as
17 hypothermia, with contributing factors of dehydration, lack of food, and "immobility due
18 to short chaining." (*Id.* at ¶ 164).  Plaintiffs allege Mr. Rahman's death was investigated
19 by the CIA and included in a CIA Inspector General Report in 2004, but no one was held
20 accountable.  Plaintiffs allege Mr. Rahman's death was concealed from the public until
21 2010. (*Id.* at 165-167).

22  **D. Alleged Conduct and Involvement of Defendants**

23      Defendant James Mitchell is a U.S. citizen and a psychologist.  He was the chief
24 psychologist at the Survival, Evasion, Resistance, and Escape ("SERE") training program
25 at Fairchild Air Force Base near Spokane, Washington.  From 2001 to 2005 he "worked
26 as an independent contractor for the CIA", and from 2005 to 2009 worked at Mitchell,
27 Jessen & Associates in Spokane, Washington, and continued to work under contract with

28 ORDER - 5

the CIA. (Complaint at ¶ 12). Defendant John "Bruce" Jessen is also a psychologist, U.S. citizen, and worked under contract with the CIA and at Mitchell, Jessen & Associates in Spokane, Washington. (*Id*. at ¶ 13).

Defendants allegedly produced a "white paper" for the CIA entitled: "Recognizing and Developing Countermeasures to Al-Qa'ida Resistance to Interrogation Techniques: A Resistance Training Perspective." (*Id*. at ¶ 24). The paper proposed countermeasures that could be employed to defeat resistance to interrogations, and according to Plaintiffs "justified the use of torture and other forms of cruel, inhuman, and degrading treatment." (*Id*. at ¶ 25). The paper allegedly described a theory of "learned helplessness."

In March 2002, U.S. authorities captured Abu Zubaydah and Defendant Mitchell was contacted to provide "real-time recommendations to overcome Zubaydah's resistance to interrogation." (*Id*. at ¶ 32). Mitchell allegedly encouraged the CIA to develop the learned helplessness techniques. (*Id*.) In April 2002, "CIA Headquarters sent Mitchell to GREEN [a CIA black-site prison] to consult on the psychological aspects of Abu Zubaydah's interrogation." (*Id*. at ¶ 34). In July 2002, the CIA and Mitchell believed Zubaydah was being "uncooperative" and decided to pursue a more "aggressive" phase of interrogation, and contracted with Defendant Jessen to assist Mitchell. (*Id*. at ¶ 41-42). The Complaint alleges Jessen and Mitchell proposed 12 coercive methods, and the CIA agreed to propose 11 of them to the Attorney General. On July 24, 2002, the Attorney General allegedly verbally approved all of the proposed methods except waterboarding. (*Id*. at ¶ 43-44). Defendants argued waterboarding was a convincing technique and necessary, and the Attorney General approved it on July 26, 2002. Plaintiffs allege Defendants "personally conducted or oversaw" aspects of Zubaydah's interrogation, including physically assaulting him, forcing him into confinement boxes, and waterboarding. (*Id*. at ¶ 46-48).

Plaintiffs claim Defendants pronounced the interrogation of Zubaydah a "success" and recommended the CIA use the aggressive coercion methods for future high value

ORDER - 6

captives. (*Id*. at ¶ 55-56).   Defendants then allegedly devised the program of CIA "enhanced interrogation techniques" including "designing instruments of torture such as confinement boxes". (*Id*. at ¶ 57).   Defendants "trained and supervised CIA personnel in applying their phased torture program". (*Id*. at ¶ 62).    Plaintiffs allege that "together with the CIA, Defendants supervised and oversaw" the program including assessing: 1) whether prisoners had been tortured long enough to induce "learned helplessness"; 2) what combinations and sequences of torture were most effective; and 3) had the prisoners become fully compliant. (*Id*. at ¶ 63).   Plaintiffs contend that between 2001 and 2010, Defendants, and the company they formed, Mitchell, Jessen, & Associates, were paid over $80 million to provide "security teams for renditions, interrogators, facilities, training, operational psychologists, de-briefers, and security personnel at all CIA detention sites." (*Id*. at ¶ 65-68).

## II. Summary Judgment Factual Record

In summary judgment proceedings, the facts are viewed in a light most favorable to the non-movant.   However, in this instance the parties have filed cross-motions for summary judgment.   The following recitation attempts to set forth the undisputed background facts.   Significant disputes of fact are noted.   Citation is frequently made to ECF No. 201 because it is an over 200-page document which consolidates Defendants' affirmative statement, Plaintiffs' response, and Defendants' reply.   Additional facts are discussed as pertinent to specific legal issues in "IV. Discussion" *infra*.

Defendants James Mitchell and John Jessen are psychologists. (D's St. Of Facts, ECF No. 201, ¶ 1).   Defendant Mitchell began work with the Central Intelligence Agency in August 2001, shortly before the terrorist attacks of September 11, 2001. (*Id*. at ¶ 2 & 4).   On September 17, 2001, President Bush signed a Memorandum of Notification authorizing the CIA "to capture and detain individuals who pose a continuing, serious threat of violence or death to U.S. persons and interests or who are planning terrorist activities." (*Id*. at ¶ 6). The Director of the CIA then directed the CIA's Counterterrorism

ORDER - 7

Center ("CTC") to establish a program to capture, detain, and interrogate al-Qa'ida operatives to obtain critical threat and actionable intelligence. (*Id*. at ¶ 7). The CIA began building secret detention facilities referred to as 'black sites'. (*Id.* at ¶ 10).

On December 21, 2001, Mitchell entered into another contract with the CIA, this time for "consultation and research on counterterrorism and special ops." (ECF No. 201 at ¶ 11). On June 13, 2002, Mitchell's contract with CIA was expanded for him to serve as "consultant to CTC special programs." (*Id*. at ¶ 14). Mitchell's contract called for a consultation fee of $1,000 to $1,800/day. At that time, Mitchell had thirteen years experience with the U.S. Air Force's Survival Evasion Resistance and Escape program ("SERE"). (*Id*. at ¶ 16). Mitchell had previously collaborated with Jessen, who in 2002, was employed by the Department of Defense. (*Id*. at ¶ 18). Jessen had also been part of the SERE program and had "helped design an advanced course that specifically prepared trainees for capture by terrorist groups." (*Id*. at ¶ 20). The CIA asked Mitchell to review the Manchester Manual, which contained instructions for resistance to interrogation, and Mitchell requested that Jessen take part in the project. (ECF No. 201 at ¶ 21-22). Jessen then contracted with the CIA on July 22, 2002. (*Id*. at ¶ 120). Defendants Mitchell and Jessen drafted a paper on Al-Qa'ida's resistance to interrogation techniques entitled, "Recognizing and Developing Countermeasures to Al-Qa'ida Resistance to Interrogation Techniques: A Resistance Training Perspective" (the "Resistance Paper"). (*Id*. at ¶ 23).

Abu Zubaydah ("AZ") was captured by the United States on March 27, 2002. (ECF No. 201, ¶ 25). Mitchell was part of the team to interrogate AZ. On April 1, 2002, a cable was sent from CIA Headquarters to black site GREEN transmitting Defendants' Resistance Paper. (*Id*. at ¶ 34). At GREEN, the Chief of Base ("COB") reported to the Station Representative who reported to Chief of Station who reported to CIA Headquarters (hereafter 'HQS'). (Id. at ¶ 41). In April 2002, Mitchell became part of a team monitoring AZ's interrogation that was led by a full-time CIA officer, who was also a psychologist. (*Id*. at ¶ 42). Mitchell's role was to observe the interrogation and make

ORDER - 8

recommendations for overcoming AZ's resistance to interrogation. (*Id*. at ¶ 43). Mitchell reported directly to HQS and Jose Rodriguez, Chief Operation Officer, Counterterrorism. (Id. at ¶ 44-45).

Mitchell made recommendations for environmental modifications to the holding compound and interrogation room for AZ. (*Id*. at ¶ 46).   The physical environment was designed to "further disorient" AZ through the use of bright light, white noise, no natural light, and sleep deprivation. (*Id*. at ¶ 51).   One of the goals of this stage of the interrogation was to induce a psychological state of "helplessness". (*Id*. at ¶ 52).   The parties dispute whether the interrogation methods were designed to induce a state of "learned helplessness."  The parties agree "learned helplessness" is a profound level of helplessness that leads to feelings of depression, passivity, and withdrawal. (*Id*. at ¶ 54).   Defendants contend they did not advocate for "learned helplessness," which is a disputed fact. (ECF No. 201 at ¶ 56).

The interrogation team for AZ was specifically told that they were not limited to traditional law enforcement methods because AZ was "not entitled to the legal protections of the Geneva Conventions." (*Id*. at ¶ 73).  The interrogation of AZ began on or about April 17, 2002. (*Id*. at ¶ 74).  Mitchell assisted in identifying AZ's resistance methods and designing effective countermeasures. (*Id*. at ¶ 76).  After each interrogation, the interrogator prepared a formal report to HQS that set forth intelligence and the interrogation team produced twice-daily situation reports. (*Id*. at ¶ 79).

On or about May 8, 2002, the interrogation team met to review strategy for further interrogation.  The team decided to interfere with AZ's sleep "to degrade his ability to maintain his full mental capacities." (ECF No. 201 at 82).  HQS ordered the AZ interrogation team to press for threat-related information and increase the pressure, including use of a confinement box. (*Id*. at 84 & 85).  In June 2002 HQS held a meeting, which Mitchell attended, to discuss the next phase of AZ interrogation. (*Id*. at ¶ 89).  The individuals present at the meeting believed AZ was withholding critical information and

ORDER - 9

they needed to take a harder line. (*Id*. at ¶ 90-91).

The interrogation team tried an isolation phase with AZ which began on June 18, 2002. (*Id*. at ¶ 96). In late-June 2002, Rodriguez asked Mitchell to identify other potential interrogation techniques that could be used on AZ to overcome his perceived resistance and obtain more information. (*Id*. at ¶ 97). In July 2002, Mitchell attended a meeting at HQS to discuss further refining tactics. (*Id*. at ¶ 98). The major focus of the meeting was to consider the next phase of interrogations, a "last hard push" to concentrate on "pending terrorist attacks". (*Id*. at ¶ 101). Mitchell suggested the use of various techniques that had been used on SERE trainees, which included walling, cramped confinement, stress positions, sleep deprivation, water boarding, and mock burial. (*Id*. at ¶ 104). At the time he made the suggestion, Mitchell did not know he would become an interrogator. (*Id*. at ¶ 107). Mitchell explained the goal of these techniques would be to "dislocate" AZ's expectations and the interrogation could produce "fear, helplessness, compliancy, or false hope." (*Id*. at ¶ 108).

At the conclusion of the July 2002 meeting at HQS, Rodriguez asked Mitchell to consider working with the CIA to use some or all of the techniques he had suggested. (*Id*. at ¶ 114). Mitchell requested the CIA also hire Jessen to assist him with the interrogation of AZ, and Rodriguez approved the request. (*Id*. at ¶ 115 & 116). Jessen agreed to assist and became an independent contractor with the CIA on July 22, 2002. (*Id*. at ¶ 120). Mitchell and Rodriguez had several meeting at HQS. On July 8, 2002, another meeting was held at HQS, which was attended by several people including Mitchell, Jessen, Rodriguez, and Rizzo. (*Id*. at ¶ 123). An "increased pressure phase" was discussed, as well as Mitchell's suggested interrogation techniques. (*Id*. at ¶ 124). After the meeting, Rodriguez requested Defendants provide him with a written list identifying potential interrogation techniques, describing how they could be implemented, and their intended effect on AZ. (*Id*. at ¶ 125). Defendants drafted a memo (hereafter 'July 2002 Memo') for Rodriguez based on their knowledge of interrogation techniques used at SERE. (*Id*.

ORDER - 10

1  at ¶ 127).  The techniques listed in the July 2002 Memo came to be known as Enhanced

2  Interrogation Techniques ("EITs"). (ECF No. 201 at ¶ 131).

3        The CIA thereafter sent a cable discussing the "next phase" of the AZ interrogation

4  which contained descriptions of the EITs consistent with the July 2002 Memo. (*Id*. at ¶

5  132-34).  The cable stated water boarding and mock burial would require Attorney

6  General approval and the others "can be approved by the CIA's legal staff." (*Id*. at ¶ 135).

7  The CIA, not Defendants, determined what approvals from the U.S. Government were

8  required for the EITs. (*Id*. at ¶ 139).  On July 13, 2002, Rizzo met with John Yoo, Deputy

9  Assistant Attorney General, and others from Department of Justice and Office of Legal

10  Counsel ("OLC") and the various EITs were discussed, with an emphasis on water board

11  and mock burial. (*Id*. at ¶ 141).  At this meeting, Rizzo reported the interrogation team

12  had concluded more aggressive methods were required for the AZ interrogation. (*Id*.).

13  Rizzo further informed it was not their intent to permit AZ to die and appropriately

14  trained medical personnel would be on site, but there was always a risk of heart attack,

15  stroke, or other adverse event. (*Id*.).

16        Thereafter, Rizzo requested Defendants comment on the short and long term

17  psychological effects of water boarding and mock burial. (ECF No. 201, at 145).  While

18  assessing the EITs the CIA prepared a memo acknowledging the effects of the EITs may

19  be different than in the SERE school setting.  The memo stated techniques "are

20  administered to student volunteers in the U.S. in a harmless way, with no measurable

21  impact on the psyche of the volunteer, we do not believe we can assure the same here for

22  a man forced through these processes and who will be made to believe this is the future

23  course of the remainder of his life.  While the CIA will make every effort possible to

24  ensure that the subject is not permanently physically or mentally harmed, some level of

25  risk still exists." (*Id*. at ¶ 150).

26        On July 17, 2002, Rodriguez and Rizzo were informed National Security Adviser

27  Condoleeza Rice had approved the use of EITs on AZ. (*Id*. at ¶ 152).  On July 23, 2002,

28  ORDER - 11

a cable was sent to HQS, stating in part that IC (independent contractor) SERE psychologists[3] "recommend using an escalating interrogation strategy" and "the escalation must culminate with pressure which is absolutely convincing." (*Id*. at ¶ 154). The cable further stated: "The plan hinges on the use of an absolutely convincing technique.  The waterboard meets this need." (*Id*.).

On August 1, 2002, Rizzo received a confidential memo from OLC Assistant Attorney General  Bybee (the "Bybee Memo") which concluded that 10 of the proposed EITs, including waterboarding, did not violate the prohibition against torture established by 18 U.S.C. § 2340A. (ECF No. 201 at 165).  This legal conclusion was communicated to black-site GREEN, where AZ was being detained.  The "aggressive phase" of the interrogation of AZ then commenced on August 4, 2002. (*Id*. at ¶ 187).  Defendants applied EITs to AZ. (*Id*. at ¶ 188).  After six days, on August 11, 2002, the interrogation team sent a cable to HQS stating "it was highly unlikely Zubaydah had actionable new information about current threats to the United States," but he may be withholding information on other issues. (*Id*. at ¶ 190).  A few days later, Defendants recommended that EITs not be used on AZ any longer. (*Id*. at ¶ 191).  HQS instructed Defendants to continue with use of the water board. (*Id.* at ¶ 194).

A videoconference was scheduled with HQS for August 13, 2002 to view the application of the EITs to AZ. (*Id*. at ¶ 196).  After the videoconference, HQS directed the EITs continue for the next two-to-three weeks. (*Id*. at ¶ 199).  Plaintiffs contend Mitchell bears some blame for the continued interrogation of AZ because he had originally recommended a 30-day period for EITs. (*Id*. at ¶ 200).  On August 16, 2002, a team from HQS arrived at GREEN to discuss the general strategy for AZ's interrogation.  On August 19, 2002, Defendants used the water board on AZ while individuals from CIA and GREEN's Chief of Base observed. (ECF No. 201, at ¶ 206).  The aggressive phase of interrogation ended on August 23, 2002, because AZ was judged

---

[3]A reference to Defendants.

ORDER - 12

to be "in a state of complete subjugation and total compliance." (*Id*. at ¶ 207). Thereafter a cable was transmitted between GREEN and HQS which recommended the aggressive phase at GREEN "should be used as a template" for future interrogation of high value captives. (*Id*. at ¶ 208). The parties dispute who wrote the cable, with Plaintiffs contending it was authored by Defendants.

Thereafter the Office of Legal Counsel confirmed EITs could be used on other detainees. (*Id*. at ¶ 209). Mitchell and Jessen understood that they were the only individuals authorized to administer EITs until around November/December of 2002. (ECF No. 201, at ¶ 225). On January 31, 2003, the CIA Director sent formalized guidelines for detainee interrogations to all CIA black-sites, including COBALT. (*Id*. at 227 & 229). COBALT was not in the United States. (*Id*. at 254). A CIA Staff Officer was Chief of Base ("COB") at COBALT and arrived in August 2002, about a month before the site became operational. (*Id*. at ¶ 255). When detainees arrived at COBALT, it was the COB's responsibility to interrogate them. (*Id*. at ¶ 258). The COB had no formal training in interrogations until April 2003. (*Id*. at ¶ 260).

Plaintiff Salim was arrested in 2003[4] in Somalia and taken to COBALT where he was detained for approximately 2 months. (*Id*. at 268). Salim was interrogated by CIA agents and testified they put a cloth around his neck and were punching him against the wall and putting him down and kicking him. (*Id*. at ¶ 269). Plaintiffs contend this was Defendants' EIT of "walling", which Defendants dispute. Salim testified that while at COBALT he was subjected to sleep deprivation, water dousing, cramped confinement, slaps, grasps, and walling. (*Id*. at ¶ 270). Neither Mitchell or Jessen conducted Salim's interrogation, and Salim is not aware that he ever met Mitchell or Jessen. (*Id*. at ¶ 272). Salim was transferred from CIA custody to Bagram Air Force Base in March 2004, and was ultimately released by U.S. Government in 2008.

Plaintiff Soud was captured in Pakistan on April 3, 2003. (ECF No. 201 at ¶ 277).

---

[4]The Complaint alleges March 2003, the Statement of Facts asserts only 2003.

ORDER - 13

Soud was transferred to COBALT later that month and held there for over a year. (*Id*. at ¶ 278). He was subjected to sleep deprivation, nudity, dietary manipulation, facial hold, attention grasp, abdominal slap, facial slap, stress positions, cramped confinement, water dousing and walling. (*Id*. at ¶ 280). Defendants Mitchell and Jessen never interacted with Soud at COBALT. Soud was released by U.S. Government on August 22, 2004. (*Id*. at ¶ 281-82).

Rahman was captured in Pakistan in October 2002. (ECF No. 201 at ¶ 284). Rahman was transferred to COBALT for interrogation. Defendant Jessen arrived at COBALT in early November 2002. (*Id*. at ¶ 286). The COB asked Jessen to assess Rahman and recommend interrogation tactics. (*Id*. at ¶ 289). The COB asked Jessen to assess whether EITs should be used on Rahman. (*Id*. at ¶ 291). Jessen interrogated Rahman over a 48-hour period and at one point used the facial slap EIT. (*Id*. at ¶ 292-93). Jessen concluded Rahman was strong, centered, focused, and good at resistance. Jessen recommended Rahman be interrogated frequently and that environmental deprivations continue. (*Id*. at ¶ 295 & 297).

Jessen observed Rahman being subjected to two unauthorized techniques – the "hard takedown" and cold showers. (*Id*. at ¶ 299 & 300). During the "hard takedown" Rahman was dragged from his cell, his clothes cut off, hands taped, and a hood put over his head. (ECF No. 175, Ex. S ¶ 107 ). Rahman was run up and down the hall, sometimes stumbled and was dragged. (*Id*.). Rahman was slapped and punched in the stomach. (*Id*.). Jessen said the takedown was "rehearsed and professionally executed" according to the CIA's Inspector General Report. (*Id*.). Mitchell then arrived at COBALT. (ECF No. 201 at ¶ 305). The COB at COBALT asked Defendants to administer a mental health status exam and provide an assessment of interrogation measures. (*Id*. at ¶ 306). Mitchell observed one interrogation of Rahman, but did not himself interrogate Rahman. (*Id*. at ¶ 308). Jessen recommended a continued interrogation plan for Rahman, and sent a cable to HQS stating in part: "The most effective interrogation plan for Gul Rahman is to

ORDER - 14

continue the environmental deprivations he is experiencing and institute a concentrated interrogation exposure regimen." (*Id*. at ¶ 309).  Defendants then left COBALT.  At the time they left, Rahman had been detained for 10 days. (*Id*. at ¶ 311-313).  Approximately 6 days after Defendants left, Rahman died.  Rahman was found 'short-chained' with his hands and feet shackled and a chain connecting the shackles which forced him to sit on the concrete floor.  He was naked from the waist down.  The temperature at COBALT was near freezing.  The cause of death was determined by an Office of Inspector General investigation to be hypothermia. (*Id*. at ¶ 322-330).

In March 2005, Defendants formed Mitchell, Jessen & Associates ("MJA") to provide "qualified interrogators, detainee security officers for CIA detention sites, and curriculum development and training services" for the Program. (ECF No. 201 at ¶ 336). From 2005 to 2009, MJA was paid between $72 and $81 million dollars.

### III.  Standard of Review

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  A motion for summary judgment will be granted when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).  While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that no genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).  When the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of evidence to support the nonmoving party's case. *Devereaux v. Abbey*, 263 F.3d 1070,

1076 (9th Cir. 2001).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* Although a summary judgment motion is to be granted with caution, it is not a disfavored remedy: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(citations and quotations omitted).

**IV.  Discussion**

Defendants raise four primary arguments in support of their Motion for Summary Judgment: 1) the court lacks jurisdiction due to the Political Question Doctrine; 2) Defendants are entitled to derivative sovereign immunity; 3) the Alien Tort Statute does not confer jurisdiction over Plaintiffs' claims; and 4) Defendants are not directly liable for violating law of nations, nor liable for aiding and abetting or conspiracy. (ECF No. 169). Plaintiffs argue in their Motion for Partial Summary Judgment the undisputed facts establish as a matter of law Defendants are liable under the Alien Tort Statute for aiding and abetting the torture and other cruel, inhuman, and degrading treatment suffered by Plaintiffs (ECF No. 178). Defendants have additionally filed a Motion seeking to exclude "any evidence or argument or reference" to the Senate Select Committee on Intelligence Study of the Central Intelligence Agency's Detention and Interrogation Program (hereafter the "SSCI Report"). (ECF No. 198, p. 2).

**1.  Defendants' Motion for Summary Judgment** - The court will first address the arguments raised in Defendants' Motion for Summary Judgment, many of which were previously raised via Motion to Dismiss. (See Order of April 28, 2016 Denying Motion to Dismiss, ECF No. 40).

ORDER - 16

### A.  Political Question Doctrine

Defendants' argument concerning the Political Question Doctrine adds little to the argument previously made and rejected by this court.  Defendants' argument relies on several factual and legal contentions which are not conclusively established by the summary judgment record: 1) the CIA exercised complete operational control over Defendants at all relevant times; 2) the EITs were not intended to cause severe physical pain and mental pain or suffering; 3) Defendants acted in good faith and/or the law was unsettled; and 4) "there is no applicable international norm prohibiting" non-consensual human experimentation. (ECF No. 169, p. 10).

Executive branch decisions are not immune from judicial review. See for example *N.L.R.B. v. Noel Canning*, 134 S.Ct. 2550 (2014)(holding the President lacked the power to make the recess appointments at issue in the case).  "Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *Alperin v. Vatican Bank*, 410 F.3d 532, 539 (9th Cir. 2005).  The Supreme Court set forth its most detailed discussion of the political question doctrine in *Baker v. Carr*, 369 U.S. 186, 217 (1962), wherein the Court articulated six considerations: 1) is there a textually demonstrable constitutional commitment of the issue to a coordinate political department; 2) a lack of judicially discoverable and manageable standards for resolving the case; 3) the impossibility of deciding the case without an initial policy determination of the kind clearly for nonjudicial discretion; 4) the impossibility of the court undertaking independent resolution without expressing lack of respect for coordinate branches of government; 5) an unusual need for unquestioning adherence to a political decision already made; or 6) potentiality of embarrassment from multifarious pronouncements by various departments on one question.

These six factors have been described as "formulations" and "six independent tests," yet there is often overlap. *Alperin*, 410 F.3d at 544.  In the arena of foreign affairs, the Supreme Court has "cautioned against sweeping statements that imply all questions

ORDER - 17

involving foreign relations are political ones." *Id.* at 544-45 citing *Baker v. Carr*. The Supreme Court has stated, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. The Ninth Circuit has stated: "The Supreme Court has made clear that the federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians." *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992).

Defendants urge the court to follow a two-part test utilized by the Fourth Circuit Court of Appeals in *Taylor v. Kellogg Brown & Root*, 658 F.3d 402 (4th Cir. 2011). This court is obviously not required to follow Fourth Circuit precedent. However, the Fourth Circuit's *Al-Shimari* case was extensively discussed during a hearing on Defendants' Motion to Dismiss. The *Al-Shimari* case has three times been dismissed by the district court, and three times reversed by the Fourth Circuit. In early briefing in this case (ECF No. 29), Defendants relied heavily on the District Court opinion from the Eastern District of Virginia, *Al Shimari v. CACI Premier Technology*, 119 F.Supp.3d 434 (E.D.Va. 2015), where the court dismissed the action based on the political question doctrine. However, the Fourth Circuit reversed that dismissal. See *Al Shimari v. CACI Premier Technology, 840 F.3d 147* (4th Cir. 2016). The *Al-Shimari* case involves four Iraqi nationals who brought suit concerning their detention and treatment at Abu Ghraib prison in 2003 and 2004. The defendant, CACI, "provided contract interrogation services for the military." *Id*. at 151. The Fourth Circuit stated: "We hold that conduct by CACI employees that was unlawful when committed is justiciable, irrespective of whether that conduct occurred under the actual control of the military." *Id*. The court further found actions would be shielded from judicial review under the political question doctrine "if they were not unlawful when committed and occurred under the actual control of the military." *Id*.

Defendants' argument asks the court to determine *inter alia* that they acted only under the control of the CIA and to determine Defendants' intent. It further asks the court to determine if Defendants' actions were lawful. These are ultimate questions, and

ORDER - 18

"when the jurisdictional facts and the facts central to a tort claim are inextricably intertwined the district court ordinarily should withhold a determination regarding subject matter jurisdiction and proceed to the merits of the case." *Id.* at 154.

The court finds it does not lack jurisdiction under the political question doctrine. Other courts have adjudicated cases touching on the same, or similar, subject matter. The Ninth Circuit has already adjudicated a case involving the several year detention of an American citizen, allegedly "held incommunicado in military detention, subjected to coercive interrogation techniques and detained under harsh conditions." The Defendant was a Deputy Assistant Attorney General with the Department of Justice. See *Padilla v. Yoo*, 678 F.3d 748 (9th Cir. 2012). The Supreme Court has found it had jurisdiction to "consider challenges to the legality of detention of foreign nationals captured abroad in connection with hostilities and incarcerated at the Guantanamo Bay Naval Base." See *Rasul v. Bush*, 542 U.S. 466 (2004). Much closer in time to the events of September 11, 2001, the courts of this country have adjudicated cases involving Executive and Legislative branch actions taken in response to those attacks. See for example *Hamdi v. Rumsfeld*, 542 U.S. 507, 509 (2004)("At this difficult time in our Nation's history, we are called upon to consider the legality of the Government's detention of a United States citizen on United States soil as an 'enemy combatant' ... We hold that although Congress authorized the detention of combatants in the narrow circumstances alleged here, due process demands that a citizen held in the United States as an enemy combatant be given a meaningful opportunity to contest the factual basis for that detention before a neutral decisionmaker."). The Ninth Circuit has stated a "claim of military necessity will not, without more, shield governmental operations from judicial review." *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992). The court further stated, "this is true in time of war as well as in time of peace, and with respect to claims by enemy civilians as well as by Americans." *Id.* at 1332. These cases demonstrate the court is not required to decline jurisdiction based on political question doctrine.

ORDER - 19

Defendants' Motion for Summary Judgment based on the political question doctrine is **DENIED**.

## B. Derivative Sovereign Immunity

Defendants claim as private contractors performing work on the Government's behalf they are immune from suit under the doctrine of derivative sovereign immunity. Defendants seek immunity pursuant to two Supreme Court cases: 1) *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940); and 2) *Filarsky v. Delia*, 566 U.S. 377 (2012). Under *Yearsley* immunity Defendants argue they acted pursuant to validly conferred authority and within the scope of their contracts, and are therefore entitled to immunity. Plaintiffs argue the Government may not immunize illegal acts by delegating them to private parties. Plaintiffs contend the Executive could not lawfully authorize torture and abuse, and therefore immunity does not shield the Defendants.

Citing *Filarsky*, Defendants argue they should not be "left holding the bag–facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." (ECF No. 169, p. 19). However, as Plaintiffs pointed out at prior arguments, Defendants can hardly be considered to be left 'holding the bag'. They operated under a profit incentive different than that of Government employees. The Defendants and the company they formed were paid $80 million dollars. There is an indemnity provision in the contracts between the Government and the CIA under which the CIA has paid the considerable defense litigation expenses for this action.

Defendants argue *Filarsky* immunity is available if the contractor's claim for immunity is: 1) historically grounded in the common law; and 2) did not violate clearly established rights. (ECF No. 169, p. 19). Plaintiffs argue Defendants are not entitled to derivative immunity under *Filarsky* because psychologists were not traditionally entitled to immunity at common law and Defendants violated clearly established rights. Defendants' argument fails under both prongs. Defendants argue psychiatrists and psychologists are given immunity when they render an opinion on a criminal defendant's

ORDER - 20

mental competency in a legal proceeding.  Defendants' actions herein are not analogous to a psychologist assisting court proceedings by evaluating a criminal defendant and writing a report or testifying.  Additionally, Plaintiffs rely on *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000) for the proposition that medical doctors performing psychological assessments during commitment proceedings are not entitled to immunity. In *Jensen* the court referenced a lack of a "firmly rooted tradition" of such immunity. *Id.* at 577.   The court also addressed privatization and market force arguments in acknowledging distinctions between private contractors and government employees. The court observed "the potential for insurance, indemnification agreements, and higher pay all may operate to encourage qualified candidates" to undertake such obligations even without immunity. *Id.*   Defendants have not established their claim for immunity is historically grounded in the common law.

Secondly, Defendants argue it was not clearly established that subjecting an individual to torture or other cruel, inhuman, and degrading conditions violated clearly established rights, citing to *Padilla v. Yoo,* 678 F.3d 748 (9th Cir. 2012).   However, the illegality of torture is long-established. See for example *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2nd Cir. 1980)("We conclude that official torture is now prohibited by the law of nations.  The prohibition is clear and unambiguous, and admits of no distinction between treatment of aliens and citizens.").  The case Defendants rely upon states,"the unconstitutionality of torturing a United States citizen was beyond debate by 2001." *Padilla v. Yoo*, 678 F.3d 748, 763 (9th Cir. 2012).  The inquiry in this case is whether the enhanced interrogation methods outlined in the Program constituted "torture".

In addition to Defendants' reliance on *Yearsley* and *Filarsky*, the analysis must include the Supreme Court's more recent discussion of derivative sovereign immunity in *Campbell-Ewald v. Gomez*, 136 S.Ct. 663 (2016).  Therein the Supreme Court framed the question as: "Do federal contractors share the Government's unqualified immunity from liability and litigation?" *Id*. at 672.  The Court answered the question quite

ORDER - 21

succinctly and definitively: "We hold they do not." *Id*. The majority opinion could be read as somewhat dismissive of the concept: "Campbell asserts 'derivative sovereign immunity,' but can offer no authority for the notion that private persons performing Government work acquire the Government's embracive immunity." *Id*. (internal citations omitted). The Court construed a private contractor's immunity as "qualified" and it may be overcome "if the defendant knew or should have known that his conduct violated a right clearly established at the time of the episode in suit." *Id*. at 673.

Government contractor immunity "unlike the sovereign's, is not absolute." *Campbell-Ewald*, 136 S.Ct. at 672. An inquiry is required into whether the contractor "exceeded his authority," or whether the governmental authority "was not validly conferred." *Id*. at 673. In either of those circumstances, the contractor could be liable. As the Supreme Court instructed in *Campbell-Ewald*, "at the pretrial stage of litigation, we construe the record in a light favorable to the party seeking to avoid summary disposition." *Id*. Plaintiffs' contentions are not merely that Defendants Mitchell and Jessen acted specifically at the direction of the Government, but rather that they designed and implemented an experimental torture program. (ECF No. 1, ¶ 20). Plaintiffs argue it was Defendants who proposed the "pseudoscientific theory" of "learned helplessness." (*Id*. at ¶ 25). Plaintiffs allege, "Defendants helped convince Justice Department lawyers to authorize specific coercive methods" and argued to the Attorney General for the use of waterboarding as "an absolutely convincing technique." (*Id*. at ¶ 43-44). It is also alleged Jessen and Mitchell personally participated in the torture of Abu Zubaydah, including waterboarding. (*Id*. at ¶ 46-52).

Plaintiffs' allegations are largely supported by the factual record. Defendants make several conclusory assertions that they acted only at the direction of the CIA, that the CIA was "responsible", or that the CIA had full operational control. However, the allegation Defendants had a role in designing the Program is supported by the evidence. Jose Rodriguez testified that prior to September 2001 the CTC had no expertise in

ORDER - 22

interrogation, he asked Mitchell to "put together an interrogation program", and Mitchell was the "architect" of the Program. (ECF No. 195, Ex. A, Rodriguez Depo. p. 46-47, 52-53, 55). Rodriguez further testified he asked Mitchell to "take charge of creating and implementing" the Program, and Defendants' proposal became the CIA's Program. (*Id.* at p. 58 & 63). John Rizzo testified Defendants were the "architects" of the Program and Defendants trained other CIA interrogators. (ECF No. 195, Ex. D, Rizzo Depo. p. 67 & 69). The CIA Inspector General Report of May 7, 2004 stated, "the two psychologists [Defendants] developed a list of new and more aggressive EITs that they recommended for use in interrogations." (ECF No. 176, Ex. 25, p. 13, ¶ 32).

The factual evidence supports Plaintiffs' assertions that Defendants recommended the EITs and advocated for waterboarding as a convincing measure. A CIA cable, apparently from July 2002, with subject "Comments on Proposed Enhanced Interrogation Process," has a section entitled, "IC SERE Psychologists Feedback." (ECF No. 176, Ex. 40). That section reads in part: "The plan hinges on the use of an absolutely convincing technique. The waterboard meets this need. Without the waterboard, the remaining pressures would constitute a 50 percent solution..." (*Id.*). John Rizzo testified Mitchell and Jessen were the only SERE psychologists providing advice to the CIA. (ECF No. 195, Ex. D, Rizzo Depo. p. 177).

The evidence is undisputed Defendants administered EITs to Abu Zubaydah, including waterboarding. Mitchell's own book describes he and Jessen utilizing the waterboarding technique on AZ. A CIA cable entitled, "Increased Pressure In The Next Phase of The Abu Zubaydah Interrogations" from July 2002 states Defendants will be the interrogators during the "increased pressure phase". (ECF No. 175, Ex. I). It states AZ will be subjected to a series of "fear and despair rounds" for approximately 30 days, and "the effectively orchestrated treatment of Abu Zubaydah will convey the feeling of helplessness." (*Id.* at p. 6-7).

Defendant Jessen testified about his interactions with Rahman, including that he

ORDER - 23

utilized the facial slap on Rahman. Jessen's testimony would support a reasonable inference that he was not specifically authorized to use EITs on Rahman. When asked how he knew the facial slap was authorized, he testified: "I was authorized to use these techniques. I was asked by the CIA to assess him for their use. The only reasonable way to determine that would be to pick the least intrusive one, see how he responded ...". (ECF No. 195, Ex. F, Jessen Depo. p. 214-215). The finder of fact could find such testimony contradicts the defense assertions the CIA exercised absolute control over who would be subjected to EITs and which EITs would be used.

The CIA Inspector General Report of April 27, 2005 concerning the Death of Rahman indicates Jessen played a significant role in his interrogation. (ECF No. 175, Ex. S). The Report states Rahman "underwent at least six interrogation sessions" and the interrogation team included Jessen. (*Id*. at ¶ 3). A lead CIA Staff Officer at COBALT told investigators "Rahman was the responsibility of Jessen." (*Id*. at ¶ 53). Jessen drafted cables documenting the interrogation sessions with Rahman. (*Id*. at ¶ 54). Mitchell came to COBALT and "participated in one of Jessen's sessions with Rahman", and then Defendants left COBALT six days prior to Rahman's death. (*Id*. at ¶ 57). The Report states Jessen "prepared the interrogation plan for Rahman" before departing COBALT. (*Id*. at ¶ 70). A CIA Staff Officer told investigators Jessen's recommendations included continuation of "environmental deprivations." (*Id*. at ¶ 123). The Report concludes a CIA Staff Officer's decision to have Rahman short-chained to a concrete floor, while wearing only a sweatshirt in near freezing temperatures, "directly led to Rahman's death by hypothermia." (*Id*. at ¶ 173). The Report found the CIA Staff Officer exhibited "reckless indifference" to Rahman's life. (*Id*. at ¶ 10). Apparently criminal charges were investigated but never filed.

As Defendants are requesting summary judgment on this issue, the facts are viewed in a light favorable to the non-movant Plaintiffs. The finder of fact could conclude Defendants Mitchell and Jessen had a significant role in the design of the Program. A

ORDER - 24

jury could find they were not acting merely and solely as directed by the Government. See *Cabalce v. Thomas E. Blanchard & Associates*, 797 F.3d 720, 732 (9th Cir. 2015)("We have held that derivative sovereign immunity ... is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'").  Additionally, Defendants were involved in the actual interrogations of certain individuals, including Rahman, which occurred in foreign, secret, locations.  The finder of fact could conclude that although the CIA may have maintained ultimate control of the Program, Defendants, being on site, exercised significant control during individual interrogations.  For example, excerpts from Mitchell's book describe that he decided to deviate from the legal guidance on the length of pours during waterboarding.  He states, "legal guidance said we could pour water between 20 to 40 seconds and then lower the cloth and pour water another 20 to 40 seconds, and so on, for 20 minutes." (ECF No. 195, Ex. C p. 83).  He states, "it quickly became apparent that 20 seconds was too long for the shortest pour," and he "decided, on the spot, to shorten the pours." (*Id*. at p. 84).  This is further evidence Defendants exercised discretion in applying the EITs.

The factual record would support a finding Defendants had a role in the design of the Program, trained interrogators for the Program, and exercised some discretion in the application of the Program.  Defendants have not established they merely acted at the direction of the Government, within the scope of their authority, and that such authority was legally and validly conferred.

Defendants' Motion for Summary Judgment on the basis of derivative sovereign immunity is **DENIED**.

## C.  Alien Tort Statute

Defendants renew the argument previously raised via Motion to Dismiss that the ATS does not apply extraterritorially and the court lacks jurisdiction.  Defendants now rely on more recently decided Supreme Court precedent, *RJR Nabisco v. European Cmty.*, 136 S.Ct. 2090, 2101 (2016).  Defendants contend under the Supreme Court's

ORDER - 25

"focus test" if the conduct relevant to the statute's focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory. (ECF No. 169, p. 21-22).

In its prior Order denying Defendants' Motion to Dismiss, this court found Plaintiffs' allegations sufficient to meet the 'touch and concern' standard of *Kiobel v. Royal Dutch Petroleum*, 133 S.Ct. 1659 (2013), and overcome the presumption against extraterritorial application of the ATS. Defendants now rely on *RJR Nabisco* to argue the 'focus' test should be applied in the context of the ATS. The Ninth Circuit has previously rejected this argument. *Doe I v. Nestle, Inc*., 766 F.3d 1013, 1028 (9th Cir. 2014)("*Morrision* may be informative precedent for discerning the content of the touch and concern standard, but the opinion in *Kiobel II* did not incorporate *Morrison*'s focus test."). Additionally, the Ninth Circuit stated, "since the focus test turns on discerning Congress's intent when passing a statute, it cannot sensibly be applied to ATS claims, which are common law claims based on international legal norms." *Id*. at 1028. The Ninth Circuit in *Nestle* did not ultimately resolve the argument concerning extraterritorial application of the ATS, but remanded for further proceedings.

*RJR Nabisco* is not an ATS case, but rather at issue was the extraterritorial application of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Thus the case did not speak directly to extraterritorial application of the ATS, but it did discuss *Kiobel*. The Supreme Court stated: "*Morrison* and *Kiobel* reflect a two-step framework for analyzing extraterritoriality issues. At the first step, we ask whether the presumption against extraterritoriality has been rebutted ... If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking at the statute's focus." 136 S.Ct. at 2101. In *Kiobel* the Court found "the presumption against extraterritoriality applies to claims under the ATS," but it did not proceed to a focus inquiry. 133 S.Ct. at 1669. Instead, the *Kiobel* court made the statement that when claims "touch and concern" the territory of the United

ORDER - 26

States "with sufficient force" they may displace the presumption against extraterritorial application. *Id.*  Justice Kennedy, concurring, observed the majority opinion "is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute." *Id*. Justices Alito and Thomas, concurring, also observed the touch and concern "formulation obviously leaves much unanswered." *Id.*  The four other concurring Justices in *Kiobel* (Breyer, Ginsburg, Sotomayor, and Kagan), would not invoke the presumption against extaterritoriality and instead would find ATS jurisdiction where: "(1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest." *Id*. at 1671.

This court finds *RJR Nabisco* has not displaced *Kiobel* when the issue is extraterritorial application of the ATS.  Therefore, *Doe I v. Nestle, Inc*., 766 F.3d 1013, 1028 (9th Cir. 2014) remains controlling authority, including its determination that *Kiobel II* did not incorporate *Morrison*'s focus test.  The court is aware on remand the district court in *Nestle* dismissed the Second Amended Complaint and found: "*Nestle*'s conclusion that the *Morrison* focus test did not apply to ATS claims is in irreconcilable conflict with subsequent Supreme Court and Ninth Circuit cases." (C.D. Cal., Case # 05-CV-5133, ECF No. 249, Order of March 2, 2017).  This court disagrees with that conclusion, and notes the *Nestle* case is again pending on appeal.

The court is also aware of the Fifth Circuit's recent decision in *Adhikari v. Kellogg Brown & Root*, 845 F.3d 184 (5th Cir. 2017), wherein a 2-1 decision the court applied the focus inquiry to an ATS claim and affirmed dismissal of plaintiffs' claims as an impermissible extraterritorial application of the ATS.  Therein, the Fifth Circuit acknowledged the Ninth Circuit had taken a different route: "The Ninth Circuit has explicitly held that *Kiobel* did not incorporate *Morrison*'s focus test." *Id*. at 194.  The Fifth Circuit also acknowledged other Circuits had "offered differing interpretations of Kiobel's 'touch and concern' language, including to what extent it adopts Morrison's

'focus' inquiry." *Id*.  As stated by the dissent in *Adhikari*, the majority's application of the focus inquiry "would eliminate the extraterritorial reach of the statute completely." *Id*. at 208. This court does not read the Supreme Court's decision in *Kiobel* as entirely eliminating the extraterritorial reach of the ATS.  To apply the touch and concern test or focus test in a manner to deprive the ATS of all extraterritorial application would be nonlogical.  As Judge Posner stated of the ATS, writing for the Seventh Circuit prior to *Kiobel*: "Courts have been applying the statute extraterritorially (and not just to violations at sea) since the beginning; no court to our knowledge has ever held that it doesn't apply extraterritorially ... Deny extraterritorial application, and the statute would be superfluous, given the ample tort and criminal remedies ... in this country." *Flomo v. Firestone Nat. Rubber Co.*, 643 F.3d 1013 (7th Cir. 2011).   This court will apply the touch and concern standard, while acknowledging it is a somewhat vague standard. <u>See</u> *Mugica v. AirScan Inc.*, 771 F.3d 580, 594 (9th Cir. 2014)("Admittedly, *Kiobel* (quite purposely) did not enumerate the specific kinds of connections to the United States that could establish that ATS claims 'touch and concern' this country.").

Plaintiffs have alleged their claims "touch and concern" the United States in several ways:

- Defendants are U.S. citizens;

- Defendants are domiciled in the U.S.;

- Defendants devised the torture plan in the U.S.;

- Defendants supervised the plan's implementation from the U.S. and pursuant to contracts they executed with the CIA in the U.S.; and

- Plaintiffs were subjected to the interrogation methods while in the custody and control of the CIA in detention facilities operated by the U.S. government.

(ECF No. 1, ¶ 18).

In considering the Motion to Dismiss, the court found those allegations sufficient to overcome the presumption against extraterritorial application of the ATS.  However,

ORDER - 28

now that discovery has closed, Plaintiffs must support those allegations with the factual record.  It is undisputed that Defendants Mitchell and Jessen are United States citizens and that they worked with the CIA and entered into contracts with the United States Government.  It is undisputed that Defendants ran Mitchell Jessen & Associates ("MJA"), a company located in Spokane, Washington, and MJA provided "qualified interrogators, detainee security officers for CIA detention sites, and curriculum development and training services" for the Program.  During the development of the Program, Mitchell attended a meeting at CIA HQS in the United States. (ECF No. 201, ¶ 98).  Mitchell in fact had several meetings at HQS with Rodriguez, and on July 8, 2002, Mitchell and Jessen met with Rodriguez and Rizzo at HQS. (*Id*. at ¶ 122 & 123).  Jessen testified that he and Mitchell put together their list of proposed EITs while at Langley. (ECF No. 195, Ex. F, Jessen Depo. p. 129).

The Ninth Circuit has recognized the Supreme Court in *Kiobel v. Royal Dutch Petroleum*, 133 S.Ct. 1659 (2013), did not delineate the "touch and concern" test with a great deal of specificity.  In *Mugica v. AirScan Inc*., 771 F.3d 580, 594 (9th Cir. 2014), the Ninth Circuit recognized a defendant's U.S. citizenship is an appropriate factor to consider, but that a plaintiff cannot bring an action based solely on extraterritorial conduct merely because the defendant is a U.S. national.  *Mugica* is factually distinguishable from the case at bar.  In *Mugica*, the plaintiffs were Colombian citizens who brought suit in California arising out of the bombing of a Colombian village by members of the Colombian Air Force. *Id*. at 584. Plaintiffs sued two U.S.-headquartered corporations for their alleged complicity in the bombing.  The *Mugica* majority decision dismissed the claim on the basis the 'touch and concern' test was not met by the mere allegation that the defendants were United States corporations.

This case bears more similarity to *Al Shimari v. CACI Premier Technology*, 758 F.3d 516 (4th Cir. 2014).  In *Al Shimari*, four foreign citizens brought claims against a U.S. corporation military contractor pertaining to alleged torture during detention at Abu

Ghraib.  The Fourth Circuit found important the claims involved the performance of a contract executed by a U.S. corporation with the U.S. Government.  Also, the court considered the defendant was headquartered in Virginia, the alleged torture occurred at a U.S. military facility, defendant hired employees in the U.S. to perform the contract, and defendant collected payments by mailing invoices to a government office in Colorado. *Id.* at 528-29.

In the present case, the two individual Defendants are U.S. citizens.  The Defendants ran a company, located in Spokane, Washington, to assist with the enhanced interrogation program at CIA detention sites.  Defendants held meetings with U.S Government officials at CIA HQS in the United States during the development of the Program.  Defendants developed their list of EITs while in the United States.  Defendants each executed multiple contracts with the CIA.  As Mitchell, Jessen, & Associates was located in Spokane, Washington, it is a reasonable inference that work related to the interrogation program was performed from the United States.

The court finds Defendants' relevant conduct touches and concerns the United States with sufficient force to overcome the presumption against extraterritorial application of the ATS.  Alternatively, although the court does not find the focus test applies, it would find the focus test to be met.  Neither the Supreme Court or Ninth Circuit has applied the the "focus" test to an ATS claim, so application is uncertain.  The Fifth Circuit stated, "the focus is conduct that violates international law, which the ATS seeks to regulate by giving federal courts jurisdiction over such claims."*Adhikari v. Kellogg Brown & Root*, 845 F.3d 184 (5th Cir. 2017).  In *Mastafa v. Chevron Corp.*, 770 F.3d 170 (2nd Cir. 2014), the Second Circuit stated, "the focus of the ATS is on conduct and the location of that conduct." *Id.* at 185. The court further stated the relevant conduct for the inquiry is "conduct of the defendant which is alleged by plaintiff to be either a direct violation of the law of nations," or "conduct that constitutes aiding and abetting another's violation of the law of nations." *Id.* at 185.

ORDER - 30

Plaintiffs have asserted a claim against Defendants for aiding and abetting. Plaintiffs have alleged, and provided evidence of, conduct of the Defendants which occurred in the United States.  Defendants created their list of EITs in Langley, Virginia. Defendants had numerous meetings at CIA HQS in the United States concerning the creation of the Program.  Although the physical acts against Plaintiffs alleged to be "torture" occurred in foreign, unknown 'black site' locations, relevant conduct to the claim of aiding and abetting occurred in the United States.  Defendants' Motion for Summary Judgment as to this issue is **DENIED**.

### D. Defendants' Liability on ATS Claim

Defendants first three arguments raise either the issue of jurisdiction or immunity. Defendants' fourth argument goes to the merits -- that they are not directly liable for violating the law of nations, nor liable for aiding and abetting or conspiracy.  As the argument intersects with the issues in Plaintiffs' Motion for Partial Summary Judgment, it is addressed *infra*.

### 2.  Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek summary judgment on their claim Defendants aided and abetted torture and other cruel, inhuman, and degrading treatment. (ECF No. 178).  Plaintiffs contend Defendants' actions, as a matter of law, satisfy the standard for aiding and abetting liability under the Alien Tort Statute ("ATS").  Plaintiffs state the "law is clear with respect to both the act and intent elements that form the basis for aiding and abetting liability." (ECF No. 178, p. 1). However, the law is not clear, as evidenced by *Doe I v. Nestle, USA*, 766 F.3d 1013 (9th Cir. 2014), discussed *infra*.    Defendants' Response (ECF No. 190) attacks Plaintiffs' recitation of the factual record.  Defendants argue their role in the CIA Program did not have a "substantial effect" on the perpetration of any crime against the Plaintiffs.  Defendants also argue they lacked the requisite mental state for aiding and abetting liability. Defendants Motion (ECF No. 169, p. 24-34) argues they are not "directly liable", did not have the necessary *mens rea* for aiding and abetting, and

ORDER - 31

are not liable for conspiring with the United States government.

The ATS provides, in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  The Supreme Court has stated although the ATS is primarily jurisdictional, "we think that at the time of enactment the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). There are three elements to an ATS claim.  Plaintiffs must: 1) be aliens; 2) claiming damages for a tort; and 3) resulting from a violation of the law of nations or of a treaty of the United States. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2nd Cir. 2009).  It is recognized torture violates the law of nations. See *Filartiga*, 630 F.2d at 878 (2nd Cir. 1980)("we hold that deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties.")

Plaintiffs are pursuing a theory of aiding and abetting liability under the ATS based largely on Defendants' design of the Program. *Doe I v. Nestle, USA*, 766 F.3d 1013 (9th Cir. 2014) is the primary Ninth Circuit authority on aiding and abetting liability under the ATS.  The Plaintiffs in *Nestle* were former child slaves who were forced to harvest cocoa in the Ivory Coast.  They sued Nestle under the ATS "alleging that defendants aided and abetted child slavery by providing assistance to Ivorian farmers." *Id*. at 1016.  The district court dismissed the complaint for failure to state a claim, but the Ninth Circuit reversed.

The three plaintiffs in *Nestle* alleged they were forced to work up to 14 hours per day, given only scraps of food to eat, and whipped and beaten by overseers. *Id*. at 1017. Plaintiffs alleged Nestle was aware of the use of child slavery on the cocoa farms. Although Nestle did not own the farms, plaintiffs alleged Nestle provided financial and technical assistance and "continue to supply money, equipment, and training to Ivorian farmers, knowing that these provisions will facilitate the use of forced child labor." *Id*.

ORDER - 32

at 1017.

The Ninth Circuit stated: "Customary international law–not domestic law–provides the legal standard for aiding and abetting ATS claims." *Id.* at 1023. The court addressed the required *mens rea* and *actus reus* requirements for aiding and abetting liability under the ATS. As to *mens rea*, the court discussed whether "knowledge" or "purpose" is required. Under the knowledge standard, one must act with "knowledge that the aider and abetter's acts would facilitate the commission of the underlying offense." *Id.* The court acknowledged that two other Circuits, the Second and the Fourth, had found for aiding and abetting liability under the ATS a defendant "must act with the purpose of facilitating the criminal act." *Id.* The Ninth Circuit concluded: "we need not decide whether a purpose or knowledge standard applies to aiding and abetting ATS claims." *Id.* at 1024. The court found plaintiffs' allegations sufficed under either standard.

The Ninth Circuit in *Nestle* found the allegations supported an inference that "defendants placed increased revenues before basic human welfare." *Id.* The allegations were that defendants, driven by the goal to reduce costs, supported child slavery, and the slavery benefitted the defendants. The court found these "allegations support the inference that defendants acted with the purpose to facilitate child slavery." *Id.* The court found important the allegation defendants "obtained a direct benefit from the commission of the violation of international law." *Id.*

On the issue of *actus reus*, the Ninth Circuit stated: "The *actus reus* of aiding and abetting is providing assistance or other forms of support to the commission of a crime." *Id.* at 1026. The parties agreed the assistance must be "substantial," but disputed whether it must be "specifically directed towards the commission of the crime." *Id.* The Ninth Circuit did not resolve the issue: "we decline to adopt an *actus reus* standard for aiding and abetting liability under the ATS." *Id.* at 1026. However, after discussing some international court opinions, the Ninth Circuit stated: "What appears to have emerged is that there is less focus on specific direction and more of an emphasis on the existence of

ORDER - 33

1  a causal link between the defendants and the commission of the crime." *Id.*

2  　　　Plaintiffs' Motion argues Mitchell and Jessen played a crucial role in developing,
3  refining, and supporting the Program and thus substantially assisted the detainee abuse.
4  Plaintiffs argue Defendants were paid millions of dollars to do so, thus evidencing their
5  purpose.  Plaintiffs contend the *actus reus* component is met because Defendants
6  provided the means for the systematic abuse of detainees, and they directly participated
7  in the interrogation of Rahman.  Plaintiffs argue Defendants cannot "claim ignorance of
8  the severe pain and suffering that prisoners could endure in the program." (ECF No. 178,
9  p. 20).  Plaintiffs point out that Defendants in applying EITs to AZ had observed
10  firsthand the ill effects to AZ. (*Id.*)("their methods caused Abu Zubaydah to vomit, cry,
11  beg, plead, shake, tremble, whimper, moan, desperately pray, and become so hysterical
12  and distressed he could not communicate.").  Much of Plaintiffs' brief is also devoted to
13  the argument that Plaintiffs were in fact submitted to torture and other cruel, inhuman,
14  and degrading treatment.

15  　　　Defendants' Response (ECF No. 190) makes several unconvincing arguments.
16  First, Defendants argue there were other "parallel" interrogation Programs, which is
17  contradicted by John Rizzo's testimony that there was only one legally authorized
18  Program. (ECF No. 205, Ex. A p. 101-102).  Second, the argument Defendants designed
19  the Program only for use on HVDs is unconvincing.  Jessen testified the terms "evolved
20  over time" and the term HVD "didn't exist when we started." (ECF No. 195, Ex. F p.
21  200-201).  He also testified he worked with MVDs at COBALT. (*Id.*).  As seen in the
22  briefing on Defendants' second Motion to Dismiss, the designation of an individual could
23  change, and is thus arbitrary.  Plaintiff Salim was designated as "low level", "high level"
24  and "no longer enemy combatant." (See Order at ECF No. 135, p. 10).  Further, the
25  designation is somewhat speculative – what information does the CIA think the
26  individual possesses.  Third, Defendants' Response makes the factually unsupportable
27  argument: "There is no connection between the EITs proposed by Defendants and those

28  ORDER - 34

1   allegedly applied to Plaintiffs." (ECF No. 190, p. 2).  This is factually incorrect – some

2   techniques are identical and others appear to be variations–such as water dousing.

3        Returning specifically to the required *mens rea*, the Ninth Circuit has not

4   determined whether it is "knowledge" that one's acts would facilitate the commission of

5   an offense, or acting with the "purpose" of facilitating the act.  The evidence would

6   support a finding Defendants designed the EITs to be used on detainees, and thus they

7   clearly had knowledge they would be so used.  Whether they had the purpose of

8   facilitating a criminal act is not as clear because of Defendants' testimony about their

9   own actions, whether they believed the EITs could be utilized safely, and whether they

10  relied on legal opinions prepared by the Government. Defendants contend they lacked the

11  requisite *mens rea* because they "believed the EITs were legal and appropriate based on

12  the OLC memos" and received constant assurances  from HQS. (ECF No. 190 at 22).

13       As to *actus reus*, whether the Defendants provided "substantial assistance" is

14  disputed.  A jury could find the Defendants provided "substantial assistance."  The jury

15  could find Defendants were asked to, and did design the EITs. A jury could find

16  Defendants then subjected Abu Zubaydah to these EITs as a way of testing them.  The

17  OLC then approved these EITs for use on other detainees.  Defendants visited COBALT

18  and knew that detainees there, such as Rahman, were being evaluated for potential use

19  of EITs.  Defendants interrogated Rahman, and Jessen admits utilizing an EIT on Rahman

20  to evaluate him.  As to Plaintiffs Salim and Soud and whether Defendants acts were

21  specifically directed at them, the Ninth Circuit has stated there appears to be "less focus

22  on specific direction and more of an emphasis on the existence of a causal link between

23  the defendants and the commission of the crime." *Nestle*, 766 F.3d at 1026.

24       In *Nestle*, the defendants did not own the cocoa farms on which were being farmed

25  by child slaves, but they were aware of the problem of child slavery in the Ivory Coast.

26  Plaintiffs in *Nestle* "conceded that defendants did not have the subjective motive to harm

27  children", but nonetheless the court found the allegations sufficient to satisfy the *mens*

28  ORDER - 35

*rea* requirement under either a knowledge or purpose standard. *Id*. at 1025-26. Similarly, Plaintiffs herein are not required to demonstrate Defendants had a subjective motive to harm Salim and Soud. As for the *actus reus*, and a causal link between Defendants and Salim and Soud, a jury could find such link established. As stated *supra*, the jury could find Defendants designed the EITs for use on foreign detainees held by the CIA, they tested the EITs on Abu Zubaydah, and they were aware EITs could be used at COBALT. Jessen and Mitchell were both at COBALT in November 2002, and Jessen evaluated Rahman for use of EITs. A jury could find Defendants were aware individuals other than HVDs were housed at COBALT. It is undisputed EIT Guidelines based on Defendants' techniques "were sent to all CIA locations, including COBALT, and all CIA personnel involved in interrogations or detentions were required to review and acknowledge them." (D's St. of Facts, ECF No. 201, ¶ 230). Defendants argue the fact their EITs were communicated to COBALT was not known to them and breaks the causal chain required for actus reus. (ECF No. 190 p. 21). Although Defendants deny knowing the Guidelines were sent to COBALT in January 2003, a jury could find they should have known. Salim and Soud arrived at COBALT in March and April of 2003 and a jury could find a sufficient *actus reus* for liability and sufficient causal link between the actions of Defendants and the treatment of Salim and Soud.

Defendants' briefing in arguing against "substantial assistance" attempts to minimize their participation, and at times goes to incredible lengths: "Defendants' involvement was limited to suggesting potential EITs for Zubaydah, and then providing a detailed list of techniques that had been used at SERE for fifty years." (ECF No. 190, p. 9). This statement is factually inaccurate and misleading. It is not credible to argue Defendants were paid $80 million dollars for suggesting some techniques the Air Force SERE program already knew about. It is also undisputed that Defendants did not merely suggest EITs they underlined actually applied EITs to Zubaydah, interrogated Rahman, and participated in the Program for several years.

ORDER - 36

The ultimate determination of aiding and abetting liability will also turn on whether the EITs constituted "torture". Defendants state: "Plaintiffs cannot demonstrate that the general rule against torture applies specifically to Defendants' proposed EITs precisely because there were no clear international norms concerning these techniques when they were being considered and applied." (ECF No. 190, p. 27). Defendants rely on *Padilla v. Yoo*, 678 F.3d 748 (9th Cir. 2012), where the court found Deputy Assistant Attorney General John Yoo was entitled to qualified immunity because it was not clearly established in 2001-2003 that the treatment which Padilla alleged amounted to torture. Padilla alleged *inter alia* he was subjected to prolonged isolation, deprivation of light, extreme variations in temperatures, "sleep adjustment", threats of physical abuse, death threats, interference with religious observance, and denial of medical care. Padilla alleged he was detained for 44-months and suffered severe mental and physical harm. The court stated: "we cannot say that any reasonable official in 2001-03 would have known that the specific interrogation techniques allegedly employed against Padilla, however appalling, necessarily amounted to torture." *Id*. at 768.

The court in *Padilla* also stated: "In 2001-03, there was general agreement that torture meant the intentional infliction of severe pain or suffering, whether physical or mental." *Id*. at 764. The court also held "the unconstitutionality of torturing a United States citizen was beyond debate by 2001." *Id*. at 763. Although there are similarities between Padilla's post-9/11 detention and alleged treatment, noticeably absent from Padilla's allegations are waterboarding, walling, confinement boxes, and extreme sleep deprivation. The Bybee Memo of August 1, 2002 recognized that waterboarding could cause "incipient panic" and the "perception of drowning". (ECF No. 174, Ex. I p. 4). It further stated, "courts tend to take a totality-of-the-circumstances approach and consider the entire course of conduct to determine whether torture occurred." (*Id*. at p. 9). The Memo further concluded: "We find that the use of the waterboard constitutes a threat of imminent death." (*Id*. at 15).

ORDER - 37

A May 10, 2005 Memo from DOJ/OLC, authored by Steven Bradbury, Principal Deputy Assistant Attorney General, to John Rizzo concerning the Program states: "Torture is abhorrent both to American law and values and to international norms. The universal repudiation of torture is reflected not only in our criminal law but also in international agreements." (ECF No. 174, Ex. S, p. 1). The Memo found use of waterboard and sleep deprivation raised "substantial questions" concerning whether their use was torture. (*Id*. at p. 28). It concluded sleep deprivation could result in "substantial physical distress." (*Id*. at p. 38). The Memo ultimately concluded, "although extended sleep deprivation and use of the waterboard present more substantial questions in certain respects under the statute and the use of the waterboard raises the most substantial issue–none of these specific techniques, considered individually, would violate the prohibition in sections 2340-2340A." (*Id*. at p. 45). Title 18 U.S.C. § 2340 defines "torture" as "an act committed by a person acting under color of law specifically intended to inflict severe physical or mental pain or suffering."

On the voluminous record submitted to the court, including over 600 pages of "statements of fact," the court finds neither side has demonstrated the absence of material dispute of fact entitling the movant to judgment as a matter of law on the issue of liability for aiding and abetting torture under the ATS. Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment are **DENIED**.

### 3. Defendants' Motion to Exclude SSCI Report

Defendants move to exclude the Senate Select Committee on Intelligence Report on the CIA's Detention and Interrogation Program ("SSCI Report") based on the argument it is hearsay. Defendants argue the SSCI Report is unreliable and is a "partisan result" of an investigation and study led by Democratic Senator Dianne Feinstein. However, Defendants acknowledge Federal Rule of Evidence 803(8)(A)(iii) provides an exception to the hearsay rule for "factual findings from a legally authorized government investigation." (ECF No. 198, p. 5).

ORDER - 38

Plaintiffs oppose the Motion and argue the specific facts from the SSCI Report which are at issue in the summary judgment briefing are admissible pursuant to the FRE 803(8)(A)(iii). Plaintiffs contend the SSCI Report contains admissible factual findings, and the Report is timely, trustworthy, and unbiased. Plaintiffs also raise the procedural argument that the Motion to Exclude is an improper motion in limine in violation of the court's prior Order requiring each side to present all trial evidentiary issues in a single consolidated motion in limine. (ECF No. 187).

The court does not find convincing Defendants' assertions that the Senate Select Committee on Intelligence was not qualified to investigate the Program and has produced an untrustworthy, partisan, and unreliable report. Defendants have submitted the Declarations of John Rizzo (ECF No. 174, ¶ 77)("The SSCI Report is an errant, inaccurate, one-side, unremitting, wholesale assault on the CIA's EIT Program) and Jose Rodriguez (ECF No. 177, ¶ 122)("The SSCI Report is an errant, one-sided assault on the CIA's EIT Program that reaches numerous unsupportable and baffling conclusions."). These are merely conclusory statements of opinion by Rizzo and Rodriguez, and not proper averments of fact for an affidavit. Additionally, given their participation and involvement with the Program they are not uninterested observers and may not be objective.

As the Declaration of Senator Ron Wyden states, the SCCI Report was the product of a "five year review of over six million pages of documents, including interrogation logs, interview transcripts, internal emails, and memoranda". (ECF No. 206-4, ¶ 5). The discussion of the SSCI Report by the United States Court of Appeals, District of Columbia Circuit, in *American Civil Liberties Union v. CIA*, 823 F.3d 655 (D.C. Cir. 2016) is also informative. The court states, "in 2009, as part of its oversight of the intelligence community, the Senate Committee announced it would conduct a comprehensive review" of the CIA's detention and interrogation program. *Id.* at 658. Arrangements were made for Senators and their staff to have access to classified

ORDER - 39

information. *Id.* Then, "in 2014, after completing its review and receiving comments and proposed edits from the Executive Branch," the SSCI produced an over 6,000 page investigative report and 500 page executive summary. *Id.* The opinion details the efforts made to allow the SSCI access to the classified materials including "review of CIA records in a secure electronic reading room at a CIA facility" and the "CIA agreed to create a segregated network drive at the CIA facility where Senate personnel could prepare their work product." *Id.* at 659. The opinion further states a draft of the full report and executive summary were provided "to an approved list of individuals in the Executive Branch for the limited purpose of eliciting their comments and proposed edits," in December 2012, over a year before the SSCI Report was finalized. *Id.* at 660.

The Seventh Circuit in *Daniel v. Cook County*, 833 F.3d 728, 740 (7th Cir. 2016), in construing this hearsay exception stated that such a report is "presumed to be admissible" and the trial court has discretion to exclude it "if circumstances demonstrate a lack of trustworthiness." *Id.* at 740. "The burden to show untrustworthiness lies on the party seeking to exclude an evaluative report." *Id.* The court noted there is also a presumption "public officials, in crafting such a report acted properly and without bias." *Id.* citing Fed.R.Evid. 803(8) advisory committee note ("Justification for the exception is the assumption that a public official will perform his duty properly..."). "The burden of persuasion still lies with the party seeking to exclude the investigative findings." *Id.* at 741; see also *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988)(under this Fed.R.Evid. 803 hearsay exception, "The presumption is one of trustworthiness, with the burden of establishing untrustworthiness on the opponent of the evidence.").

The parties have briefed a four-factor test for considering the trustworthiness of public reports: 1) timeliness; 2) special skill or experience of investigator; 3) whether hearings were held; and 4) possible bias/motivation problems. Some courts utilize such a test. See for example  *United States v. The Boeing Company*, 825 F.3d 1138 (10th Cir. 2016). However, the court is not required to employ the test. See *Daniel v. Cook County*,

ORDER - 40

833 F.3d 728, 741 (7th Cir. 2016)(observing the test comes from the advisory committee notes and "is not the law of this court"). The court will briefly address these factors. The court does not find the SSCI Report untimely. It was commissioned in 2009, shortly after the Program was ended. The investigation and comprehensive review of millions of pages of documents took time, and the SSCI Report was completed in 2014. Concerning special skill or experience, the Senate Select Committee on Intelligence has the duty to oversee and study the intelligence agencies of the United States and report its findings to the Senate. (ECF No. 206-4, Dec. of Senator Ron Wyden, ¶ 1). Plaintiffs contend no hearings were held because the information was classified.

The fact hearings were not held because the SSCI was dealing with classified information does not render the Report untrustworthy, nor does the fact some portions of the Executive Summary are still redacted. In *United States v. The Boeing Company*, 825 F.3d 1138 (10th Cir. 2016), the party seeking to exclude a Federal Aviation Administration report argued it was untrustworthy because it was partially redacted. The Tenth Circuit rejected the argument: "Relators cite no authority suggesting partial redaction of a public record is a sign of untrustworthiness, and we decline to find so here." *Id*. at 1146.

Lastly, the court does not find Defendants' allegations of partisanship render the SSCI Report, as a whole, untrustworthy. The Declaration of Senator Wyden states the decision to initiate a study of the CIA's detention and interrogation program was approved by a 14-1 bipartisan vote. (*Id*. at ¶ 3). The SSCI then approved the Study by a 9-6 vote, and voted to make the Executive Summary public by an 11-3 vote. (*Id*. at ¶ 6). Defendants' assertion the Report is untrustworthy because 6 Republicans on the SSCI voted against it is not convincing.

The court finds Defendants' have not met their burden of establishing the SSCI Report is untrustworthy. The Motion to Exclude (ECF No. 198) is **DENIED**. The court will not exclude references to the SSCI Report from the summary judgment record.

ORDER - 41

1    Defendants may renew their motion for purposes of trial[5].

2    Defendants have also argued in the instant briefing that portions of the SSCI
3    Report "lack[] the 'factual findings' contemplated by Rule 803, and as such, cannot be
4    admitted under this exception." (ECF No. 198, p. 5). The parties should bear in mind the
5    Supreme Court's holding in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162 (1988),
6    that "factually based conclusions or opinions are not on that account excluded from the
7    scope" of the Rule 803 exception. The Supreme Court referred to the "broad approach
8    to admissibility" under the Rule 803(8) exception. *Id*. at 169. The Court also observed:
9    "the admission of a report containing 'conclusions' is subject to the ultimate
10   safeguard–the opponent's right to present evidence tending to contradict or diminish the
11   weight of those conclusions." *Id*. at 168.

12   **V. Conclusion**

13   Defendants present three arguments in their Motion for Summary Judgment which
14   were previously made via Motion to Dismiss and rejected. When considering the past
15   Motion to Dismiss, the court was considering the allegations of the Complaint. Now the
16   court is considering the evidence in the summary judgment record. As Plaintiffs have
17   presented evidence which generally supports the basic allegations of the Complaint, the
18   arguments concerning political question, derivative sovereign immunity, and
19   extraterritorial application of the ATS largely fail for the reasons previously stated.

20   As to ATS jurisdiction, the legal landscape is evolving, but this court finds the
21   touch and concern test of *Kiobel* and *Doe I v. Nestle*, 766 F.3d 1013 (9th Cir. 2014), to be
22   the appropriate and controlling standard. The court does not agree with the formulation
23   of the 'focus test' as presented by the Fifth and Second Circuit cases discussed *supra*, but
24   if required to utilize the focus inquiry, the court would find it met as the evidence of
25   record would support a finding Defendants engaged in the relevant conduct to aid and

_____

27   [5]The court observes Plaintiffs have raised this issue in a recently filed Motion in Limine
28   (ECF No. 234, p. 23-25), which will be addressed at the Pretrial Conference.

ORDER - 42

abet the Program from the United States.

On the merits of the claims, the issue of aiding and abetting liability under the ATS present complicated issues of both fact and law. Neither side has demonstrated judgment as a matter of law is appropriate.

**IT IS HEREBY ORDERED:**

1. Defendants' Motion for Summary Judgment (ECF No. 169) is **DENIED**.

2. Defendants' Motion to Exclude the SSCI Report (ECF No. 198) is **DENIED**.

3. Plaintiffs' Motion for Partial Summary Judgment (ECF No. 178) is **DENIED**.

4. This matter remains set for the commencement of what appears to be a lengthy pretrial conference in Spokane, Washington on August 21, 2017, at 10:00 a.m. Jury trial remains set to commence on Tuesday, September 5, 2017.

5. All pretrial deadlines remain as previously set (See Order at ECF No. 187), with the exception of the trial brief deadline. At counsel's request, the deadline for trial briefs is extended to **Friday, August 25, 2017, at 4:00 p.m.**

**IT IS SO ORDERED**. The Clerk shall enter this Order and furnish copies to counsel.

Dated August 7, 2017.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 43